*State Center, LLC, et al. v. Lexington Charles Limited Partnership, et al.*, No. 12, September Term, 2013

**JUDICIAL REVIEW—MARYLAND RULE 8-602—MOTION TO DISMISS APPEAL—LACK OF PRESERVATION AND IMPROPRIETY OF PRESENTATION TO THIS COURT:** This Court's discretion to dismiss an appeal is limited to certain statutory grounds by Maryland Rule 8-602(a). Neither lack of preservation nor impropriety of presentation to this Court are a permissible ground upon which this Court may grant a dismissal of an appeal. Thus, Appellees' Motion to Dismiss the appeal was denied.

**ADMINISTRATIVE AGENCY—EXHAUSTION OF ADMINISTRATIVE REMEDIES:** A claimant is not required to exhaust administrative remedies that the claimant is not eligible to pursue.

**REAL PROPERTY—GOVERNMENT REDEVELOPMENT PROJECT— PROPERTY OWNER STANDING—AGGRIEVED CLASS:** When determining whether a protestant is a "person aggrieved" for purposes of having standing to challenge a government redevelopment project, the most important factor to consider is proximity, as measured by the physical location of the protestant's property to the subject site.

**REAL PROPERTY—GOVERNMENT REDEVELOPMENT PROJECT— PROPERTY OWNER STANDING—SPECIAL AGGRIEVEMENT—ECONOMIC EFFECTS—TRANSIT ORIENTED DEVELOPMENT SCOPE:** When determining whether a person is "specially aggrieved," for purposes of having standing to challenge a government redevelopment project, the economic effects which may result from the redevelopment project are irrelevant. Similarly, the scope of the transit-oriented development of the project is not relevant to this determination.

**REAL PROPERTY—GOVERNMENT REDEVELOPMENT PROJECT— STANDING—SPECIAL AGGRIEVEMENT—PROTESTANT LACKS PROXIMITY:** When a protestant lacks proximity to the government redevelopment project's site, claims of harm, including a change in the character of the neighborhood, increase in traffic, and limited visibility, are not sufficient to show special aggrievement.

**JUDICIAL REVIEW—TAXPAYER STANDING—LACK OF PRIVATE RIGHT OF ACTION:** Under the common law doctrine of taxpayer standing, a complainant has standing if he/she/it meets the requirements for the doctrine; no private right of action is required additionally.

**JUDICIAL REVIEW—TAXPAYER STANDING:** To establish taxpayer standing in Maryland, a taxpayer need only allege: (1) that he is a taxpayer; (2) an action by a municipal corporation or public official that is illegal or *ultra vires*; and (3) that such

action may result reasonably in a pecuniary loss to the taxpayer or an increase in taxes. Appellees met these requirements in their Complaint challenging the State's actions of entering into the formative contracts for the subject Project as illegal under the Procurement Code, but failed in their challenge to the TOD designation.

**EQUITY—AFFIRMATIVE DEFENSE—DOCTRINE OF LACHES:** The equitable doctrine of laches bars stale claims when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party. Here, the delay in bringing the lawsuit was unreasonable and caused great prejudice to the State Agencies and Developers. Thus, the doctrine of laches barred Appellees' remaining claims.

Circuit Court for Baltimore City
Case No. C10009242V10
Argued: 3 Oct. 2013

IN THE COURT OF APPEALS OF
MARYLAND

No. 12

September Term, 2013

STATE CENTER, LLC, ET AL.

v.

LEXINGTON CHARLES LIMITED
PARTNERSHIP, ET AL.

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
*Eldridge, John C. (Retired,
          Specially Assigned),
Rodowsky, Lawrence F.  (Retired,
          Specially Assigned),

          JJ.

Opinion by Harrell, J.
Battaglia, J., joins in judgment only

Filed: March 27, 2014

*Eldridge, J., participated in the hearing and
conference of this case after being recalled
pursuant to the Constitution, Article IV,
Section 3A, but did not participate in the
decision or adoption of this opinion.

# Table of Contents*

I.   **Background Facts** ............................................................................................... 2

II.  **The Procedural Path of the Present Case** ....................................................... 13

III. **Appellees' Motion to Dismiss the Appeal** ...................................................... 24

IV.  **Applicable Standards of Appellate Review** ................................................... 27

V.   **Analysis** ............................................................................................................ 29

   A.   JUSTICIABILITY ............................................................................................ 29

      1.   Procurement Claims Brought By Appellees As Plaintiffs ........................... 35

      2.   Are The Statutory Administrative Remedies Really "Available" Here? ................... 40

      3.   Private Right of Action ................................................................................. 50

      4.   Property Owner & Taxpayer Standing Doctrines ....................................... 52

         a.   Property owner standing ...................................................................... 54

         i.   Whether property owner standing doctrine applies here? ................... 57

         ii.  Whether Appellees alleged sufficient facts for "special aggrievement" to confer property owner standing? ................................................................................. 62

            (1)  Prima facie aggrieved property owners? ........................................... 65

            (2)  Almost prima facie aggrieved property owners? ............................. 70

            (3)  Nebulous third category of property owner standing? .................... 73

         b.   Taxpayer standing ................................................................................ 75

         i.   Taxpayer standing & procurement claims: is a private right of action required for taxpayer suits? ................................................................................................... 79

         ii.  The necessary party plaintiffs for taxpayer standing doctrine. ........................... 85

         iii. A governmental action that is illegal or *ultra vires* ........................... 95

         iv.  Specific injury sufficient. .................................................................... 96

            (1)  What types of "harm" amount to a pecuniary loss? ........................ 100

            (2)  Nexus .............................................................................................. 114

            (3)  Amount of pecuniary harm ............................................................. 123

   B.   THE FATAL FLAW—THE DOCTRINE OF LACHES. ......................................... 126

      1.   Propriety of Addressing Laches. ................................................................. 127

      2.   Standard of Review. .................................................................................... 128

      3.   The Fatal Flaw. ........................................................................................... 129

         a.   Whether laches applies to taxpayer suits? .......................................... 130

         b.   Delay in filing. .................................................................................... 133

         i.   The starter's gun sounds. ..................................................................... 134

         ii.  Whether the delay was unreasonable ................................................. 149

         c.   Prejudice from the delay ..................................................................... 155

**\* Every novella-length appellate opinion warrants one.**

The State Center Project (the "Project") is a $1.5 billion, multi-phase redevelopment project intended to replace aged and obsolete State office buildings with new facilities for State use and to revitalize an approximately 25-acre property owned by the State of Maryland in midtown Baltimore ("City"), without burdening unduly the State's capital budget. To these ends, in 2005, the State issued a public Request for Qualifications ("RFQ") to solicit a "Master Developer" who would be granted the exclusive right to negotiate with the State to execute the entire project, which included the reconstruction of older deteriorating buildings currently on the site of the project, as well as the receipt of a 75-90 year leasehold interest. The State Center, LLC, was chosen as the Master Developer. The Maryland Department of General Services ("DGS"), the Maryland Department of Transportation ("MDOT") and the State Center, LLC, negotiated for the Project, entering into a series of agreements between 2007 and 2010 for the purpose of completing the Project in a timely manner. These agreements, thus far, are: (1) the Master Development Agreement ("MDA"); (2) the First Amendment to the MDA ("First Amendment"); (3) two Phase I ground leases; and, (4) four approved Phase I occupancy leases.

In 2010, fifteen plaintiffs, property owners in downtown Baltimore (many with available office space for rent) and taxpayers of the State, filed suit in the Circuit Court for Baltimore City against the DGS, MDOT, and the State Center, LLC, and its subsidiaries, seeking a declaratory judgment that the formative contracts for the Project were void and an injunction to halt the Project. The result of the suit in the trial court was the voiding of the formative contracts of the Project on the grounds that they violated the

State Procurement Law. On appeal, we are asked to address the Circuit Court's denials of Defendants' Motions to Dismiss and the trial court's partial grant and partial denial of their Motion for Summary Judgment. Embedded in these questions are justiciability issues of taxpayer and property owner standing; the requirements for the exhaustion of administrative remedies and, if necessary to be reached, whether a private right of action existed; and, lastly, the equitable doctrine of laches. If the resolution of any of these threshold issues is not dispositive, there waits potentially at the end of the day questions regarding the interpretation of the State Procurement Law.

## I. BACKGROUND FACTS

The State Center complex, as it currently blights the skyline of midtown Baltimore, consists of five Soviet-block style buildings and approximately 1,300 parking spaces. It was built in the 1950s and 60s to house a number of State agencies. Today, it is agreed widely that these buildings are long past their useful lives. Although the State Center may be deemed fairly a "concrete wasteland,"[1] the property has substantial re-development potential. The State Center sits next to a passenger rail station that connects the area to the rest of the city. It serves as a major employment node for the State Center offices and the Maryland General Hospital. Moreover, the Center borders many of the City's major cultural and educational institutions, and enjoys relative proximity to downtown Baltimore and the waterfront. Despite this potential, the current State Center

---

[1] Governor Martin O'Malley referred once to the complex as a "concrete wasteland." *See* Annie Linskey, *O'Malley says State Center under way*, The Baltimore Sun (July 27, 2010), http://articles.baltimoresun.com/2010-07-27/news/bs-md-state-center-20100727_1_grocery-store-developer-office-and-retail-space.

2

complex, it is said, "does not form a true crossroads [between the neighborhoods] and more often forms a barrier separating neighborhoods."

In anticipation of the need for more modern structures and the currently unrealized potential of the property, the State Center Project was conceived in 2004 during the administration of Governor Robert L. Ehrlich. In September 2005, the DGS and MDOT (hereinafter, collectively, "State Agencies") issued a public RFQ to solicit and select a "Master Developer" for the purpose of redeveloping comprehensively the State Center complex. The RFQ envisioned, as its overarching goal, "through new TOD [Transit-Oriented Development][2] at State Center and nearby properties[,] the existing cultural and educational institutions of the Cultural Center can be enhanced and the area diversified so that it becomes one of the City's most diverse and historically significant communities and resources."[3] The RFQ noted also that a "significant goal" of the State

---

[2] The RFQ listed the principles of Transit Oriented Development ("TOD") as follows: "development that is physically and functionally integrated with transit; that reduce auto dependency; increase pedestrian/bicycle trips; foster safer station areas; enhance walkable connections to transit stations; provide mixed-use development, including housing and convenience goods and services; other attractive public spaces; promote and enhance ridership; and encourage revitalization and sound growth. The Federal Transit Administration's definition is also available at www.fta.dot.gov/library/policy/IFT/iftb.html."

[3] The State listed its specific objectives as: "[1] Develop financially viable projects using private-sector funding sources; [2] Create new revenue sources for the public sector; [3] Increase Metro and Light Rail ridership; [4] Expand State and local property, sales and income tax base; [5] Provide a mix of housing for a broad range of incomes, including working families and others of very low, low and moderate incomes; and [6] Implement TOD principles." Additionally, according to the RFQ, "[t]he State sought to ensure that the resulting development reflects a commitment to the following values: [1]

(Continued…)

3

was "the integration of the State Center development program with other redevelopment efforts . . . , as well as other nearby properties owned by other institutions and private owners."

The RFQ expected "[t]he Master Developer and a team [to] assemble resources and a team that can entitle, design, finance, construct, and market mixed-use, mixed-income urban TOD that supports surrounding neighborhood needs and is acceptable to the various regulatory agencies." The prospective "Master Developer" was described in the document as "a development entity or entities with the capacity and demonstrated experience to acquire the State-owned properties and successfully handle all aspects of the development process, including planning, community involvement, design, negotiation of public/private partnerships, structuring of private and public financing sources, construction, sales and leasing, and ongoing management." Moreover, the RFQ required the responding statements to include information on the "Project Team," defined as "the lead developer plus any other developers and key team members such as architects, engineers, economists, contractors, bankers, etc. who are critical for consideration by the State."

To implement this wide-range of purposes, the RFQ envisioned "sustained collaboration between the selected developer, State, City, neighborhood representatives,

---

(…continued)
Affordable Housing; [2] Green Design; [3] Senior Friendly Design; [4] Historic Preservation and Appropriate Design; and [5] Support of Creative Arts and Culture."

and other stakeholders in order to formulate a feasible project that can successfully accomplish a wide range of objectives." To that end, the RFQ provided:

> The State is also interested in a public private partnership with the Master Developer that results in creative approaches to development to ensure maximum return to the State and the City while minimizing direct public financial participation and development risk. To support this [public private] partnership, the State has committed to retaining the entire State workforce at the redeveloped State Center. The State will consider creative options for redevelopment of its existing buildings or occupancy in new privately owned buildings along with other private tenants.

Ultimately, the State "anticipated that the resulting project will be privately owned and managed." The RFQ emphasized that prior experience and background were critical to the State's consideration of the responding statements submitted by applicants.

The State explained, in the RFQ, that the envisioned need for sustained collaboration was also the reason a RFQ process was being used to select a Master Developer, instead of "the more traditional" Request for Proposals ("RFP"). The RFQ emphasized that it sought responding statements "only from experienced developers of large scale urban mixed use, mixed income projects." The RFQ re-emphasized this point in stating, "[p]rofessional service providers, building contractors or others should not respond to this RFQ."

The RFQ provided that it "[was] <u>not</u> conducted under the provisions of Maryland Procurement Law (COMAR Title 21)." (Emphasis in the original.) Instead, according to the State, "[b]ecause the mixed-use real-estate development is to be privately owned and privately managed, the State's conveyance of a 75-90 year real estate leasehold interest to the Developer, with conditions for redevelopment of the site in order to achieve the

5

State's economic development goals for the community, [fell] under the authority of § 10-305 of the State Finance and Procurement Article."[4] Although professing that it was not conducted generally under the provisions of the procurement statute, the RFQ adopted the Procurement Law's protest policy, requiring that "[p]rotests relating to this solicitation or the award of a contract must be filed in accordance with Title 15, Subtitle 2, Part III of the State Finance and Procurement Article, Annotated Code of Maryland, and COMAR Title 21 (State Procurement Regulations), Subtitle 10, Administrative and Civil Remedies."  The RFQ provided also that the selected Master Developer would be given the exclusive right to negotiate with the State for the Project, which included the public-private partnership and the comprehensive redevelopment envisioned in the RFQ. "Any formal contract becomes final only upon approval by the Maryland Board of Public Works ["BPW"] and, where applicable, the Federal Transit Administration and the US Department of Labor."

---

[4] Section 10-305(a) of the State Finance and Procurement Article provides, in pertinent part:

> [A]ny real or personal property of the State or a unit of the State government may be sold, leased, transferred, exchanged, granted, or otherwise disposed of:

> (1) to any person, to the United States or any of its units, or to any unit of the State government, for a consideration the Board decides is adequate; or

> (2) to any county or municipal corporation in the State subject to any conditions the Board imposes.

Md. Code (1985, 2009 Repl. Vol.), State Fin. & Proc. Article ("SFP"), § 10-305(a).

Four applicants, including the State Center, LLC, submitted responses to the RFQ. Pursuant to the selection procedure provided in the RFQ, the Evaluation Committee reviewed the responses, interviewed the applicants, and provided recommendations to the State that ranked State Center, LLC, above the other applicants. On 21 March 2006, Governor Ehrlich announced that the team was selected for the exclusive initial right to negotiate definitive agreements with the State to develop the Property. After announcement of the selection of the team, but prior to entering the MDA, the State Center, LLC, and the State Agencies executed a series of prefatory agreements. On 22 June 2007, the BPW approved a Memorandum of Understanding ("MOU"), which outlined how the negotiation process between the parties would unfold and the activities to be undertaken by each during the interim period. On 12 December 2007, the BPW approved an Interim Development Agreement ("IDA") between the DGS and State Center, LLC. The IDA confirmed the continued negotiations of the parties, outlined interim duties and responsibilities, and, among other things, contemplated that State Center, LLC, would submit a Preliminary Development Plan ("PDP"), as a preliminary concept plan for the Project, to the DGS. On 3 March 2008, the DGS acknowledged receipt of a PDP from the State Center, LLC, and approved the PDP, through the issuance on 2 September 2008 of a Letter of Intent ("LOI"), as the overall conceptual plan for the redevelopment of the Property. The LOI stated that it did not create "a binding contract or agreement of any sort, preliminary, final or otherwise," and that no binding development agreement would exist "unless and until a [MDA] was agreed to by the parties and approved by the BPW."

7

In March 2009, after the execution of the IDA and prior to entering into the MDA, the ownership structure of the State Center, LLC, changed.[5] The State Center Executive Committee, which was given the authority to approve alterations in the ownership structure on behalf of the State, approved these alterations by letter dated 12 May 2009.

On 15 June 2009, with the BPW's approval, the State Center, LLC (hereinafter, "Developer"),[6] and the State, by and through the DGS, entered into the MDA. Generally speaking, the MDA presented the formal plan of five development phases for the State Center project and contemplated that the State would lease the State Center property to the Developer with certain conditions for its development. The MDA provided that the State would acquire construction services, as well as architectural and engineering design work.

The MDA "specifically contemplate[d] the disposition of the Property pursuant to phased Ground Leases (each a 'Phase Ground Lease') or fee simple dispositions, and set forth the procedural and pragmatic requirements for taking down and developing each Phase, the parties agree[d] that, except as otherwise provided in the[] [MDA], the economic terms, dimensions, uses, and other elements necessary to accomplish the vision

---

[5] The State Center, LLC, was composed originally of three companies. On 16 January 2009, Doracon Development, LLC, withdrew voluntarily from the team and project. On 22 March 2009, Struever Bros. Eccles & Rouse, Inc. transferred its interest to PS Partners, LLC. According to the MDA, these changes in the ownership structure of State Center, LLC, occurred "to bring greater financial strength to the development team and to help achieve completion of the Project."

[6] We use the term "Developer" to refer to the State Center, LLC, as well as its affiliated subsidiaries.

of the parties and the Approved Concept Plan[7] shall be determined prior to the initiation of each Phase upon terms and conditions to be agreed upon between [the] DGS and [the] Developer. Any such terms and conditions will provide for an economic return to the State in accordance with th[e] [MDA] which includes a base rent, the fair market value of the Property, recovery of pre-development costs, and a participation in the profits and the net proceeds of sale and refinancing."

The MDA endowed the Developer "with exclusive development rights to the Property for the duration of while this Agreement is in effect and in order to complete development of the Project." The MDA provided that the "Developer anticipates acquiring portions of the Property by Phases . . . ." Moreover, the MDA conceived that, "Each Phase Ground Lease will be generally consistent with the terms of the Phase Ground Lease attached hereto as Exhibit 2.3 and the Approved Concept Plan, except as to further details such as the description of the property, the uses permitted or required for that Phase and the economic terms negotiated between the parties. The parties anticipate that each Phase Ground Lease will be submitted to the BPW for approval . . . ." The MDA specified also the terms of compensation payable to the State under a Phase Ground Lease.

---

[7] The MDA defined the "Approved Concept Plan" as a collection of documents, including, *inter alia*, the PDP, as confirmed in the LOI.

The State committed, in the MDA, "to pursue leasing" for State agencies of office space on two of the site's six parcels.[8] The MDA provided also that all spaces leased by the State will be "in accordance with the Approved Concept Plan, . . . standard State procurement practices and documented by an Occupancy Lease substantially in the form attached [to the MDA] . . . ." The economic terms of each Occupancy Lease shall be negotiated and determined "in part by the formula, calculations and determinations set forth in the Economic Terms Sheet" attached to the MDA. The MDA prohibited expressly, though, that "any Lease Proposal for any Occupancy Lease contain financial terms which are in excess of the then current market rental rates for comparable new construction of buildings in the Baltimore metropolitan area having comparable services, features, and elements included in the calculation of the rent."

Following execution of the MDA, the parties to the agreement commenced negotiation and preparation of the first phase of redevelopment of the Project ("First Phase"). The First Phase was the redevelopment of Parcels G and I-2, as identified on the PDP of the Approved Concept Plan. Furthermore, pursuant to the MDA, the Developer commenced the architectural and engineering design work necessary to construct the First Phase.

---

[8] The MDA states specifically that the State "commits to pursue leasing the anticipated Initial Space as part of the First Phase, and the anticipated Total Space, as part of the Project, all in accordance with the terms of the Occupancy Leases." "Initial Space," as defined in the MDA, means "[a]pproximately 300,000 leasable square feet in a single building to be constructed and rehabilitated as part of the First Phase." "Total Space" is defined in the MDA as "[a]pproximately 1,000,000 leasable square feet in several buildings to be constructed or rehabilitated as part of the Project suffices to accommodate the State's space needs for approximately 3,500 employees."

10

In September 2010, with the approval of the BPW, the State, by and through the DGS, and the Developer entered into the First Amendment to the MDA ("First Amendment"). The First Amendment made several changes to the MDA, laid out the process for beginning the first phase of development ("Phase I"), and relieved the Developer from the responsibilities of developing a parking garage and committed $28.3 million for the MDOT to build the parking garage, subject to certain conditions.

On 28 July 2010, the BPW considered and approved three ground leases, which were executed on 1 September 2010. One of these leases, the garage ground lease agreement, the DGS agreed, pursuant to State Finance and Procurement Article of the Maryland Code, § 10-304,[9] to lease the Garage Site to the MDOT and that the MDOT

---

[9] This section provides:

**Scope of section**
(a) This section does not apply to:
(1) property that is pledged to secure the payment of principal of or interest on revenue bonds; or
(2) real property that is owned or controlled by the State Highway Administration, unless the property is being transferred to the Maryland Transportation Authority or to another unit in the Department of Transportation.
**Power to transfer property**
(b)(1) The Board may transfer any property, and all rights of physical custody and control over the property, from a unit of the Executive Branch of the State government to another unit of the Executive Branch of the State government.
(2) Any property transferred under this subsection is exempt from the appraisal requirements under § 10-305(b)(2)(i) of this title.
(3) Any property transferred under this subsection is subject to the continuing general jurisdiction of the Board.

SFP § 10-304.

11

committed to $1.00 rent and "to finance, construct, operate, repair, and maintain the Garage, or to secure some or all of the foregoing services from one or more third parties . . . ",[10] as envisioned in the First Amendment. The other two ground leases, Parcel G Phase Ground Lease and Parcel I-2 Phase Ground Lease (hereinafter, collectively, "Phase I Ground Leases"), were between the State, to the use of the DGS, as Landlord, and affiliates of the Developer, State Center Parcel G Master Tenant, LLC, and State Center Parcel I-2 Master Tenant, LLC, respectively. These Ground Leases provided for the use and development of the First Development Phase, as envisioned and provided in the MDA. On 28 July and 15 December 2010, the BPW approved additionally four occupancy leases, as amended, in Phase I of the Project (hereinafter, collectively, "Phase I Occupancy Leases").[11]

The Project was designated as a TOD, pursuant to Transportation Article, § 7-101(m)(3), by the Maryland Secretary of Transportation on 19 October 2010, and by the Mayor and City Council of Baltimore on 5 November 2010.

---

[10] The lease agreement recognized that the Secretary of MDOT may contract with any person to provide these services, supplies, construction, and maintenance for the Garage because of its transportation related purpose, pursuant to § 2-103(h) of the Transportation Article of the Maryland Code.

[11] The MDA provides that "[t]he parties anticipate that each Phase Ground Lease and applicable Occupancy Lease(s) for such Phase will be submitted jointly to the BPW for review and approval (provided that DGS, with the concurrence of the Developer, may elect to submit the Occupancy Lease for approval prior to the Phase Ground Lease). The parties agree that a Phase Ground Lease will be conditioned upon DGS agreeing to the terms of the Occupancy Lease(s) for the applicable Phase." MDA ¶ 2.5.

12

## II.     THE PROCEDURAL PATH OF THE PRESENT CASE

On 17 December 2010, fifteen Plaintiffs[12] filed a Complaint for Declaratory and Injunctive Relief ("Original Complaint") in the Circuit Court for Baltimore City against the two State Agencies and the Developers.  In the Original Complaint, Plaintiffs alleged, among other things, that they were "excluded . . . from the bidding process" for the Project that, according to them, was contrary to the State Procurement Law.  Specifically, they alleged that they were harmed by the unlawful awarding of the Project to the Developers despite that the Plaintiffs were "ready, willing, and able to submit proposals to lease comparable office, retail, and parking space . . . on terms that are more favorable" than those provided to and by the Developers.

The State Agencies and the Developers each moved to dismiss the Original Complaint on numerous grounds.  One ground, which both sets of defendants asserted in their respective motions, was that the Circuit Court lacked jurisdiction because the Plaintiffs were required to exhaust administrative remedies before a state procurement officer and the Maryland State Board of Contract Appeals ("Appeals Board") prior to

---

[12] In the Original Complaint, the fifteen Plaintiffs, each of which were either a limited liability corporation or a limited partnership, were the following: St. Paul Plaza Office Tower, LLC; Lexington Charles Limited Partnership; 301 Charles Street, LLC; Park Charles Apartments Associates, LLC; Park Charles Office Associates, LLC; 501 St. Paul Street, LLC; St. Paul and Franklin, LLC; Robopark, LLC; Charles Plaza, LLC; 39 W. Lexington, LLC; Baltimore Condo 2-8, LLC; Fayette Garage, LLC; Charles Tower, LLC; The Marlboro Classic, LP; and Redwood Square Apartments, LP.

The parties listed as Plaintiffs changed on several occasions during the proceedings in the Circuit Court.  The collective term "Plaintiffs," as used in this opinion, refers to the moveable feast of Plaintiffs as they changed throughout the proceedings.

presenting their claims to the Circuit Court.  On 28 January 2011, the Plaintiffs amended the complaint ("Amended Complaint"), and, among other changes, added a new Plaintiff, David And Dad's Inc.[13]

The Amended Complaint set forth eight counts.  Counts I – VII of the Amended Complaint sought declaratory judgment for the following propositions:

(I)     Invalidity of First Amendment and Incorporated MDA;
(II)    Invalidity of the Occupancy Leases and the Commitment to Enter Occupancy Leases;
(III)   Invalidity of Alleged Occupancy Leases as "Agreements to Agree";
(IV)    Agency Failure to Promulgate Mandatory Regulations;
(V)     State Lacks Authority to Enter the First Phase Occupancy leases for Parcel G and Parcel I-2, and Any Amendments Thereto;
(VI)    State Center is Not and Could Not Be A TOD and its Designation as such Long After Execution of the MDA and First Amendment Renders Those Agreements Null and Void; and,
(VII)   The Parking Garage "Procurement" Violates SFP Title 13.

Count VIII of the Amended Complaint sought injunctive relief to enjoin the Defendants from proceeding under the formative contracts of the Project (including the First Amendment, the MDA, Phase I Ground Lease, Phase I Occupancy Leases, and "the architecture, engineering and construction services related to the parking garage") absent full compliance with the competitive procurement provisions of Title 13 and Chapter 484, Laws of Maryland, as well as "until after DBM [Department of Budget and

---

[13] Additionally, in a Second Amendment by Interlineation of the Amended Complaint, filed on 1 April 2011, the following parties were added as Plaintiffs: DaMimmo's Italian Restaurant; Sabatino's, Inc.; Chiapparelli's, Inc.; Vaccaro's Italian Pastry Shop, Inc.; Bonnie's Peanut Shoppe, Inc.; Davis and Davis, Inc., d/b/a Flowers by Gina D.; and Caesar's Den, Inc.

Management] and/or DGS promulgate the proper regulations mandated by SFP § 10-305(h)."

The State Agencies and the Developers moved to dismiss the Amended Complaint, as they had the Original Complaint. On 6 April 2011, a trial court judge held a hearing on the Defendants' Motions to Dismiss. On 19 July 2011, the Circuit Court entered two orders denying both Motions.

First, the Circuit Court rejected the Defendants' challenge to the Plaintiffs' taxpayer standing raised by both Motions to Dismiss:

> The Court of Appeals has recognized, however, that "the extent to which a taxpayer is capable of detailing the damage anticipated from an illegal and ultra vires act may be rather limited at the time the suit is initially filed." [*120 W. Fayette Street, LLLP v. Mayor of Baltimore*, 407 Md. 253, 266, 964 A.2d 662, 669 (2009)]. Thus, the Court has held that "the taxpayer plaintiff is not required to allege facts which *necessarily* lead to the conclusion that the taxes will be increased; rather, the test is whether the taxpayer reasonably *may* sustain a pecuniary loss or a tax increase - - whether there has been a showing of *potential* pecuniary damage." *Id.*

> Plaintiffs have pled that State agencies engaged in illegal and ultra vires acts that could potentially cause Plaintiffs pecuniary harm or an increase in taxes. This Court finds that the allegations contained in Plaintiffs' Amended Complaint are sufficient to establish taxpayer standing.

Second, in ruling on another common challenge in the Motions to Dismiss, the Circuit Court rejected the Defendants' exhaustion of administrative remedies defense because the Plaintiffs' claim "is not the type of 'contract claim' contemplated to be within the [Appeals Board's] jurisdiction."

> While it is arguable that Plaintiffs' complaint may be in the nature of a 'protest,' given that Plaintiffs are not prospective bidders or offerors, or bidders or offerors, they would not be entitled to submit such a protest to

15

the Appeals Board. Further, the absence of a procurement contract arguably precludes the submission of a contract claim.

Reasoning further, the Circuit Court distinguished *State v. State Board of Contract Appeals & Law Offices of Peter G. Angelos*, 364 Md. 446, 773 A.2d 504 (2001), on the bases that the "Plaintiffs are not a party to the contracts at issue in the case *sub judice*. Furthermore, Plaintiffs are neither assignees nor parties in line to benefit from the contracts at issue."

Third, in regards to both sets of Defendants' laches argument, the Circuit Court rejected their argument that "Plaintiffs adopted a 'wait and see attitude' and should have brought their claims following the issuance of the [RFQ] in 2005." The judge noted that "[w]hen considering a motion to dismiss, the court must assume the truth of Plaintiffs' well-pleaded factual allegations in the complaint." The trial judge stated that "Plaintiffs assert[ed] that the [MDA], executed and approved in June 2009, was the first binding agreement related to the State Center Project and that the operative documents giving rise to this suit were the September 1, 2010 First Amendment . . . and the Phase I Occupancy Leases, approved July 28, 2010 and amended on December 15, 2010." The Circuit Court concluded that "[a]s Plaintiffs' initial complaint was filed on December 17, 2010, this Court finds that Plaintiffs' claims are not barred by latches [sic]."

Then, the Circuit Court rejected the argument, advanced by the Developers' Motion to Dismiss only, that Plaintiffs lack standing to seek a declaration that the State's commitment to pursue future Occupancy Leases is unenforceable as "agreements to agree" because they are not parties to the contract. The judge reasoned that, because

16

"Plaintiffs challenge the agreements as being ultra vires acts, which are part of an 'unlawful procurement conspiracy,'" they "are neither required to be a party to the contract nor in privity with a party to the contract in order to make such a challenge."

Lastly, the Circuit Court ruled on arguments raised only in the State Agencies' Motion to Dismiss. The judge concluded that "the Plaintiffs' claims, concerning the interpretation and implementation of State procurement laws, and seeking declaratory and injunctive relief, are within the province of judicial review" and, thus, rejected the DGS's and DOT's "purely political question" assertion. Then, the Circuit Court found "that Plaintiffs' claims for declaratory and equitable relief are not barred by the doctrine of sovereign immunity" because "[s]overeign immunity is not a bar to Plaintiffs challenging 'the legality of State laws and regulations, or the alleged unlawful implementation of such law and regulations by a State official.'" (Citations omitted.)

Almost two years of discovery followed the trial court's rejection of the Motions to Dismiss. Throughout this time, and even prior to the court's order denying the Motions to Dismiss, the Defendants sought to expedite the litigation in the hope to proceed with the development in as timely a manner as possible.

On 2 September 2011, the State Agencies filed a $100,000,000 Counterclaim against the Plaintiffs/Counter-Defendants for Tortious Interference with Economic Relationships. The State Agencies averred that the filing and prosecution of Plaintiffs' suit was "wrongful, illegal, and in bad faith" because the suit's purpose was to cause the State Agencies damage and loss, and "to restrain trade and competition and the public and private benefits thereof." Moreover, "[Plaintiffs/Counter-Defendants] filed [the suit]

17

after unreasonable and unexcusable delay, having waited six years since the inception of the Project, until the Project reached a critical juncture in its development, all in order to maximize the resulting disruption to progress and funding of the Project." The State Agencies averred that "DGS and [M]DOT have suffered, and will continue to suffer, actual and prospective damage and loss as a result of the tortious acts of Plaintiffs/Counter-Defendants in bringing and maintaining this suit."[14]

On 6 September 2011, the Plaintiffs/Counter-Defendants filed a Motion to Dismiss Counterclaim on the grounds that the *Noerr-Pennington* doctrine[15] barred the

---

[14] Specifically, the State Agencies alleged that "Plaintiffs'/Counter-Defendants' filing and prosecution of this lawsuit is responsible for causing damages and loss to DGS and [M]DOT in the form[s] of delayed and/or lost base ground rents[;] . . . delayed and/or lost additional ground rents[;] . . . increased construction and/or financing costs for the garage associated with the Project[;] . . . delayed and/or lost revenues from the garage associated with the Project[;] . . . increased State-funded Project predevelopment costs[;] . . . increased office space rental costs due to increased building construction costs and/or increased interest rates[;] . . . prolonged and increased costs of maintaining rather than replacing the obsolete State office buildings on the Project site[;] . . . delayed and/or lost State tax revenues."

[15] The Court of Special Appeals explained recently the basis of the *Noerr-Pennington* doctrine as follows:

[The *Noerr-Pennington* doctrine] derives from Supreme Court decisions in *E. Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961) and *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), statutory construction cases, where the court considered the right to petition in interpreting federal anti-trust laws. The immunity conferred by *Noerr–Pennington* extends to those who "use ... courts to advocate their causes and points of view regarding resolution of their business and economic interests, *vis-a-vis* their competitors." *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 92 S. Ct. 609, 30 L. Ed. 2d 642

(Continued…)

18

State Defendants' counterclaim and that the State Agencies cannot establish the elements of tortious interference with economic relations, as a matter of law. The Circuit Court agreed that the *Noerr-Pennington* doctrine barred the Counterclaim and entered an order granting the Plaintiffs' Motion to Dismiss Counterclaim on 22 December 2011.

On 7 November 2012, the State Agencies and Developers moved collectively for summary judgment on several grounds: (1) "Because The [MDA] And First Amendment Are Not Procurement Contracts, The Defendants Are Entitled To Summary Judgment On Counts I, II, and V Of The Amended Complaint;" (2) "Plaintiffs' Claims About Future Occupancy Leases Are Not Ripe and Will Be Invalid If They Ever Ripen;" (3) "Contrary

---

(…continued)

(1972). However, such immunity does not apply if a lawsuit is a sham both objectively and subjectively. *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60–61, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993). In *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002), the Supreme Court extended the *Noerr–Pennington* doctrine—at least as to direct petitions, *i.e.*[,] lawsuits—to cases under the *National Labor Relations Act,* 29 U.S.C. § § 151 *et seq.* Although the Supreme Court has not spoken on the issue, lower courts, including some state courts, have recognized [a] First Amendment right to petition defenses, similar to *Noerr–Pennington*, to state common law and statutory claims. *See Annot.: Application of Noerr–Pennington Doctrine by State Courts,* 94 A.L.R. 5th 455 (2001). Federal courts have wrestled with whether the reach of *Noerr–Pennington* doctrine in antitrust cases is the same in suits brought under the common law or other statutes. *See, e.g., Venetian Casino Resort v. NLRB,* 484 F.3d 601, 611–13 (D.C. Cir. 2007), and *Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 208 F.3d 885, 889–91 (10th Cir. 2000).

*Hamot v. Telos Corp.*, 185 Md. App. 352, 367 n.13, 970 A.2d 942, 951 n.13 (2009).

To Count IV, Regulations For The Disposition Of Land Were Properly Promulgated As A Matter Of Law"; (4) "The [TOD] Designation Is Within The Exclusive Discretion Of The Secretary Of Transportation: Count VI Is Without Basis In Law"; and (5) "The Construction of the State Center Parking Garage Is Not Subject To The Maryland Procurement Code: Count VII Is Invalid."

On 15 January 2013, the Circuit Court held a hearing on the Motion for Summary Judgment. Two days later, the judge entered an order granting the motion in part and denying it in part. She noted that there were no disputes of material fact. Therefore, she stated, "the parties' contentions present only issues of law, and the question before the court is whether either party is entitled to judgment as a matter of law upon the undisputed facts."

The judge granted partial summary judgment in favor of the Plaintiffs on Counts I, II, III, and V.[16] The Circuit Court, relying upon *Department of General Services v. Harmans Associates Ltd. Partnership*, 98 Md. App. 535, 633 A.2d 939 (1993), found that, "[d]espite the purported structure of the transaction, the 'essence of the transaction' was not a simple disposition of land governed by [SFP § 10-305], but a complex creative way to develop State land." Because the "essence of the transaction" was a "complex creative way to develop State land," the judge concluded that the formative documents – the MDA, the First Amendment, and the Ground Leases – are governed by [SFP § 11-101, *et seq.*]. The State Agencies and the Developers conceded, and the Circuit Court

---

[16] Plaintiffs withdrew voluntarily Count IV.

20

found, that they "did not comply with the procedures required in the code" and, therefore, the four formative contracts – the MDA, the First Amendment, and the Ground Leases – are void pursuant to SFP § 11-204. Accordingly, the Circuit Court found that the Plaintiffs were "entitled to judgment and to a declaratory judgment in their favor based on these counts."

Then, the judge entered partial summary judgment in favor of the Defendants with respect to Counts VI, VII, and VIII. With regard to Count VI of the Plaintiffs' Amended Complaint, claiming that the projects conceived in the MDA and the First Amendment cannot be designated as TOD, the Circuit Court stated that Md. Code (1977, 2008 Repl. Vol.), Transportation Art., § 7-101, *et seq.* "permit[s] the Maryland Secretary of Transportation and local governments or multicounty agencies discretion in applying TOD designation" and, thus, found no merit in the argument. As to Count VII, the Circuit Court found that the provisions of the MDA and the First Amendment "are principally funded by the Maryland Economic and Development Corporation, which carries out its corporate purposes without the consent of any State unit and without being subjected to General Procurement Law," pursuant to Md. Code (2008), Economic Development Art., § 10-111. Lastly, as to Count VIII, the judge found that "the extraordinary remedy of injunctive relief is not necessary or appropriate because Defendants have voluntarily refrained from acting under the [MDA] and the First Amendment . . . , and the legal issue is resolved by the declaratory relief granted herein."

The State Agencies and the Developers (now Appellants) appealed timely to the Court of Special Appeals, but also petitioned contemporaneously this Court for a writ of certiorari and sought expedited review of three questions:

(1) Did the [C]ircuit [C]ourt err in concluding that the State Center Project violates State procurement law on the ground that the project is "a complex, creative way to develop" land owned by the State?

(2) Does the Circuit Court for Baltimore City lack jurisdiction to address, in the first instance, the plaintiffs' claim that the State Center Project violates State procurement law, because such claims fall within the primary or exclusive jurisdiction of the Maryland State Board of Contract Appeals?

(3) Do the plaintiffs lack standing, under the taxpayer standing theory they invoked, to challenge the State Center Project, because they failed to allege facts to support either their claim of illegal, ultra vires action or their contention that they will suffer the requisite special damage if the State Center Project proceeds?

Appellees filed an Answer to the Petition for Writ of Certiorari and a Conditional Cross-Petition for Writ of Certiorari. Appellees did not object to Appellants' request for a writ of certiorari on the first issue presented, but requested that the question be reframed, so as not to "distort[] and truncate[] the lower court's decision," as follows:

Did the [C]ircuirt [C]ourt correctly hold that the essence and true nature of the State Center development agreements was not a simple disposition of land, but rather a complex financing plan for the State's acquisition of construction, construction-related services, and leaseholds, and that the acquisitions were subject to the requirement of competitive sealed proposals.

Appellees objected to the second and third questions presented by Appellants on the grounds that "[they] present ordinary issues that are not certworthy and arise from rulings on Petitioners' Motions to Dismiss that were not raised in Petitioners' Motions for

22

Summary Judgment or addressed by the [C]ircuit [C]ourt's summary judgment." As to

Appellees' Cross-Petition, they sought review of the following question:

> Did the [C]ircuit [C]ourt err in declining to review the belated and defective designation of the State Center Project as a Transit-Oriented Development that permitted the Project to be unlawfully prioritized, and improperly receive substantial site-selection and other benefits?

We issued, prior to a decision in the Court of Special Appeals, a Writ of Certiorari

regarding the three questions tendered in Appellants' Petition for Writ of Certiorari and

the additional question tendered in Appellees' conditional Cross-Petition. 430 Md. 344,

61 A.3d 344 (2012). Thus, on appeal, we confront the following questions, if necessary

to reach them all in order to decide this case:

> 1) Did the trial court err in concluding that the State Center Project violates [the] State Procurement Law on the grounds that the project is not a simple disposition of land but "a complex, creative way to develop" land owned by the State that should have been subject to the requirement of competitive sealed proposals?
>
> 2) Does the Circuit Court for Baltimore City lack jurisdiction to address Appellees' claim that the project violates [the] State Procurement Law because such claims fall within the primary or exclusive jurisdiction of the Maryland State Board of Contract Appeals?
>
> 3) Do Appellees lack standing, under the taxpayer standing theory, to challenge the project because they failed to allege facts to support either their claim of illegal, *ultra vires* action or their contention that they will suffer special damage if the project proceeds?
>
> 4) Did the trial court err in declining to review the belated designation of the project as a Transit-Oriented Development, a designation which permitted the project to be prioritized and receive substantial site-selection and other benefits?

23

On 1 February 2013, the State Agencies and the Developer moved for an immediate stay of enforcement of the judgment of the Circuit Court for Baltimore City entered on 24 January 2013. We denied this Motion on 12 February 2013.

### III. APPELLEES' MOTION TO DISMISS THE APPEAL

Appellees included in their brief a Motion to Dismiss certain arguments mounted in the State Agencies' appeal on the basis, provided in Maryland Rule 8-602(a)(1), that the arguments are not permitted by the Maryland Rules or other law. Appellees moved to dismiss "portions" of the Appellants' Brief that are directed to questions that "(a) are not included in the writ of certiorari; (b) are not certworthy; and (c) were not presented to and/or decided by the [C]ircuit [C]ourt." Specifically, Appellees argued that the Court should not entertain three arguments—(1) laches; (2) lack of a private right of action; and (3) lack of privity of contract—which the State Agencies raised in their brief, but which were not contained in their Petition for, or the Writ of, Certiorari. In response, the State Agencies averred that Appellees failed to assert any ground upon which this Court is authorized to dismiss an appeal, pursuant to Rule 8-602(a) and, therefore, the Motion should be denied. We shall deny Appellees' Motion to Dismiss.

The alleged shortcomings (that certain arguments were unpreserved and/or not presented properly in the Petition for Writ of Certiorari) are not proper grounds for the dismissal of an appeal, as provided by Maryland Rule 8-602(a). Instead, the points advanced in the Motion to Dismiss are addressed by Maryland Rule 8-131, which provides the proper context for our appellate review and governs the manner in which this Court deals with alleged arguments that are unpreserved and not presented properly

24

in the grant of the Writ of Certiorari. As will be seen after examining these rules, the proper scope of our appellate review under Rule 8-131 is not co-extensive with the bases for granting a motion to dismiss, as provided in Rule 8-602. Thus, although Maryland Rule 8-131 states explicitly that it limits the Court's jurisdiction, a motion to dismiss is not the proper method to ask this Court not to address an assertedly unpreserved or improperly presented argument.

Maryland Rule 8-602(a) governs the grounds for which this Court may dismiss an appeal. It provides:

> On motion or on its own initiative, the Court may dismiss an appeal for any of the following reasons:
> (1) the appeal is not allowed by these rules or other law;
> (2) the appeal was not properly taken pursuant to Rule 8-201;
> (3) the notice of appeal was not filed with the lower court within the time prescribed by Rule 8-202;
> (4) the appellant has failed to comply with the requirements of Rule 8-205;
> (5) the record was not transmitted within the time prescribed by Rule 8-412, unless the court finds that the failure to transmit the record was caused by the act or omission of a judge, a clerk of court, the court reporter, or the appellee;
> (6) the contents of the record do not comply with Rule 8-413;
> (7) a brief or record extract was not filed by the appellant within the time prescribed by Rule 8-502;
> (8) the style, contents, size, format, legibility, or method of reproduction of a brief, appendix, or record extract does not comply with Rules 8-112, 8-501, 8-503, or 8-504;
> (9) the proper person was not substituted for the appellant pursuant to Rule 8-401; or
> (10) the case has become moot.

Md. Rule 8-602(a).[17] Neither a lack of preservation nor failure to present an argument in the petition for writ of certiorari is listed as a permissible ground upon which this Court may dismiss an appeal.[18]

Instead of calling for dismissal of an unpreserved question or argument, the applicable Maryland Rules and our case law governing consideration of unpreserved issues and issues not raised in the petition for certiorari grant this Court the discretion to address the issue in its opinion. Specifically, Md. Rule 8-131(a) provides that, where an issue or argument was not preserved for appellate review, this Court possesses discretion whether to reach and resolve the matter. Moreover, Md. Rule 8-131(b) governs whether this Court will determine an issue or argument not raised in the petition for writ of certiorari or cross-petition.

Because Appellees failed to allege any grounds that warrant dismissal of an appeal under Md. Rule 8-602(a), we deny Appellees' Motion to Dismiss. Instead, we shall address, pursuant to the applicable Md. Rule 8-131, the State Agencies' alleged failures

---

[17] Maryland Rule 8-603(c) limits the possible grounds for a motion to dismiss included in an appellee's brief to subsections (1), (2), (3), (9), or (10) of Md. Rule 8-602(a).

[18] Even if the alleged shortcomings were listed as proper grounds for a motion to dismiss an appeal in this Court, whether to dismiss the appeal is within the discretion of the Court. *See, e.g.*, *Woods v. Constantine*, 337 Md. 487, 489, 654 A.2d 885, 885 (1995) (recognizing that, because "Maryland Rule 8–602(a)(10) authorizes, rather than mandates the dismissal of a moot appeal," the appellate courts "ha[ve] discretion to decide a question which has become moot" even though it may be subject to dismissal pursuant to Md. Rule 8-602) (citations omitted); *Leavy v. Am. Fed. Sav. Bank*, 136 Md. App. 181, 191, 764 A.2d 366, 371 (2000) ("Dismissal of an appeal, however, is a discretionary matter.") (citations omitted).

(both to preserve all issues in the Circuit Court and to raise them properly in the Petition for Writ of Certiorari), and the propriety of addressing such issues on the record before us, at appropriate places in this opinion.[19]

## IV.    APPLICABLE STANDARDS OF APPELLATE REVIEW

This appeal arises from both the Circuit Court's denial of the State Agencies' and the Developers' Motions to Dismiss and its partial grant and partial denial of their collective Motion for Summary Judgment (we shall attribute hereafter the Motions to the State Agencies, with the understanding that the Developers joined them as well). Thus, the standard of review differs depending on context. We relate briefly the overarching principles that guide our review of the Circuit Court's judgment here, but may repeat later the relevant portions in our discussion of the individual questions presented and related arguments.

In reviewing whether the Circuit Court denied properly the State Agencies' Motions to Dismiss, we employ the following principles:

> Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the

---

[19] Appellees included the merits of some of their arguments in their Motion to Dismiss the appeal. In their Brief, they chose not to repeat their arguments, but rather referenced their arguments stated in their Motion to Dismiss. Although we address these arguments in this case, we point out that ordinarily we do not permit parties to argue the merits of issues in a motion to dismiss. Permitting this practice permits improperly (*i.e.*, without our prior permission) Appellees to have the final word on the argument (in their Reply to Appellants' Response to Motion to Dismiss) and potentially to expand the number of pages permitted for the merits.

allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. Consideration of the universe of "facts" pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any. The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice. Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct.

*RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643-44, 994 A.2d 430, 433-34 (2010) (internal citations omitted).

With regard to the partial grant and partial denial of the summary judgment Motion, *Barclay v. Briscoe*, 427 Md. 270, 47 A.3d 560 (2012), serves as an apt authority iterating our standard of review:

Under Maryland Rule 2–501, the grant of a motion for summary judgment is appropriate only "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Rule 2–501(f). As we recently stated in *Muskin v. State Dep't of Assessments & Taxation,* 422 Md. 544, 30 A.3d 962 (2011), "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Muskin,* 422 Md. at 554, 30 A.3d at 967 (citing *Conaway v. Deane,* 401 Md. 219, 243, 932 A.2d 571, 584 (2007)). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is . . . whether the trial court's legal conclusions were legally correct." "In reviewing a grant of summary judgment, we independently review the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to a judgment as a matter of law." In determining whether a fact is material we have said that "a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment."

28

> We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-pled facts against the moving party. Further, an appellate court ordinarily should limit its review of a grant of a motion for summary judgment to "only the grounds upon which the trial court relied in granting summary judgment."

427 Md. at 281-82, 47 A.3d at 566-67 (some internal citations omitted).

## V.    ANALYSIS

### A. JUSTICIABILITY

"Concepts of justiciability have been developed to identify appropriate occasions for judicial action." Charles A. Wright, et al., *Federal Practice and Procedure* § 3529, at 611 (2008). "Numerous doctrines have evolved under the justiciability umbrella which are aimed at isolating those circumstances in which courts should withhold decision, either from deference to the particular authority and competence of another branch of government, or from recognition of the functional limitations of the adversary system." *Reiman Corp. v. City of Cheyenne*, 838 P.2d 1182, 1186 (Wyo. 1992).

Among the doctrines under the umbrella of justiciability is standing. The concept of standing has been described as "one of 'the most amorphous (concepts) in the entire domain of public law.'" *Flast v. Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 1952, 20 L. Ed. 2d 947 (1968) (quoting *Hearings on S. 2097 Before the Subcomm. on Constitutional Rights of the Senate Judiciary Comm.*, 89th Cong., 2d Sess. 498 (1966) (statement of Prof. Paul A. Freund)). The history of the law on standing, described also as "cluttered,

confused, and contradictory . . . ," fairs no better.[20] 3 Kenneth C. Davis, *Administrative Law Treatise*, § 22.18 (1965 Supp.). Justice William O. Douglas observed on one occasion that "[g]eneralizations about standing to sue are largely worthless as such." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151, 90 S. Ct 827, 829, 25 L. Ed. 2d 184 (1970).

In the present case, the parties throw the textbook on standing at the Court. Unfortunately, the chapters in that textbook regarding Maryland law are often confusing and contradictory. One aspect of this confusion stems from the very definition of the concept of standing and its relation to other justiciability concepts. In particular, "the concept of the cause of action figures prominently in debates over how courts should analyze standing issues." Anthony J. Bellia, Jr., *Article III and the Cause of Action*, 89 Iowa L. Rev. 777, 779 (2004). Thus, we begin with a general discussion of these concepts, as presented in this State and comparatively or analogously in the federal courts.

"Under current [Supreme Court] doctrine, federal courts determine whether a plaintiff has standing by asking whether the plaintiff has suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by a decision in the plaintiff's favor." Bellia, *supra*, at 779 n.5 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)). Under this

---

[20] While Professors Freund and Davis referred in these quotations to the federal doctrine of taxpayer standing, these descriptions apply equally as well to the status of Maryland's taxpayer standing doctrine.

doctrine, the concepts of jurisdiction, standing, cause of action,[21] and remedy were

treated separately.  In order for the federal courts to reach a claim properly, the complaint

must meet the requirements for each of these doctrines as a prerequisite to judicial review

of the claim.  The Supreme Court of the United States explained the basic concept of

each doctrine (in terms of the federal judicial system) as follows:

> *[J]urisdiction* is a question of whether a federal court has the power, under
> the Constitution or laws of the United States, to hear a case; *standing* is a
> question of whether a plaintiff is sufficiently adversary to a defendant to
> create an Art. III case or controversy, or at least to overcome prudential
> limitations on federal-court jurisdiction; *cause of action* is a question of
> whether a particular plaintiff is a member of the class of litigants that may,
> as a matter of law, appropriately invoke the power of the court; and *relief* is
> a question of the various remedies a federal court may make available.

*Davis v. Passman*, 442 U.S. 228, 239 n.18, 99 S. Ct. 2264, 2274 n.18, 60 L. Ed. 2d 846

(1979) (internal citations omitted).  That a plaintiff may satisfy one of these requisites

does not mean necessarily that he can meet the other requirements.  For example, the

---

[21] Some scholars criticize the federal courts' continued use of the concept of the
cause of action.  As Professor Bellia explained,

> the concept of the cause of action is supposed to be dead.  The framers of
> the Federal Rules of Civil Procedure omitted the term from the Rules
> purposefully, employing instead the concept of "claim."  We were to think
> in terms of claims rather than in terms of causes of action because the latter
> term was fraught with formal technicalities that served no good functional
> purpose.  Certain manners of legal discourse, however, die hard.  By all
> appearances, the concept of the cause of action is thriving.  In 2002, federal
> courts employed the term cause of action in over 8000 opinions.  That same
> year, legal commentators employed the term in over 4000 journal and law
> review articles.  One context in which courts and scholars regularly invoke
> the term is in formulating and analyzing doctrines of federal judicial power.

Anthony J. Bellia, Jr., *Article III and the Cause of Action*, 89 Iowa L. Rev. 777, 778
(2004) (footnotes omitted).

31

Supreme Court explained, "[a] plaintiff may have a cause of action even though he be entitled to no relief at all, as, for example, when a plaintiff sues for declaratory or injunctive relief although his case does not fulfill the 'preconditions' for such equitable remedies." *Id.* (citing *Trainor v. Hernandez*, 431 U.S. 434, 440-43, 97 S. Ct. 1911, 1916-17, 52 L. Ed. 2d 486 (1977)).

In *Davis v. Passman*, the Supreme Court concluded that the petitioner had standing to bring the suit because, "[i]f the allegations of her complaint are taken to be true, she has shown that she 'personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S. Ct. 1601, 1608, 60 L. Ed. 2d 66 (1979)). Despite concluding that the petitioner had standing, the Supreme Court emphasized that "[w]hether petitioner has asserted a cause of action, however, depends not on the quality or extent of her injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce the right at issue. The focus must therefore be on the nature of the right petitioner asserts." *Id.*

This approach, which analyzes standing and cause of action as separate concepts, has not been embraced by all courts and has been criticized by many scholars.[22] The alternative approach, sometimes referred to as "cause of action" standing, simply asks

---

[22] *See generally* David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 (1981); Lee A. Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief*, 83 Yale L.J. 425 (1975); William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221 (1988).

whether governing law confers on the plaintiff a right to bring the claim to the courts. Bellia, *supra*, at 779. Part of the rationale is that standing and cause of action are so interrelated that it is difficult to analyze one without the other creeping into the analysis.[23]

Apparently, the appellate courts in Maryland have adopted the "cause-of-action" approach,[24] which groups the traditionally distinct concepts of standing and cause of

---

[23] Professor Bellia expanded on this interrelation as follows:

Consider three fundamental questions of the scope of the Article III judicial power: what kinds of cases Congress may empower federal courts to adjudicate (jurisdiction), who may initiate a case in federal court (standing), and when a federal court may afford a plaintiff a private remedy for the violation of a federal regulatory scheme (implied rights of action). Federal courts have answered each of these questions, and scholars have evaluated their answers, based on certain presuppositions regarding when a cause of action exists and what the properties of a cause of action are. Take first the question of jurisdiction. To determine whether a case that Congress has empowered a federal court to hear is one "arising under" federal law for purposes of Article III, federal courts ask whether a federal question forms an "ingredient of the original cause" that the plaintiff is asserting. As a court applies the ingredient test, what it understands a "cause" to be is crucial to the outcome: the more pliable the court's conception of a cause of action (and thus the more fluid the ingredients of one), the more likely the court will be to sustain a congressional grant of jurisdiction. Courts and scholars appear to share a pliable understanding of the cause of action in this context, and, accordingly, they have concluded that Congress has a vast power to confer "arising under" jurisdiction on the federal courts.

**Similarly, the concept of the cause of action figures prominently in debates over how courts should analyze standing issues**. In particular, scholars have argued that federal courts should abandon their current approach to standing in favor of an approach that simply asks whether the plaintiff has a cause of action under a federal regulatory scheme.

Bellia, *supra*, at 778-79 (emphasis added) (footnotes omitted).

33

action into a single analytical construct, labeled as "standing," to determine whether "the plaintiff [has] show[n] that he or she 'is entitled to invoke the judicial process in a particular instance.'" *Kendall v. Howard Cnty.*, 431 Md. 590, 593, 66 A.3d 684, 685 (2013) (quoting *Adams v. Manown,* 328 Md. 463, 480, 615 A.2d 611, 619 (1992)); *see also 120 West Fayette St., LLLP v. Mayor of Baltimore*, 407 Md. 253, 270, 964 A.2d 662, 671-72 (2009) ("As to standing, the question is 'whether the interest sought to be protected by the complainant is *arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'") (quoting *News American v. State*, 294 Md. 30, 40, 447 A.2d 1264, 1269 (1982)); *Adams*, 328 Md. at 480, 615 A.2d at 619 ("One requirement of justiciability is that the plaintiff have standing in the sense that the person is entitled to invoke the judicial process in a particular instance.") (citing *Reyes v. Prince George's Cnty.,* 281 Md. 279, 288, 380 A.2d 12, 17 (1977)); *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md. App. 479, 501, 822 A.2d 478, 491 (2003) ("For an affected interest to furnish a basis for aggrieved person standing, the interest must be legally protected. Thus, just as an impact on a person's property interest affords a basis for standing, an impact on a person's interest arising out of contract, protected from tortious invasion, or founded on a statute that confers a privilege likewise provides a basis for standing.").

---

(…continued)

[24] We temporize by using the descriptor "apparently" because, upon review of our case law, it does not appear that this Court adopted this approach purposefully. Rather, it is simply a convention with which this Court fell into step.

As such, we must understand the claims that are brought by a plaintiff prior to attempting to answer a challenge of standing. Thus, we provide first an overview of the procurement claims brought by Appellees, prior to analyzing whether they are required to exhaust administrative remedies or to aver a private right of action, and whether they have standing under either the taxpayer or property owner standing doctrines.[25]

### 1. *Procurement Claims Brought by Appellees as Plaintiffs.*

The State Finance and Procurement Article of the Maryland Code, *see* SFP §§ 11-101 to 17-402, and its regulations, *see* Code of Maryland Regulations (COMAR) 21.01.01 to .14.07, govern the solicitation and award of *certain* state contracts for the purchase of goods and services. *See Univ. of Md. v. MFE Inc.*, 345 Md. 86, 92, 691 A.2d 676, 679 (1997) ("State procurement is governed by statute and regulation . . . "). This set of Procurement statutes and regulations reflects the wide range of interests in the award of government contracts: "[a] contract with the State implicates the community of taxpayers and its representatives, procurement officers and their using agencies, and the MSBCA [Maryland State Board of Contract Appeals] members and the judges who review MSBCA decisions under the Administrative Procedures Act (APA)." Scott A.

---

[25] Although we granted Appellees' Cross-Petition to consider potentially whether the trial court erred in declining to review the belated and defective designation of the Project as a TOD, Appellees chose not to pursue it on their cross-appeal "[b]ecause it is not necessary to present the transit-oriented development ('TOD') issue in order to support affirmance," but summarized their arguments on the issue briefly in a footnote in their initial brief. The State Agencies, in their Reply Brief, stated that "the plaintiffs have dropped any appeal from that ruling [referring to that of the TOD designation]." Similarly, we conclude that, because Appellees stated explicitly that they chose not to pursue the issue on appeal, we do not address it either.

Livingston & Lydia B. Hoover, *Principles of Maryland Procurement Law*, 29 U. Balt. L. Rev. 1, 2 (1999).

Where a contract is a "procurement contract," the Procurement Code sets forth various methods for procuring goods and services: competitive sealed bidding; competitive sealed proposals; non-competitive negotiation for human, social or educational services; sole source procurement; emergency or expedited procurement; small procurement; intergovernmental cooperative purchasing; auction bids; and unsolicited proposals. *See* SFP § 13-102. A "procurement contract" is defined as "an agreement in any form entered into by a unit for procurement . . . ."[26] SFP § 11-101(n). Moreover, "procurement" is defined as "the process of (i) leasing real or personal property as lessee; or (ii) buying or otherwise obtaining supplies,[27] services,[28]

---

[26] The statute defining a "procurement contract" excludes "(i) a collective bargaining agreement with an employee organization; (ii) an agreement with a contractual employee . . . ; (iii) [certain] reimbursement contract[s] . . . ; or (iv) a Medicaid contract with a managed care organization . . . ." SFP § 11-101(n)(2).

[27] "Supplies" means, among other things, tangible personal property and services necessarily associated with tangible personal property. SFP § 11-101(w)(1). The term "supplies" does not include an interest in real property. SFP § 11-101(w)(2).

[28] "Services" is defined as follows: "Except as provided in paragraph (3) of this subsection, "services" means: (i) the labor, time, or effort of a contractor; and (ii) any product or report necessarily associated with the rendering of a service." SFP § 11-101(t)(1). The term "includes services provided by attorneys, accountants, physicians, consultants, and other professionals who are independent contractors" but "does not include (i) construction related services; (ii) architectural services; (iii) engineering services; or (iv) energy performance contract services." SFP § 11-101(t)(2)-(3).

construction,[29] construction related services,[30] architectural services,[31] engineering services,[32] or services provided under an energy performance contract," and states that the term "includes the solicitation and award of procurement contracts and all phases of

---

[29] "Construction" is defined as "the process of building, altering, improving, or demolishing an improvement to real property." SFP § 11-101(e)(1). The term "includes any major work necessary to repair, prevent damage to, or sustain existing components of an improvement to real property" but "does not include the maintenance or routine operation of an existing improvement to real property, or activities related to an energy performance contract." SFP § 11-101(e)(2)-(3).

[30] "Construction related services" is defined as "feasibility studies, surveys, construction management, construction inspection, and similar efforts associated with construction or the acquisition of public improvements as defined in § 4-401(d) of this article." SFP § 11-101(f)(1). "Construction related services" does not include services provided in connection with an energy performance contract. SFP § 11-101(f)(2).

[31] "Architectural services" is defined as "professional or creative work that: (i) is performed in connection with the design and supervision of construction or landscaping; and (ii) requires architectural education, training, and experience." SFP § 11-101(b)(1). The term "includes consultation, research, investigation, evaluation, planning, architectural design and preparation of related documents, and coordination of services that structural, civil, mechanical, and electrical engineers and other consultants provide," but "does not include construction inspection services or services provided in connection with an energy performance contract for structural, mechanical, plumbing, or electrical engineering." SFP § 11-101(b)(2)-(3).

[32] "Engineering services" is defined as "professional or creative work that: (i) is performed in connection with any utility, structure, building, machine, equipment, or process, including structural, mechanical, plumbing, electrical, geotechnical, and environmental engineering; and (ii) requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences." SFP § 11-101(i)(1). The term "includes consultation, investigation, evaluation, planning, design, and inspection of construction to interpret and ensure compliance with specifications and design within the scope of inspection services." SFP § 11-101(i)(2).

37

procurement contract administration." SFP § 11-101(m). Subtitle 2 of Title 15 of the Procurement Code sets forth the statutory remedies for "dispute resolution" involving procurements under the Procurement Article.

The Procurement Code's general requirements are subject to many exceptions. For example, certain agencies are not subject to the State's general procurement laws. *See, e.g.*, *Building Materials Corp. of America v. Bd. of Educ. of Baltimore Cnty.*, 428 Md. 572, 576, 53 A.3d 347, 349 (2012) (noting that local schools boards are not subject to the State's general procurements laws). Procurement by those agencies are governed generally by other State statutes. *See, e.g.*, Md. Code (1978, 2008 Repl. Vol.), Education Article § 5-112 (requiring local school boards to comply with competitive bidding procedures in certain circumstances). The Executive Branch is permitted to enter contracts, which do not fall within the definition of a "procurement contract," without compliance with the aforementioned provisions, but which are subject sometimes to other restrictions. One example, which is relevant for purposes of this appeal, is SFP § 10-305, which provides that, subject to certain exceptions not pertinent here, "any real or personal property of the State or a unit of the State government may be sold, leased, transferred, exchanged, granted, or otherwise disposed of" to "any person . . . for a consideration the Board [of Public Works] decides is adequate." SFP § 10-305(a)(1). Additionally, certain types of transactions (none of which are relevant here) are exempted from the procurement law altogether. *See* SFP § 11-203(a).

In the present case, the State issued a RFQ to solicit a "Master Developer" to carry-out the State Center Project. The State asserts that the Project—and its solicitation

38

and formative contracts—were not subject to the Procurement Law because the transaction was principally a transfer of an interest in real property. According to the State Agencies, a RFQ was used as the initiating mechanism in light of the anticipated need for continued cooperation between the Developers and the State over the course of a multi-phase development. The MDA, First Amendment, and ground and occupancy leases were entered into by the parties according to the envisioned plan as described in the RFQ. Future occupancy leases would be awarded via the "sole source" authority pursuant to SFP § 13-107.

Appellees counter that the term "RFQ," a term which does not appear in SFP Division II, is not a competitive source selection procedure. They argue that this approach was improper because the "essence" of the transaction was not the transfer of interests in real property, but the construction of the State Center complex for state offices. Moreover, according to Appellees, the "swap-out" of the members of the original Developers' group, State Center, LLC, in 2009 and 2010, was a material change that required competitive source selection, under SFP Division II, of new members of the Developers for the Project. Lastly, Appellees aver that the State "may not manufacture the conditions that give rise to a sole source and then claim that there is only one vendor capable of performing the task."

In challenging these aspects of the Project, Appellees did not challenge in their Original Complaint the RFQ because "it was not a binding development agreement for the Project." Instead, they waited until late 2010 to challenge the "swap-out" of the members of the Developers' group, as well as the MDA, the First Amendment, two

39

ground leases, four occupancy leases, and the future occupancy leases—all in a fell swoop. This approach triggers an additional level of analysis because, for each issue, we must decide whether we view the issue in light of the "essence" of the entire State Center Project or as individual challenges to each binding document. As will be seen later in this opinion, the appropriate approach depends on which challenge we are analyzing.

We address first the claims by the State Agencies that, because the Legislature established an administrative agency (the Maryland State Board of Contract Appeals) to review protests relating to procurement contracts, Appellees were required to exhaust the available statutory administrative remedies. Because the Appellees failed to do so here, the State Agencies argue, they lacked the ability to prosecute their claims before the Circuit Court. Next, we shall address the State Agencies' contention that Appellees lack the right to bring their claim to the Circuit Court because they have no private right of action. Based on our disposition of these points, we move to addressing those predicates, as claimed by Appellees' complaint, that they have the right to maintain their claims under the property owner standing and/or taxpayer standing doctrines.

### 2. *Are the statutory administrative remedies really "available" here?*

One ground upon which a claimant may seek to redress an alleged wrong is through an administrative process, if one is provided to the claimant by the Legislature.

> "A claimant ordinarily must seek to redress the wrong of which he complains by using the statutory procedure the legislature has established for that kind of case, if it is adequate and available, and that if he is unsuccessful and wishes aid from the courts, he must take judicial appeals in the manner the legislature has specified rather than by seeking to invoke the ordinary general jurisdiction of the courts. . . . Consequently, we have

40

consistently held that where a special form of remedy is provided, the litigant must adopt that form and must not bypass the administrative body or official, by pursuing other remedies."

*Maryland Comm'n on Human Relations v. Mass Transit Admin.*, 294 Md. 225, 231, 449 A.2d 385, 388 (1982) (internal brackets omitted) (quoting *Prince George's Cnty. v. Blumberg*, 288 Md. 275, 283-84, 418 A.2d 1155, 1160 (1980)).

In the present case, the State Agencies argue that Appellees' Procurement Code claims fall under the exclusive jurisdiction of an administrative agency, the Maryland State Board of Contract Appeals, or the "Appeals Board" as the Code sometimes refers to it. *See, e.g.*, SFP § 15-201 ("'Appeals Board' means the Maryland State Board of Contract Appeals"). Section 15-211(a)(1) of the State Finance and Procurement Article provides that "[t]he Appeals Board shall have jurisdiction to hear and decide **all appeals** arising from the final action of a unit . . . **on a protest relating to the formation of a procurement contract** . . . ." (Emphasis added.) The State Agencies argue that, because Appellees' claims on-their-face "relat[e] to the formation of a procurement contract," the General Assembly provided an explicit and exclusive remedy through the administrative appeal process of the Appeals Board for the violations alleged. Because Appellees failed to exhaust this exclusive remedy, the State Agencies aver that Appellees lacked the ability to bring this suit in the Circuit Court.

In response, Appellees plead ineligibility to file a protest with the Appeals Board. Therefore, the Appeals Board could not entertain their claims. Accordingly, they are not required to exhaust the administrative remedy alleged by the State Agencies because that road was closed to them.

41

The Circuit Court found that "[w]hile it is arguable that Plaintiffs' complaint may be in the nature of a 'protest,' given that Plaintiffs are not prospective bidders or offerors, or bidders or offerors, they would not be entitled to submit such a protest to the Appeals Board." Further, the Circuit Court reasoned that, "the absence of a procurement contract arguably precludes the submission of a contract claim." The Court explained,

> With regard to a contract claim, the Board clearly has jurisdiction over disputes arising out of performance, breach, modification or termination of a procurement contract. Plaintiffs allege that certain contracts and/or agreements entered into by the State were not made in accordance with procurement law. Arguably, Plaintiffs take issue with the *formation* of these contracts, to which they are not a party. Therefore, it appears that this is not the type of "contract claim" contemplated to be within the Board's jurisdiction.

The Circuit Court concluded that, "[u]pon review of [SFP] §§ 15-215, 217 and COMAR 21.02.02.02, . . . [the] Plaintiffs are not required to bring their claims before the Maryland State Board of Contract Appeals."

In reviewing whether the Circuit Court denied properly the State Agencies' Motion to Dismiss, we "assume the truth of, and view in a light most favorable to the non-moving party, [Appellees,] all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them . . . ." *RRC Ne., LLC*, 413 Md. at 643, 994 A.2d at 433 (citations omitted). Dismissal is proper "only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted." *Id.* (citations omitted). Upon appellate review, the trial court's decision to

42

grant or deny such a motion is analyzed to determine whether the court was legally correct.

We conclude that the Circuit Court's denial of the Motions to Dismiss was correct as a matter of law. In deference to the Legislature, we hold consistently that "'[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy.'" *Laurel Racing Ass'n v. Video Lottery Facility Location Comm'n*, 409 Md. 445, 461, 975 A.2d 894, 904 (2009) (quoting *State v. State Bd. of Contract Appeals & Law Offices of Peter G. Angelos*, 364 Md. 446, 457, 773 A.2d 504, 510 (2001)). We have held that the Appeals Board, under Title 15 of the State Finance and Procurement Article, has either primary or exclusive jurisdiction. *Peter G. Angelos*, 364 Md. at 457, 773 A.2d at 510-11 (citing *Driggs Corp. v. Md. Aviation*, 348 Md. 389, 406-08, 704 A.2d 433, 442-43 (1998)); see *also Laurel Racing Ass'n*, 409 Md. at 460-65, 975 A.2d at 903-06 (examining a number of cases in which this Court has so held). "Consequently, a party must exhaust the administrative remedy and obtain a final administrative decision by the [Appeals Board] before resorting to the courts." *Laurel Racing Ass'n*, 409 Md. at 460, 975 A.2d at 903.

This requirement for exhaustion of administrative remedy applies, however, only if the Appeals Board has jurisdiction of the claim under scrutiny. Where there is no statutory basis for the Appeals Board's jurisdiction over a claim, the Appeals Board may not entertain the claim. *See, e.g.*, *MFE Inc.*, 345 Md. at 104-05, 691 A.2d at 685 (holding that, because the Procurement statutes did not include governmental agencies in the list of

43

those parties who could appeal the final action of a unit, the Appeals Board lacked subject matter jurisdiction over the governmental agency's claim relating to a procurement contract). Where the jurisdiction of the administrative agency is an issue, the court must determine "whether, under all of the circumstances, the parties are entitled to a judicial decision concerning the nature of the contract prior to a final decision by the [Appeals Board]." *Peter G. Angelos*, 364 Md. at 457, 773 A.2d at 510. We have required the courts to "await a final decision by the agency before reviewing the matter unless the administrative agency is *palpably without jurisdiction*." *MFE Inc.*, 345 Md. at 104-05, 691 A.2d at 685 (quoting *Peter G. Angelos*, 364 Md. at 458, 773 A.2d at 511) (internal quotation marks omitted). Thus, we are tasked here with determining whether, under the SFP, the Appeals Board was "palpably without jurisdiction" with regard to Appellees' claims.

*Peter G. Angelos* provides instructive guidance for our analysis. In that case, a fee dispute arose out of a contract between the Office of the Maryland Attorney General and a private law firm, pursuant to which the firm represented the State in tobacco litigation. The firm filed three separate contract claims to the Attorney General, who denied all three claims. The firm appealed administratively the Attorney General's denials to the Appeals Board. The Attorney General argued that the contract was not a procurement contract and, thus, the Appeals Board had no jurisdiction.

Prior to any action by the Board, the State and the Attorney General filed in the Circuit Court for Baltimore City a complaint seeking an injunction and a declaration that the Board had no jurisdiction. The firm intervened. Additionally, the State and the

44

Attorney General filed a motion with the Appeals Board to dismiss the Firm's appeal to the Board for lack of jurisdiction. The Appeals Board determined that the disputed contract was subject to the Procurement Code and denied the motion. Thus, at the time the judicial appeal was heard, the administrative action was pending before the Board.

While the primary question on appeal was "whether the Attorney General's authority to hire private legal counsel is subject to Maryland's general procurement law," *Peter G. Angelos*, 364 Md. at 450, 773 A.2d at 506, this Court noted that "the more appropriate question is whether, under all of the circumstances, the parties are entitled to a judicial decision concerning the nature of the contract prior to a final decision by the Board of Contract Appeals." *Id.*, 364 Md. at 457, 773 A.2d at 510. We concluded that, "[r]egardless of how the 'procurement contract' issue is ultimately resolved, it is obvious that the [Appeals Board] is not 'palpably without jurisdiction.'" *Id.*, 364 Md. at 458, 773 A.2d at 511. We found that "[w]hile [the disputed contract] may or may not technically be a 'procurement contract' within the meaning of the state procurement law, the issue is obviously a **reasonably debatable one**." *Id.* (emphasis added). Because the parties' dispute on this point was "reasonably debatable," we concluded that, "[a]s the agency charged with making final administrative adjudications under the procurement law, the [Appeals Board's] determination of the issue, embodied in a final decision by the Board, would be helpful prior to a judicial resolution of the issue." *Id.*

In the present case, whether the formative enforceable contracts of the Project are "procurement contracts" is "reasonably debatable." Thus, if that were the only element of the Appeals Board's jurisdiction requiring consideration, then we would resolve that

45

the Appeals Board was not "palpably without jurisdiction" and the Circuit Court was required to await a final decision of the Appeals Board prior to issuing any judicial decision. The analysis, however, does not end there.

Section 15-211(a)(1) of the SFP provides, in pertinent part, that "[t]he Appeals Board shall have jurisdiction to hear and decide **all appeals arising from the final action of a unit** . . . on a protest relating to the formation of a procurement contract . . ."[33] (emphasis added). Under the Procurement Law, however, the ability to obtain a "final action of a unit" from which to appeal is limited to certain persons. As a prerequisite to obtaining a "final action of a unit," a person must file first a protest under SFP §§ 15-217. Only certain persons may file a protest, however. As SFP § 15-220(a) provides,

> Except for a contract claim related to a lease for real property, a **bidder or offeror, a prospective bidder or offeror, a unit, or a contractor** may appeal the final action of a unit to the Appeals Board.

SFP § 15-220(a) (emphasis added). Therefore, a person who is not "a bidder or offeror, a prospective bidder or offeror, a unit or a contractor" may not appeal the final action of a unit to the Appeals Board.

The Circuit Court found that none of the Plaintiffs/Appellees in this case was "a bidder or offeror, a prospective bidder or offeror, a unit or a contractor" to the challenged

_____

[33] Section 15-211(b) of the same article states that a "decision of the Appeals Board is final, subject to any judicial review." *See also* COMAR 20.10.01(a). Under SFP § 15-223(a), a "decision of the Appeals Board is subject to judicial review in accordance with Title 10, Subtitle 2 of the State Government Article," the Maryland Administrative Procedure Act. *See also* COMAR 20.10.01(b).

46

contracts and, thus, could not appeal the final action of the relevant unit to the Appeals Board. Both in the trial court and on appeal, the State Agencies latch onto the fact that "[i]n [Appellees'] first Complaint, the [Appellees] themselves alleged they were 'excluded from the bidding process' for the State Center contract. The [Appellees] further contended that they were 'ready, willing, and able to submit proposals to lease [to the State] comparable office, retail and parking space . . . on terms that are more favorable' than those the State agencies allegedly are receiving from the defendant State Center, LLC." The State Agencies aver that "[a]fter reviewing the defendants' first motion to dismiss—explaining the indisputable legal requirement timely to initiate and then to exhaust administrative remedies, the plaintiffs attempted to cleanse such suggestions from their complaint." The State Agencies, citing *MEMC Electronic Materials, Inc. v. BP Solar International, Inc.*, 196 Md. App. 318, 9 A.3d 508 (2010), for the proposition that "a prior complaint is 'an admission,'" urge that Appellees "cannot walk away from prior allegations through pleading amendments." Moreover, the State Agencies contend that "[Appellees'] disagreement amongst themselves—between their first complaint and amended complaint—demonstrates that their status as prospective bidders is 'reasonably debatable.'" Thus, in the State's view, because "[i]f a question determining the Board's jurisdiction is 'reasonably debatable,' it must be submitted to the Board first," the Circuit Court "erred by resolving the question itself."

We disagree with the State Agencies' interpretation of precedent on the effect of amended pleadings. In *MEMC*, the Court of Special Appeals restated the well-established principle that "[f]or pleading purposes, an amended complaint that does not

47

incorporate or otherwise reference a prior complaint supersedes prior complaints and becomes the operative complaint." 196 Md. App. at 348, 9 A.3d at 526 (citing *Shapiro v. Sherwood,* 254 Md. 235, 239, 254 A.2d 357, 359 (1969)).  The intermediate appellate court went on to recognize that "[t]his does not necessarily mean, however, that the contents of a superseded pleading may not be admissible in evidence as an admission or for purposes of impeachment." *Id.*  The court explained, "[a]s is true with all questions of admissibility, . . . the admissibility of complaints has to be determined on a case by case basis, after due consideration of relevance, potential prejudice, and any rule of exclusion that might be applicable to specific content." *Id.*  The court found, in that case, "the [circuit court's] ruling [to not admit the contents of a superseded pleading into evidence] was within the trial court's discretion." *MEMC*, 196 Md. App. at 349, 9 A.3d at 526.

Applying those principles to the present case, we conclude that the Circuit Court's ruling that Appellees were not debatably "bidders or offerors" or "prospective bidders or offerors,"[34] despite the allegations in the Original Complaint, was correct and made

---

[34] The Circuit Court considered Appellees' claims as aimed at the "challenged contracts" generally.  We agree to the extent that the "challenged contracts" included the MDA, the First Amendment, and the Phase I ground leases.  With regard to the Phase I and future occupancy leases, however, we note that there could be "reasonable debate" whether Appellees, as owners of assertedly competitive commercial office space, parking facilities, and retail space, were capable of characterization as "prospective bidders." Thus, Appellees may qualify as a "prospective bidder" for some *aspects* of the State Center Project.  The State, however, did not seek bids for the individual aspects of the State Center Project.  Rather, it sought a developer to manage *all* of the aspects. Appellees were unqualified as a group or individually for the solicited "Master

(Continued…)

48

properly by the court. The Amended Complaint superseded the Original Complaint. Moreover, the allegations in the Amended Complaint did not contradict outright those in the Original Complaint. Both Complaints averred that the Developers were procured illegally and that the negotiations and modifications since then constituted additional illegality.[35] Thus, in viewing the facts in a light most favorable to the non-moving party (Appellees), we view the Complaint as the Circuit Court did and conclude that Appellees (as a group or individually) were ineligible to submit a response to the RFQ seeking to be selected as Master Developer.

Because we agree with the Circuit Court that none of the Appellees were "a bidder or offeror, a prospective bidder or offeror, a unit or contractor," we conclude that the Appeals Board lacked jurisdiction over their claims advanced in this litigation. Because the Appeals Board was "palpably without jurisdiction" over Appellees' claims, Appellees were not required to exhaust any administrative remedy in this case and the propriety of the Circuit Court's consideration of their claims depended solely upon whether the court had jurisdiction otherwise. *See Schley v. Lee*, 106 Md. 390, 403-04, 67 A. 252, 257-58 (1907) (finding that, where the taxpayer could not avail himself of the right of appeal of an unlawful assessment to the Comptroller and Treasurer, which was given to the

---

(…continued)
Developer" designation and, thus, ineligible to submit a response. Thus, we conclude that Appellees were not prospective bidders for the RFQ as issued.

[35] For these reasons, we rely on the Amended Complaint throughout the remainder of this analysis.

corporation, but that which would have a serious loss and injury upon the taxpayers of the country through the consequent reduction of the basis of taxation for county purposes, the taxpayer had a right to relief in equity by injunction to restrain the proposed unlawful act of the public official).

### 3. *Private Right of Action*

The State Agencies argued that Appellees lacked the right to bring their claims before the Circuit Court because the Procurement Code that forms the foundation of Appellees' complaint did not create a private right of action by which they could avoid the administrative authority, and that taxpayer standing is not a substitute. We note first that, as explained further below, whether a private right of action exists for Appellees to bring *any* procurement claim to the Circuit Court is a different question than whether taxpayer standing doctrine permits Appellees to bring *their* procurement claims to the Circuit Court.

Preliminarily, we address the propriety of addressing these issues because Appellees urge this Court, in their Motion to Dismiss, to dismiss that portion of the State's brief to this Court devoted to the argument of an asserted absence of a private cause of act under the Procurement Law because it was not preserved in the Circuit Court and it was not presented properly to this Court in the Petition for Writ of Certiorari. In reviewing the lengthy record extract, we find that the State Agencies and Developers argued extensively that the administrative remedies provided in the Procurement Law are the sole remedies available for "all disputes arising under a contract with any State agency . . ." and that, because no other private right of action existed, Appellees could not

50

bring their claims to the Circuit Court. Moreover, the Developers argued, albeit briefly, in their Reply in Support of their Motion to Dismiss, filed on 9 March 2011, that taxpayer standing did not provide a substitute path to the Circuit Court. *See* Reply in Support of [their] Motion to Dismiss Amended Complaint, at 9 ("The [Appeals Board] thus has primary jurisdiction over Plaintiffs' claims, regardless of their status as protestors or taxpayers.").

Moreover, the questions presented in the State's Petition for Writ of Certiorari focused on whether the Circuit Court lacked jurisdiction because the claims fell within the primary or exclusive jurisdiction of the Appeals Board and did not address explicitly the alleged lack of a private right of action. Despite this focus, we find that these issues are more properly labeled as sub-issues of the questions presented in the Petition for Writ of Certiorari and, thus, are included properly.

Because the State Agencies and Developers touched upon both of these arguments before the trial judge in their Motions to Dismiss and we find the private right of action argument fairly to be a sub-part of the questions presented in the Petition for Writ of Certiorari, we find that it would be proper for us to address them, but nonetheless we do not reach the merits ultimately. In this section of the opinion, we address solely the State Agencies' argument that a private right of action does not exist for Appellees to bring any procurement claim to the Circuit Court. Later, as part of our consideration of taxpayer standing, we address whether that doctrine permits Appellees to bring their procurement claims to the Circuit Court.

51

A private right of action is a basis upon which a claimant may bring a claim.  In the past, this Court addressed this basis for standing when a plaintiff alleged standing specifically on this ground.  We held repeatedly that, for purposes of standing, the claimant alone is responsible for raising the grounds for which his right to access to the judiciary system exists.  *See, e.g.*, *Kendall*, 431 Md. at 607-08, 66 A.3d at 694 (refusing to address taxpayer standing because petitioners did not assert it).  Because Appellees insist that an implied private right of action is not the basis for their standing, we do not address further the argument.

### 4. *Property Owner & Taxpayer Standing Doctrines*

Two additional doctrines permit a property owner or tax-paying inhabitant to bring a claim where his, her or its proprietary interests are injured by an alleged *ultra vires* or illegal governmental act.  These doctrines are unique in that, essentially, where conferred upon a complainant, the doctrines provide the "cause of action" standing sufficient for justiciability.  In other words, these doctrines, when asserted properly, provide both the cause of action (or claim) and the right of the individual to assert the claim in the judicial forum.  Moreover, both doctrines provide avenues for a complainant to challenge what may be termed as a "public wrong," the allegedly unlawful actions of the government.  As Professor Jaffe explained, the line distinguishing a "public" and "private" right is fuzzy at best:

> Let us denominate the two types of suit broadly as "public" and "private," although the line between the two cannot be conceived absolutely. The plaintiff in asserting a "public right" may be a person who is affected no differently from any other person. This would be the broadest possible category of potential plaintiffs. A shade narrower is the category of

52

"citizen"; and the category of "taxpayer" will include some who are and some who are not "citizens." Yet an action by any of these can properly be thought of and evaluated as a public action. As the class grows smaller, a member of it will be more particularly affected; quite apart from the availability of a public action, he may be able to bring himself within the class of persons entitled to protest an interference with their "rights" or "interests." The difficulty involved in drawing a line between the two types may be one argument against any distinction based on the plaintiff's degree of involvement.

Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265, 1267 (1961).

In light of the "public" nature of the alleged wrongs under these doctrines, it is important to remember that the general rule that "'. . . where the duty about to be violated by the corporation or its officers is public in its nature, and affects all of the inhabitants alike, that one not suffering any special injury cannot in his own name or by uniting with others maintain a bill to enjoin it'" still applies in both of these doctrines. *Kelly v. City of Baltimore*, 53 Md. 134, 141 (1880)[36] (quoting 2 Dillon, *Municipal Corporations* § 736 (1872)). Accordingly, under each of the doctrines, the complainant must have a special interest in the subject-matter of the suit distinct from that of the general public.

The implication of this requirement is that a major component of each of the doctrines is the definition of a sufficient "injury" to confer standing upon a complainant. While these doctrines share such basic similarities, the requisites for a sufficient "standing" differs, such that each doctrine has a set of its own requisites. Thus, a

---

[36] *Kelly* was decided upon the basis of taxpayer standing doctrine, but recognized a similar right to challenge allegedly illegal municipal actions based on property ownership. 53 Md. at 141.

taxpayer who owns property within a municipality or other governmental district (such as a State) may allege a sufficient injury to bring suit for an illegal or *ultra vires* municipal act under the taxpayer standing doctrine, but not under the property owner standing doctrine, or vice versa.

Despite the differences, complainants who allege property owner standing will assert, and often successfully establish, taxpayer standing as well. The overlapping nature of these doctrines has led this Court to issue many opinions addressing both of these doctrines in a somewhat convoluted, mixed result manner. Such an approach, which, at times, suggests that the requirements to establish the applicability of each doctrine blend together, has led to some confusion. As discussed below, however, each doctrine has separate requirements. When a complainant alleges standing under both doctrines, the issues related to each doctrine should be analyzed separately, even if this renders repetitive portions of the discussion of the facts.

### a. Property owner standing

The property owner standing doctrine recognizes that owners of real property may be "specially harmed" by a decision or action (usually related to land use) in a manner different from the general public. The basis of this type of "standing" is found in the zoning law concept of "special aggrievement," which stems, in turn, from the State's statutory zoning laws. Recently, in *Ray v. Mayor of Baltimore*, 430 Md. 74, 59 A.3d 545 (2013), we analyzed who qualifies as a "person aggrieved" for purposes of standing for judicial review of a planned unit development ("PUD") ordinance, under Md. Code (1957, 2010 Repl. Vol.), Article 66B, § 2.09(a)(1)(ii), which provided:

(a) *Who may appeal; procedure.*–(1) An appeal to the Circuit Court of Baltimore City may be filed jointly or severally by any **person**, taxpayer, or officer, department, board, or bureau of the City **aggrieved** by:
   (i) A decision of the Board of Municipal and Zoning Appeals; or
   (ii) A zoning action by the City Council.

430 Md. at 80, 59 A.3d at 549 (emphasis added in *Ray*) (quoting Md. Code (1957, 2010 Repl. Vol.), Art. 66B, § 2.09(a)(1)(ii)).  The *Ray* Court described a "person aggrieved" by the decision of a board of zoning appeals as:

"one whose personal or property rights are adversely affected by the decision of the board.  The decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is **personally and specially affected in a way different from that suffered by the public generally**."

430 Md. at 81, 59 A.3d at 549 (emphasis added in *Ray*) (quoting *Bryniarski v. Montgomery Cnty. Bd. of Appeals*, 247 Md. 137, 144, 230 A.2d 289, 294 (1967)).

*Ray* continued to summarize a long line of cases analyzing the zoning law concept of an "aggrieved person."  Guiding this precedent are the roots of the concept which is found in the laws pertaining to the tort action of public nuisance.[37]  *Ray*, 430 Md. at 82,

---

[37] In *Ray*, this Court summarized the distinction between a public and a private nuisance as follows:

A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 80, 642 A.2d 180, 190 (1994) (internal citation and quotation marks omitted). A public nuisance is a "nuisance[ ] which ha[s] a common effect and produce[s] a common damage." *Burley v. Annapolis,* 182 Md. 307, 312, 34 A.2d 603, 605 (1943).

430 Md. at 82 n.5, 59 A.3d at 550 n.5.

59 A.3d at 549-50 (citing 4 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 63:14 (2012)).  As we cited in *Ray*,

> The "special damage" rule was an outgrowth of the law of public nuisance. **Inasmuch as a public nuisance was an offense against the state and, accordingly, was subject to abatement on motion of the proper governmental agency, an individual could not maintain an action for a public nuisance unless he suffered some special damage from the public nuisance**.

430 Md. at 82, 59 A.3d at 549 (emphasis added in *Ray*) (internal brackets and quotation marks omitted) (quoting Ziegler, *supra*, § 63:14).  "Without the special damage, 'a private citizen has no standing to champion the right of the public in abating a public nuisance.'"  *Ray*, 430 Md. at 82, 59 A.3d at 549-50 (quoting Zeigler, *supra*, § 63:14 n.1).  Similarly, in the property owner standing doctrine, unless the complainant alleges sufficient "special aggrievement," the complainant has no standing to challenge the act, but rather is merely "generally aggrieved," in a similar manner as the rest of the public.[38]

With this background in mind, a long line of cases in this State developed principles governing property owner standing in Maryland to be used to analyze who qualifies as a "person aggrieved" for purposes of standing for judicial review of zoning ordinances and regulations.  *See Ray*, 430 Md. at 80-87, 59 A.3d at 548-52 (summarizing the governing principles).  Before considering these principles here, however, we must determine first whether the principles, which were limited traditionally to judicial review

---

[38] When analyzing the distinction between "special aggrievement" and "generalized aggrievement," because of these roots, courts "call upon the law of nuisance for enlightenment."  *Ray*, 430 Md. at 82, 59 A.3d at 549-50.

of the decisions of zoning bodies (and nuisance actions), apply in this case, in which the Circuit Court exercised jurisdiction over claims involving the Project. Because we conclude that the present case is a kind of "land-use decision" or action susceptible to these principles, we analyze the applicable principles governing the concept of "special aggrievement" further and determine that they do not confer standing upon Appellees in this case.[39]

> ### i.      *Whether property owner standing doctrine applies here?*

As a preliminary matter, the State Agencies aver (briefly) in their brief that the property owner standing doctrine is inappropriate altogether to the type of challenge mounted in this case. According to the State Agencies, property owner standing is available only to challenges of pure-bred land-use decisions, such as zoning and nuisance claims. Because this case does not involve such a land-use decision, the State Agencies

---

[39] It is important to remember that

> [t]he status of a person to appeal as a 'person aggrieved' is to be distinguished from the result on the merits of the case itself. In determining status to appeal, the question is whether the property owner may reasonably be thought to be specially damaged if the application [or other "land-use decision" or action] is approved. Testimony may be taken on the point by the trial court. If, on the merits, the board acted properly . . . , the protesting property owner is not damaged in law, however much he may be damaged in fact. His damage is then damnum absque injuria. Because the result on the merits might be adverse, however, does not mean that the protestant would not have status to challenge the board's [or other governmental agency's] action.

*Bryniarski*, 247 Md. at 145-46, 230 A.2d at 295 (internal citation omitted).

aver that this species of standing cannot support a claim grounded on the Procurement Law. Appellees counter that this argument is meritless because this Court provided property owner standing to challenge an *ultra vires* Baltimore City development project in *120 West Fayette Street, LLLP v. Mayor of Baltimore*, 407 Md. 253, 270-72, 964 A.2d 662, 671-73 (2009) ("*Superblock I*").[40]

As previously mentioned, the principles of property owner standing in Maryland stem from the State's statutory zoning laws, which grant an "aggrieved person" the right to challenge many zoning actions. *See Ray*, 430 Md. at 80-81, 59 A.3d at 548-90 (analyzing the definition of an "aggrieved person" under the then-current zoning enabling statute, Md. Code (1957, 2010 Repl. Vol.), Article 66B, § 2.09(a)(1)(ii)); *Bryniarski*, 247 Md. at 143-44, 230 A.2d at 294 (analyzing the definition of a "person aggrieved" under the then-current zoning law, Md. Code (1957, 1965 Cum. Supp.), Article 66B, § 7(j)).[41] Although the zoning laws serve as the origin of these principles governing the "special aggrievement" requirement, we held in *Superblock I* that these principles permit eligible plaintiffs to invoke the jurisdiction of the courts to challenge a greater variety of "land use decisions" and actions than thought to be the case previously. *Superblock I*, 407 Md. at 270-73, 964 A.2d at 671-73. In *Superblock I*, we explained,

---

[40] Appellees urge additionally that this Court should not address this argument because the State Agencies "do not develop, and therefore waived, the argument." We exercise our discretion, as authorized under Maryland Rule 8-131, to address this issue because the record is adequate to that end.

[41] Although the language in the zoning statute has been amended on several occasions, the phrase a "person aggrieved" "has remained constant throughout the evolution of the statute." *Ray*, 430 Md. at 81 n.4, 59 A.3d at 549 n.4.

Because "land use . . . is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned," *Master Royalties v. Balto. City*, 235 Md. 74, 92, 200 A.2d 652, 661 (1964), we conclude that the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging a municipalities' [sic] allegedly illegal avoidance of urban renewal and procurement ordinances.

*Id.* (citations omitted). We held that "120 West Fayette had standing to challenge the legality of the City's entry into a Land Disposition Agreement (LDA) to sell to Lexington Square Partners, LLC (Lexington Square) property in the Superblock," an urban redevelopment area in downtown Baltimore. *120 West Fayette St., LLLP v. Mayor of Baltimore*, 426 Md. 14, 43 A.3d 355 (2012) ("*Superblock III*") (citing *Superblock I*, 407 Md. at 258, 964 A.2d at 664-65).

This holding of *Superblock I* was limited, however, when we addressed the same issue in the third iteration of the Superblock project litigation. In round three of the Superblock project litigation, 120 West Fayette asserted, *inter alia*, that *Superblock I* provided it with the grounds for legal standing under its facts. *Superblock III*, 426 Md. at 25-26, 43 A.2d at 362. The Court rejected that argument and, first, found *Superblock I* "fundamentally distinguishable":

In essence, 120 West Fayette claimed **a violation of a law** in *Superblock I,* but claims in the instant case **the breach of a contractual provision**. The distinction renders inapposite the holding of *Superblock I,* extending tax-payer and adjoining landowner standing to a party alleging a violation of an urban renewal ordinance.

*Superblock III*, 426 Md. at 27-29, 43 A.3d at 363-64 (emphasis added). Next, the *Superblock III* Court explained why the property owner standing principles did not apply

59

in that case to confer standing, namely, the challenged execution of the Memorandum of Agreement (MOA) was not a land use action. The Court stated that, "[g]enerally defined, a land use decision is a decision (typically an ordinance or regulation) enacted or promulgated by a legislative or administrative body for the purpose of directing the development of real estate." *Id.* The majority found, in that case, that the "MOA … is not an ordinance, variance or permit. Furthermore, the MOA binds only two parties (as opposed to the general public). The MOA was not enacted by a legislative or administrative body." *Superblock III*, 426 Md. at 33, 43 A.3d at 366. Most importantly, the Court found that the "the MOA does not direct the use or development of real estate in the Superblock," even though the MOA purported to vest the Historic Trust with the authority to control demolition of regulated structures in a historic area. *Id.* The statute which established the Trust and described its responsibilities did not empower the Trust to direct the development of real estate, but rather required a State unit that issues permits or licenses for demolition to "cooperate" with the Trust by providing it with notice and consulting with it before taking any final action to permit demolition. *Superblock III*, 426 Md. at 33-35, 43 A.3d at 366-68. Thus, the majority concluded that the MOA was not a land use decision or action and, therefore, "120 West Fayette cannot rely on the principles that extend standing to an adjoining landowner in review of land use decisions." *Superblock III*, 426 Md. at 35, 43 A.3d at 368.

In the present case, unlike the three *Superblock* cases, each of which challenged an individual aspect of the Superblock Project, Appellees challenged the MDA, the First Amendment, the ground and occupancy leases, as well as the State's commitment to

60

future leases. Thus, we must divide our analysis to determine whether each of these contracts is a "land use decision" or action subject to being challenged under the property owner standing doctrine. In so doing, we conclude, for the purpose of property owner standing analysis, that the MDA and the First Amendment are "land use decisions" or actions, but the occupancy and ground leases (present and future) are not.

In regards to the MDA and the First Amendment, although not traditional land use regulations or ordinances, these formative contracts to the Project govern the development of real estate at the State Center. *See Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 687-88, 46 A.3d 473, 504 (2012), *aff'd on other grounds*, 432 Md. 292, 68 A.3d 843 (2013) (concluding that "[a]lthough not a traditional land-use regulation, the [challenged] program[, which] provides a financial incentive to landowners to voluntarily restrict their land to agricultural and woodland use rather than commercial, industrial, or residential use," is a "land use decision" under *Superblock I*). As in *Superblock I*, land use is patently one of "the prime considerations" in the urban renewal project at the State Center and its formative documents and agreements intend to bind the general public to the Project with the Developers. *See Superblock I*, 407 Md. at 272, 964 A.2d at 673. Moreover, Appellees' complaint alleges a violation of the Procurement Law, not of any contractual obligations between two parties.[42] Thus,

---

[42] The Amended Complaint relied on language in the MDA, which suggested that it could have been within the ambit of *Superblock III*. *See* Amended Complaint, at ¶ 166 ("The MDA, at ¶2.4, required that '[a]ll space leased by the State will be in accordance with standard State procurement practices . . . ' The State failed to do so."). Despite this single statement, though, the gravamen of the Amended Complaint lay in the State's

(Continued…)

61

*Superblock I* extends to this case for the challenges to those contracts and "the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging a [Government's] allegedly illegal avoidance of . . . procurement ordinances [or statutes]." *Id.* (citations omitted).[43]

In contrast, however, the ground and occupancy leases do not constitute a "land use decision" or action for the same reasons set forth in *Superblock III*, 426 Md. at 27-29, 43 A.3d at 363-64. The ground and occupancy leases do not direct the development of any real property. Rather, they commit the State (in a similar manner as any lessee who enters into a lease) to lease the property once the development is accomplished. Thus, Appellees may allege, if they did, a claim under the property owner standing doctrine to challenge the MDA and the First Amendment, but not the ground or occupancy leases.[44]

> ii. *Whether Appellees alleged sufficient facts for "special aggrievement" to confer property owner standing?*

---

(…continued)
violations of the Procurement Code, not in the State's violation of the procedures set forth in the MDA.

[43] Appellees suggest that *Superblock I* may extend the principles of a "person aggrieved" in zoning cases to challenges of all *ultra vires* government projects. Such an extension misconstrues the limited holding of *Superblock I*, as clarified in *Superblock III*.

[44] Practically speaking, we acknowledge that, if the challenges to the MDA and the First Amendment were found valid by us and, thus, the voidance of those contracts affirmed, then the ground and occupancy leases fall as well. We treat these challenges in this initial analysis of standing separately for analytical purity.

62

Because we conclude that the principles governing property owner standing apply to Appellees' challenges to the MDA and the First Amendment, we apply those relevant principles to scrutinize what Appellees alleged to support such standing. First, we consider what constitutes "special aggrievement," as established in precedent interpreting the zoning version of a "person aggrieved." Then, we analyze whether Appellees' allegations in the Amended Complaint confer property owner standing upon them. In this analysis, Appellees need only allege sufficient facts that at least one of them qualifies as "specially aggrieved" because "'[w]here there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing.'" *Long Green Valley Ass'n*, 205 Md. App. at 652, 46 A.3d at 483 (quoting *Bd. of License Comm'rs v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990)).

We begin by reiterating a brief overview of the "special aggrievement" requirement, found largely in *Ray*'s recent and thorough discussion of this requirement. In discussing the "special aggrievement" principles, the *Ray* Court restated two general guiding principles:

> First, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie*, to be specially damaged and, therefore, a person aggrieved." [*Bryniarski*, 247 Md.] at 145, 230 A.2d at 294. Second, "[a] person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved . . . [unless] he meets the burden of alleging and proving . . . that his personal or property rights are specially and adversely affected." *Id.*, 230 A.2d at 295.

63

430 Md. at 81, 59 A.3d at 549 (some alterations in original). Beyond these general guiding principles, the standard for "what it means to be 'specially affected' or how one proves that his harm is different from the public harm . . . is flexible in the sense that it is based on a fact-intensive, case-by-case analysis." *Id.*

The *Ray* Court reviewed comprehensively the facts of prior cases discussing property owner standing and found that, in sum, "Maryland courts have accorded standing to challenge a rezoning action to two types of protestants: those who are *prima facie* aggrieved and those who are almost *prima facie* aggrieved." 430 Md. at 85, 59 A.3d at 551. The Court defined the first category of a "*prima facie* aggrieved" protestant as one whose "proximity makes him an adjoining, confronting, or nearby property owner." *Id.* Second, "[a] protestant is specially aggrieved when she is farther away than an adjoining, confronting, or nearby property owner, but is still close enough to the site of the rezoning action to be considered almost *prima facie* aggrieved, **and** offers 'plus factors' supporting injury." *Id.*, 430 Md. at 85, 59 A.3d at 551-52. Otherwise, "[o]ther individuals are generally aggrieved." *Id.*, 430 Md. at 85, 59 A.3d at 552.

In addition to the two types of protestants accorded standing by this Court previously, the *Ray* Court noted that "[d]icta in Maryland cases suggest a third, poorly-defined category of protestants with standing who, despite being 'far removed from the subject property,'" may be able nevertheless "to establish 'the fact that his personal or property rights are specially and adversely affected by the board's action.'" *Ray*, 430 Md. at 85-86, 59 A.3d at 552 (quoting *Bryniarski*, 247 Md. at 145, 230 A.2d at 295). Despite this observation, *Ray* found no instance in which the Court held that a person who was far

removed from the site of rezoning actually qualified as "specially aggrieved." *Id.*, 430 Md. at 86, 59 A.3d at 552. Now, having established the proper approach to our analysis of a claim mounted on the back of the property owner standing doctrine, we move on to the relevant allegations in this case and determine whether Appellees fit within any of the aforementioned categories of parties with standing.

*(1) Prima Facie Aggrieved Property Owners?*

First, we consider whether Appellees are "*prima facie* aggrieved" or, in other words, whether "[their] proximity makes [them] . . . adjoining, confronting, or nearby property owner[s]." *Ray*, 430 Md. at 85, 59 A.3d at 551. Appellees argue that the allegations in their Complaint that "they own or operate property, not only affected, but directly targeted, by the Project" were sufficient to qualify them as "*prima facie* aggrieved." Although Appellees acknowledge that, "[i]n prior cases the test for proximity has been measured by distance," they contend that "the test 'is not readily reduced to a set of rules,' [*Ray*, 430 Md. at 77, 59 A.3d at 547,] and in this case it should be a functional one." As Appellees see it, this case is unique, and unlike the PUD in *Ray*, because "the Project directly and uniquely harms [Appellees] as surely as if they were located directly across the street from it."

The "functional" test for proximity that Appellees urge us to adopt in evaluating whether a property owner is proximate to the project recognizes the "purpose, intent, scope, size, nature, and consequences of the project." Illustrating these considerations, they hypothecate an example of "a property owner 3,000 feet from a nuclear waste dump or odiferous slaughterhouse is likely 'proximate,' while one the same distance from a

65

child's tot lot likely is not." Specifically, Appellees argue that the TOD nature of the Project demands that the area of the State Center, the subject property from which proximity is analyzed, be expanded to the entire TOD area. Appellees maintain that they "are in the economic, if not literal, shadow of this Project, [and] abut the TOD district," and, thus, are *prima facie* aggrieved.

The State Agencies counter that Appellees, each of which are located more than 3,000 feet from the outermost boundary of the State Center Project, are not located proximately enough to enjoy property owner standing. Moreover, according to the State Agencies, the challengers' reliance on the "effects" of the project extending into downtown is misplaced because "this Court has never recognized proximity to the effects of a land use as a basis for standing."

We reject Appellees' invitation to extend the test of proximity in this doctrine. While "the test to show standing . . . is fact-sensitive and is not readily reduced to a set of rules," the test "has been established in Maryland for more than half a century . . . ." *Ray*, 430 Md. at 77, 59 A.3d at 547. During this time period, this Court has developed a set analytical framework to determine whether a litigant meets the standing requirements. Contrary to Appellees' wishes, this Court is not inclined to redefine the basis of this framework.

Accordingly, *Ray* controls this analysis by providing that "[w]hen deciding whether a protestant is *prima facie* aggrieved, . . . **proximity is the only relevant factor . . . [and] the sole determinative factor**." 430 Md. at 83 n.6, 59 A.3d at 550 n.6 (emphasis added). The Court clarified that the proximity "inquiry is focused **solely on**

66

**whether the protestant is '[a]n adjoining, confronting or nearby property owner**.'"

*Id.* (brackets added in *Ray*) (emphasis added) (quoting *Bryniarski,* 247 Md. at 145, 230 A.2d at 294). Thus, the "*prima facie* aggrievement" analysis is focused solely on proximity, as measured by physical distance from the subject property. Because *prima facie* aggrievement analysis is limited as such, we do not analyze the other factors urged by Appellees to become part of this analysis here, but rather analyze them as part of the other categories of potential "specially aggrieved" property owners, where they belong more properly.[45]

Examining the physical location of Appellees' properties relative to the Project in this case, we conclude that Appellees' properties are too far away from the State Center to be considered as *prima facie* aggrieved. The physical locations of Appellees' properties are at a range of distances of 0.57 miles at the closest to 0.84 miles at the furthest from the State Center. Such a distance cannot be classified as satisfying the "adjoining, confronting or nearby" test for *prima facie* aggrievement. *See Ray*, 430 Md. at 83, 83 n.6, 59 A.3d at 550, 550 n.6. Compare with *Sugarloaf v. Dep't of Environment*,

---

[45] Appellees misunderstand the notion of a "*prima facie*" showing in their argument here. That the "*prima facie* aggrievement" analysis is a straight-forward rule does not abandon the *Bryniarski* rule that the facts and circumstances of each case would govern whether a litigant is "specially aggrieved," however. The *prima facie* test is only intended for those cases which are so clear that a presumption is established that they are, in fact, "specially aggrieved" for purposes of standing, without any further evidence.

This notion of "*prima facie* aggrievement" is so straight-forward that, in *Ray*, the petitioners conceded that neither of them fell within this category as they both resided approximately 0.4 miles away from the PUD. *Ray*, 430 Md. at 91, 59 A.3d at 555. Similarly, Appellees here should have recognized the clear limitations of settled doctrine and focused their creative arguments on the other, broader categories of "special aggrievement."

344 Md. 271, 298-99, 686 A.2d 605, 618-19 (1996) (holding as *prima facie* aggrieved protestants who owned property **adjacent** to the tract containing a solid waste incinerator) (emphasis added); *Wier v. Witney Land Co.*, 257 Md. 600, 612-13, 263 A.2d 833, 839-40 (1970) (holding as *prima facie* aggrieved protestants who owned property "**in sight distance** of the property forming the subject of the petition" and "located approximately 1,100 feet from one of the parcels reclassified by Board") (emphasis added); *Bryniarski*, 247 Md. at 148, 230 A.2d at 295-96 (holding as *prima facie* aggrieved protestants described as "owners of property **immediately contiguous or in close proximity** of the proposed site for the apartment hotel") (emphasis added); *Comm. for Responsible Development on 25th Street v. Baltimore*, 137 Md. App. 60, 86, 767 A.2d 906, 920 (2001) ("[T]o be considered an aggrieved party, the complaining property owner **must be in 'sight or sound' range** of the property that is the subject of his complaint.") (emphasis added).

In an attempt to circumvent this clear precedent, Appellees attempt to extend the "lebensraum" of the State Center Project through annexation of the TOD area. This attempt fails, however, to satisfy the "special and adverse[] affect" that is required to transmute the asserted general injury into a specific one. Using the TOD area to define the affected area would provide virtually every property owner in the City with standing. This Court has held multiple times that similarly sweeping definitions of "proximity" destroy the very concept of "special aggrievement." For example, in *Ray*, this Court rejected the argument that, in analyzing "proximity," the court should define the

aggrieved class as the entire city "neighborhood" in which each protestant lived. 430

Md. at 87-90, 59 A.3d at 552-54. The *Ray* Court explained,

> **the creation of a class of aggrieved persons is done on an individual scale** and not based on delineations of city neighborhoods. *See Marcus* [*v. Montgomery Cnty.*]*,* 235 Md. [535,] 538, 541, 201 A.2d [777,] 779, 781 [(1964)] (denying standing to property owner 0.75 miles from site because "[t]here is no evidence that his home is within sight of the subject properties nor that the proposed rezoning would have any effect whatever on it except such effect as all other residential properties in the whole Wheaton and Glenmont area of Montgomery County might suffer"); *see also DuBay* [*v. Crane*]*,* 240 Md. [180,] 183, 213 A.2d [487,] 489 [(1965)] ("[I]n addition to showing the proximity of one property to the other, [standing] requires proof of the adverse effect the changed status of the rezoned property has, or could have, on the use, enjoyment and value of the property of the protestant in order to establish the status of the appellant as an aggrieved person."). As we sketched out above, with the exception of those protestants who are *prima facie* aggrieved, the requirement that an individual prove special aggrievement has been well-established for more than half a century. We are not aware of any case in which this Court has deviated from that standard.

*Id.*, 430 Md. at 88-89, 59 A.3d at 553-54 (emphasis added) (footnotes omitted).

Appellees attempt to distinguish this analysis in *Ray* by explaining that the TOD area

expands the area of the Project, not the class of aggrieved persons. This argument, albeit

framed differently than in *Ray*, similarly fails, though, to explain how such a definition

would support the notion of a "*special* aggrievement." At the core of this argument (and

that rejected in *Ray*) is the failure to recognize that such a wide sweep is not consistent

with the "roots" of this concept of special aggrievement, as discussed earlier.

In light of the "roots" of the property owner standing doctrine and our precedent,

we reject Appellees' attempt to expand the proximity test to include the "purpose, intent,

scope, size, nature, and consequences of the project," specifically by measuring

proximity from the entire TOD area.[46]  Similar to *Ray*, Appellees here failed to allege

how the State Center Project "would cause him or her any unique or special kind of

damage other than that suffered by the whole community."  *See DuBay*, 240 Md. at 185,

213 A.2d at 490.

*(2) Almost prima facie aggrieved property owners?*

Second, Appellees claim that they are "almost *prima facie* aggrieved," defined in

*Ray* as those who are "farther away than an adjoining, confronting, or nearby property

owner, but still close enough to the site of the rezoning action to be considered almost

*prima facie* aggrieved, **and** offers 'plus factors' supporting injury."  430 Md. at 85, 59

A.3d at 551-52.   In *Ray*, we explained this category further, noting nonetheless the

continued importance of proximity as an influencing factor in this category of protestants,

as follows:

> There is, however, no bright-line rule for exactly how close a property must
> be in order to show special aggrievement. Instead, this Court has
> maintained a flexible standard, finding standing in cases that do not quite
> satisfy the "adjoining, confronting or nearby" standard of *prima facie*
> aggrievement, but are nudging up against that line. Protestants in such cases
> will be considered to pass the standing threshold if they allege specific facts
> of their injury. In other words, once sufficient proximity is shown, some
> typical allegations of harm acquire legal significance that would otherwise
> be discounted. But in the absence of proximity, much more is needed.

---

[46] In this regard, Appellees are not challenging in this appeal the classification or
boundaries of the TOD area.  As we determined earlier, Appellees are capable of
challenging only the MDA and the First Amendment on the basis of property owner
standing.  Thus, we review these two formative contracts, which affect the State Center
property only.  The TOD area is not implemented by these contracts and, thus, is not part
of this analysis.

For example, an owner's lay opinion of decreasing property values and increasing traffic has been considered sufficient for special aggrievement **when combined with proximity that is almost as great as in cases where properties are "adjoining, confronting or nearby**." . . . Conversely, **without sufficient proximity, similar facts will only support general aggrievement**. For example, when the affected properties are not sufficiently close to the site to qualify as almost prima facie aggrieved, claims of increasing traffic, change in the character of the neighborhood, lay opinion projecting a decrease in property values, and limited visibility have been held to show only general aggrievement.

430 Md. at 83-84, 59 A.3d at 550-51 (emphasis added) (citations omitted).

Appellees lack sufficient proximity to qualify as "almost *prima facie* aggrieved."

The closest Appellee property is over 3,000 feet or 0.57 miles distant. As noted earlier,

"[a]lthough there is no bright-line rule for who qualifies as 'almost' *prima facie*

aggrieved," this Court recognized in *Ray* that "we have found no cases, in which a person

living over 2000 feet away, has been considered specially aggrieved." 430 Md. at 91, 59

A.3d at 555. In fact, this Court stated in *Ray* that

protestants who lived more than 1000 feet from the rezoning site have repeatedly been denied standing. *See Shore Acres* [*Imp. Ass'n v. Anne Arundel Cnty. Bd. of Appeals*]*,* 251 Md. [310,] 312, 317–18, 247 A.2d [402,] 403, 406 [(1968)] (not specially aggrieved when 3760 feet and out of sight of subject property); *White* [*v. Major Realty, Inc.*]*,* 251 Md. [63,] 64, 246 A.2d [249,] 250–51 [(1968)] (not specially aggrieved when 0.5 miles from site, even though asserting an increase in traffic, increase in use of water system, and overcrowded schools); *DuBay*, 240 Md. at 182–84, 185–86, 213 A.2d at 488–90 (three protestants—1500 feet, 0.4 miles, and 0.9 miles—who were separated by beltway or could not see site, not specially aggrieved); *Marcus* [*v. Montgomery Cnty. Council*]*,* 235 Md. [535,] 537–38, 541, 201 A.2d [777,] 778–79, 781 [(1964)] (protestant living 0.75 miles away who could not see subject property denied standing); *25th Street,* 137 Md. App. at 86, 89, 767 A.2d at 920, 922 (protestant two blocks west and three blocks north, without sight of, or sound from, subject property, denied standing).

430 Md. at 92, 59 A.3d at 555. Rather, the category of "'almost' *prima facie* aggrieved" "has been found applicable only with respect to protestants who lived 200 to 1000 feet away from the subject property." *Ray*, 430 Md. at 91, 59 A.3d at 555 (citing *Habliston v. City of Salisbury*, 258 Md. 350, 352, 354-55, 265 A.2d 885, 885-87 (1970); *Chatham Corp. v. Beltram*, 252 Md. 578, 579-80, 584, 251 A.2d 1, 2, 4 (1969)).

In recognition of these strict proximity requirements, Appellees urge this Court to recognize that several other factors unique to this case confer standing upon them in order to overcome the lack of pure proximity. Appellees allege that the increased traffic, one business owner's lay opinion of decreased property values, and the prophecy of lost customers and tenants due to the competition from the subsidized State Center Project are sufficient "plus factors" to confer property owner standing. Appellees misunderstand, however, the gravamen of *Ray*'s discussion of this second category of protestants accorded with standing. In *Ray*, this Court found that, because the "[p]rotestants, who reside far away from the rezoned site [approximately 0.4 miles] . . . cannot establish special aggrievement through proximity," they were limited to "only look[ing] to the theoretically recognized, but never before found in fact, third category of standing that requires a showing that the reclassification produces a harm directly and specifically impacting their property." 430 Md. at 92, 59 A.3d at 556 (citing *Bryniarski*, 247 Md. at 145, 230 A.2d at 295). Similarly, because all Appellees here are a considerable distance from the State Center (at least 0.57 miles away), they do not fit within this second

72

category.[47]    Despite these alleged "plus factors," we conclude that Appellees are

ineligible for "'almost' *prima facie* aggrieved" status due to a lack of sufficient

proximity.

*(3) Nebulous third category of property owner
standing?*

Under this last category, recognized only in dicta,[48] standing may be conferred

upon a litigant based upon "the fact that his personal or property rights are specially and

---

[47] It is well-settled that "[a] person whose sole reason for objecting to the board's action is to prevent competition with his established business is not a person aggrieved." *Bryniarski*, 247 Md. at 145, 230 A.2d at 295 (citing *Kreatchman v. Ramsburg*, 224 Md. 209, 167 A.2d 345 (1961)).  Whether the increased competition and predicted lost customers and tenants due to the subsidized Project may serve as an additional "plus factor" to push this case over the line into this second category is, however, a novel question for this Court.  The State Agencies cite *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md. App. 479, 500, 822 A.2d 478, 490-91 (2003), "for the proposition that a desire to stave off competition cannot support standing."  Appellees counter that that principle from *Superior Outdoor Signs* (a zoning dispute between competing billboard companies) "is applicable to the private zoning dispute present in that decision," but "is inapposite to this challenge to *ultra vires* State action."  The difference, according to Appellees, is that "[u]nlike the zoning cases, here [Appellees] challenge unlawful State actions and assert as a special harm the fact that the State intends to use their taxes to subsidize their competitors and then raise their taxes."

We conclude that economic harms resulting from the subject land use actions are not the type of injury to be analyzed in these cases.  Thus, the reasoning and result in *Superior Outdoor Signs*,150 Md. App. at 490, 822 A.2d at 485, is apt.  We conclude that such allegations do not raise Appellees' status to "special aggrievement."

Moreover, to the extent that Appellees assert that the special harm suffered is an increase in their taxes to subsidize competitors, that type of harm falls more aptly (if anywhere) within the taxpayer standing doctrine, not the property owner standing doctrine.

[48] This dicta appeared originally in *Bryniarski*, 247 Md. at 245, 230 A.2d at 295. Since then, several cases have quoted that exact language and cited this dicta from *Bryniarski*; however, no other case applied, even in dicta, this category of standing.

73

adversely affected by the board's action." *Bryniarski*, 247 Md. at 245, 230 A.2d at 295. While we do not venture today to map further this "Higgs boson particle," or determine even whether it exists in the material world, we pause now to consider as a threshold matter whether Appellees' other allegations might be considered as sufficient to give substance to this last category.[49] Ultimately, though, we are confident the present case is not drawn within its theoretical gravitational field under known circumstances.

Appellees urge us to recognize other factors, which may be grouped as (1) the harm caused by the State relocating its offices and (2) the economic harm caused by the Project's competition, as conferring "special aggrievement" upon them. We find none of them relevant or persuasive here. First, in regards to the relocation of State offices as an "effect" of the State Center Project, we find this factor irrelevant because Appellees failed to show how the State offices' relocation affects them in any manner distinct from the general public (other than perhaps economic competition, which we reject as a proper factor below). *See Ray*, 430 Md. at 94, 59 A.3d at 557 (finding that petitioners' "complain[t] that commercial establishments now existing in their neighborhood . . . will close because of competition from Wal-Mart, and that they will become vacant buildings, which are detrimental to a community. . . . failed to show that any of these businesses, whether open or closed, affect them in a manner distinct from the general public.").

_____

[49] Appellees focused their additional allegations throughout their arguments on "*prima facie* aggrievement" and "almost *prima facie* aggrievement." As discussed earlier, however, these additional "factors" are not considered properly in those analyses without sufficient proximity. Because we found Appellees lacked sufficient proximity, we did not analyze Appellees' arguments in those sections, but left our response to this last category.

74

Moreover, to extend property owner standing's definition of "aggrieved persons" to include economic competition and harm is improper. *See Bryniarski*, 247 Md. at 145, 230 A.2d at 295 ("A person whose sole reason for objecting to the board's action is to prevent competition with his established business is not a person aggrieved.") (citing *Kreatchman v. Ramsburg*, 224 Md. 209, 167 A.2d 345 (1961)). The property owner standing doctrine has its roots in nuisance and trespass. Those actions do not permit claims on the grounds of mere economic harm. Accordingly, Appellees' allegations that they will be injured financially in a way that is different from the general public, due to the State-subsidized Project that may compete with their businesses, is irrelevant. Competition that results from a land use decision or action is not a factor in either the *prima facie* aggrieved or almost *prima facie* aggrieved analyses.

Accordingly, because Appellees' standing allegations do not fit within any of the three categories of property owner standing in our case law, they must look elsewhere for standing.

### b. Taxpayer standing

The common law taxpayer standing doctrine permits taxpayers to seek the aid of courts, exercising equity powers, to enjoin illegal and *ultra vires* acts of public officials where those acts are reasonably likely to result in pecuniary loss to the taxpayer. *See, e.g.*, *Superblock I*, 407 Md. at 267, 964 A.2d at 669-70. In the present case, the State Agencies argued, in their Motions to Dismiss, that Appellees lacked taxpayer standing. The Circuit Court denied the Motions to Dismiss, finding, among other things, that Appellees enjoyed standing under the taxpayer standing doctrine. In analyzing each of

75

the State Agencies' arguments that Appellees lack taxpayer standing, we find all of them wanting. Therefore, we conclude that denial of the Motions to Dismiss on grounds of lack of taxpayer standing was proper.

The doctrine of taxpayer standing has existed for quite some time. Judge Dillon, in his early work on *Municipal Corporations*,[50] reviewed all of the then-extant decisions in Great Britain and the United States. He concluded, "there appears to be little difference of judicial opinion as to the right of the taxable inhabitants, whenever the threatened illegal corporate act will increase the burden of taxation, to the aid of equity in proper cases to prevent it." *Kelly v. City of Baltimore*, 53 Md. 134, 141 (1880) (citing 2 Dillon, § 736). "The chief difference," Judge Dillon concluded, "is as to the proper party plaintiff in a bill of this character." *Id.* From his review, he found that three types of proper party plaintiffs existed:

---

[50] We explore later in this opinion whether a distinction exists between a complainant's right to seek to enjoin a municipality's action and that of the State's action. For now, we observe that the early focus of the taxpayer standing doctrine regarding municipal actions was a reflection of "the panorama of American history." Note, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895, 899 (1960). In this sense, "[t]he early suits were all brought against municipalities and were few in number, probably because of the relatively limited municipal expenditures and activities of that era." *Id.* "With the expanding role of local government in economic activity after the Civil War, taxpayer litigation increased . . . ." *Taxpayers' Suits*, 69 Yale L.J. at 899-900 (footnote omitted). "As such litigation gained a firm basis in judicial precedent, taxpayers were allowed to challenge state as well as municipal actions." *Taxpayers' Suits*, 69 Yale L.J. at 900. *But see* Comment, *Taxpayers' Actions: Public Invocation of the Judiciary*, 13 Wake Forest L. Rev. 397, 399 (1977) (suggesting that the early suits' focus on municipalities' actions was due to courts' perception "that the relationship of taxpayers with local government was so much closer than with state and federal government").

"1st. That the proper parties may resort to equity, against municipal corporations and their officers when these are acting *ultra vires,* and where such illegal acts affect injuriously the property owner or the taxable inhabitant. But if in these cases the parties injured have adequate remedy at law, equity will not interfere.

2nd. That in the absence of special legislation, the proper public officer of the commonwealth may file an information or bill in equity to prevent misuse of corporate powers, or to set aside or correct illegal corporate acts.

3rd. A bill may be filed in the name of one or more of the taxable inhabitants for themselves and all others similarly situated, and that the court should regard it in the nature of a public proceeding to test the validity of the corporate acts sought to be impeached and deal with and control it accordingly."

*Kelly*, 53 Md. at 141 (quoting 2 Dillon, § 736a).

In our 1869 benchmark case on taxpayer standing, this Court explained the purpose of this long-standing doctrine:

In this state the Courts have always maintained **with jealous vigilance** the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations; and **have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them** within the limits of their lawful authority, and of protecting the citizen from the consequence of their unauthorized or illegal acts.

If the right to maintain such a bill as this be denied, citizens and property-holders residing or holding property within the limits of a municipal corporation, would be without adequate remedy to prevent the injury and damage which might result to them from the unauthorized or illegal acts of the municipal government, and its officers and agents.

*Baltimore v. Gill*, 31 Md. 375, 395 (1869) (emphasis added).

From this decision [*Baltimore v. Gill*] and the long line of Maryland cases following in its wake, the principle has become established that a taxpayer may invoke the aid of a court of equity to restrain the action of a public official or an administrative agency when such action is illegal or ultra vires, and may injuriously affect the taxpayer's rights and property.

*Citizens Planning & Housing Ass'n v. Cnty. Exec. of Baltimore Cnty.*, 273 Md. 333, 339, 329 A.2d 681, 684 (1974) (citing *Gill*, 31 Md. at 395), *superseded by statute on other grounds as stated in Patuxent Riverkeeper v. Maryland Dep't of Environment*, 422 Md. 294, 29 A.3d 584 (2011).

Most recently, we re-characterized this well-established principle of taxpayer standing doctrine as having two general requirements:

> "[A] party, as a taxpayer, may satisfy the 'special damage' standing requirement by alleging both '1) an action by a municipal corporation or public official that is illegal or ultra vires, and 2) that the action may injuriously affect the taxpayer's property, meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes.'"

*Kendall v. Howard Cnty.*, 431 Md. 590, 605, 66 A.3d 684, 693 (2013) (quoting *Superblock I*, 407 Md. at 267, 964 A.2d at 669-70). Beyond those two general requirements, which have been repeated in nearly every taxpayer standing doctrine case, the doctrine has been disorganized largely and, at times, seemingly contradictory, particularly in the application of these requirements.

In an attempt to clarify this doctrine, we shall engage here in a general discussion of the principles and case law on taxpayer standing doctrine in Maryland and answer the parties' plethora of arguments concerning the doctrine raised in this case. We begin by analyzing the State Agencies' argument that taxpayers may not challenge violations of the Procurement Code due to the statutory language and history and the case law governing the State's procurements. Because we find that taxpayer standing may exist for such challenges, we analyze next the requisites for eligibility to assert standing under this doctrine or, in other words, the requisites to establish taxpayer status. Then, we

78

move to the two requirements that provide the taxpayer with a "special interest" distinct from that of the general public.

> i. *Taxpayer standing & procurement claims: is a private right of action required for taxpayer suits?*

The authority for taxpayer suits in this State stems from the common law, *see Gill*, 31 Md. at 395, and is not governed generally by statute.[51] In this sense, the traditional understanding of the authority for a taxpayer suit is described as follows:

> The taxpayer litigant is often likened to a "private attorney general" because he is essentially performing the function of an attorney general by suing to enforce the laws. **The taxpayer does not assert a private cause of action but, instead, that of his government.** Therefore, a taxpayers' suit is essentially a "derivative proceeding" akin to a corporate shareholders' suit. The public corporation, like its private counterpart, has the same right of action, but presumably it has neglected to pursue it. Taxpayers are injured by unlawful acts or omissions of governmental officials because taxpayers are the constituents of government and they contribute the tax funds that are misused. Recoveries in taxpayers' suits run directly to the government and indirectly to the taxpayers in the form of tax dollar savings and good government.
>
> A trust theory, as well as a shareholders' derivative analogy, has also been used to justify the taxpayers' suit. By this rationale, the public officer is the trustee who cares for the property of the taxpayer, the cestui que trust. As trustee, the public officer or agency vested with control of public property has a duty to protect the interest of the equitable owners and to act for their benefit.

Comment, *Taxpayers' Actions: Public Invocation of the Judiciary*, 13 Wake Forest L. Rev. 397, 397-98 (1977) (emphasis added) (footnotes omitted). Because of this nature of the suit, courts often require that the complainant *not* have an adequate remedy at law. *See id.*, at 398 n.11. Where the complainant does not have an adequate remedy at law,

---

[51] Other states have adopted statutes granting taxpayers standing to sue.

however, the common law demands that we permit the suit unless the General Assembly has pre-empted this common law right.

In this case, the State Agencies and Developers argue that Appellees, even though taxpayers, cannot bring this suit because the Procurement Code does not provide them a private right of action (and, as discussed above, Appellees have no right to the statutory administrative remedies). Much of their argument on this issue focuses on alleging that the Procurement Code does not authorize or permit private causes of action. Determining whether the Procurement Code permits private causes of action is irrelevant in this case, however, because, as discussed above, taxpayer suits do not require private causes of action. Accordingly, the State Agencies' arguments regarding whether the Procurement Code implies a private right of action are irrelevant.[52]

Most illustrative of the irrelevancy of much of their argument against taxpayer standing is the fact that none of the cases cited by the State Agencies involved standing based on taxpayer suits. Instead, those cases involve private litigants alleging an injury caused by a violation of a statute and seeking a remedy provided under that statute.

Moreover, the State Agencies cited in their initial brief also *Baker v. Montgomery Cnty.*, 427 Md. 691, 716, 50 A.3d 1112, 1126-27 (2012), as support for their proposition that "[l]ast year, this Court left open the question whether a private right of action is

---

[52] This analysis would be different if Appellees' claims were based in the Procurement Code and sought a remedy provided in the Procurement Code. Here, however, because Appellees bring suit based upon taxpayer standing and seek relief as such, we do not need to entertain arguments regarding whether a private right of action exists.

80

necessary to seek injunctive or declaratory relief, at least where there is taxpayer standing;" and cited *1000 Friends of Md. v. Ehrlich*, 170 Md. App. 538, 548, *cert. denied*, 396 Md. 12 (2006) and *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 78 Md. App. 550, 554 A.2d 434 (1989), *aff'd*, 319 Md. 558, 573 A.2d 1325 (1990), for the proposition that "[t]he Court of Special Appeals already has resolved this question, demanding that plaintiffs seeking a declaration that a Maryland statute was violated or an injunction against future violations of the statute have a private right of action under that statute." The State Agencies misinterpreted woefully these cases: *1000 Friends of Maryland* never mentioned taxpayer standing,[53] and *Baker* and *Sugarloaf*, although discussing the doctrine, did not lend support to the State Agencies' assertions.

First, *Baker*'s analysis of why the petitioners lacked standing supports, albeit not explicitly, the fact that taxpayer standing is an alternative to possessing a private right of action. In that case, the litigation focused on whether a private cause of action existed under the relevant statute. After the Court concluded that the relevant statute did not provide the petitioners with a private cause of action, and even though petitioners did not

---

[53] In that case, private complainants brought a suit challenging the actions of the BPW in approving for State funding a proposed expansion of a road. The complainants "sought mandamus, a declaratory judgment, and injunctive relief **based on their contention that the Board was obligated to issue findings of fact to support its decision**." *1000 Friends of Md.*, 170 Md. App. at 547, 907 A.2d at 871 (emphasis added). The intermediate appellate court found that the relevant statute precluded private causes of action generally, including declaratory judgment and injunctive relief claims. *Id.*, 170 Md. App. at 548, 907 A.2d at 871. The court noted, however, that the statutory preclusion of private causes of action did not preclude appellants from seeking a writ of mandamus. *Id.* Ultimately, however, the court concluded that appellants' mandamus claim failed otherwise as a matter of law. *1000 Friends of Md.*, 170 Md. App. at 550-51, 907 A.2d at 873.

81

allege taxpayer standing, the Court discussed taxpayer standing in the final paragraph of the opinion. The Court pointed out that

> Petitioners maintained steadfastly, **albeit quixotically**, in the Court of Special Appeals that they were not asserting standing as taxpayers, **relying instead solely on their claimed private cause of action theory**. *Baker,* 201 Md.App. at 679 n. 27, 30 A.3d at 289 n. 27. Petitioners acknowledged also that some of them are neither Maryland residents nor Maryland taxpayers.

*Baker*, 427 Md. at 716, 50 A.3d at 1126 (emphasis added). Immediately thereafter, the Court repeated the basic rule for taxpayer standing doctrine: "'A taxpayer may invoke the aid of a court of equity to restrain the action of a public official or an administrative agency when such action is illegal or ultra vires, and may injuriously affect the taxpayer's rights and property.'" *Id.* (quoting *Citizens Planning*, 273 Md. at 339, 329 A.2d at 684). Then, the Court concluded that "**[i]n the face of these concessions** and our opinion as to the private cause of action issue, we conclude that Petitioners have no basis to obtain equitable or declaratory relief." *Id.* Even if *Baker*'s analysis does not support the conclusion that taxpayer standing is an alternative to a private cause of action, the *Baker* Court made it explicitly clear that it "d[id] not decide whether Petitioners had standing, on a basis other than an implied private cause of action under Transportation Article § 21–809, to seek a declaration that Respondents' contracts with ACS violate § 21–809(j) or to an injunction against Respondents' enforcement of their speed monitoring systems." *Baker*, 427 Md. at 716 n.19, 50 A.3d at 1126 n.19.

Next, *Sugarloaf*, cited extensively by the State Agencies, rather than supporting the State Agencies' arguments, demonstrates the importance of the particular basis of the

82

complainant's alleged standing. In *Sugarloaf*, the Sugarloaf Citizens Association and two private individuals (hereinafter referred to collectively as "Sugarloaf") filed an amended complaint against the County Council of Montgomery County and Michael Gudis, an individual County Council member. The amended complaint alleged that a County Council resolution, promulgated to implement an earlier 4-3 vote of the County Council members, should be rendered void under section 19A-22(b) of the Montgomery County Code. According to Sugarloaf, Gudis had a conflict of interest in the vote and, thus, his vote violated section 19A-7 of the Montgomery County Code. In the amended complaint, appellants stated that "the plaintiffs herein are acting in the best interests of the public and the citizens of Montgomery County . . . by seeking the remedy provided by Section 19A-22(b)" and, according to the Court of Special Appeals, quoted extensively from the Montgomery County Public Ethics Law. *Sugarloaf*, 78 Md. App. at 556 n.2, 554 A.2d at 436 n.2. The Circuit Court granted the County Council and Gudis's Motion to Dismiss.

On appeal, in its reply brief, Sugarloaf "stated that the basis for their complaint was their common law right as taxpayers 'to challenge legislative action that is procedurally or otherwise defective.'" *Id.* The intermediate appellate court disagreed. The court pointed out that "[t]he sole relief requested, other than a general request for 'such other and further relief as the Court deems just and proper,' is to void the action taken by the Council, consistent with the remedy provided by Section 19A-22(b)." *Id.* Thus, the court found that it was clear that "[t]he violation complained of and the relief requested are found within the ethics law provisions." *Id.* The court acknowledged that

83

Sugarloaf "*may* have otherwise possessed standing to invalidate alleged legislative action," such as through the common law taxpayer doctrine, "their standing, as evidenced by their amended complaint, is based upon the Montgomery County Public Ethics Law." *Id.*

As such, the intermediate appellate court went on to analyze whether the Montgomery County Public Ethics Law, upon which Sugarloaf's alleged standing was based, provided either an explicit or implicit private cause of action, and found that it did not. The court noted, however, that it did not view Sugarloaf's complaints as based on taxpayer standing:

> At common law a taxpayer had standing to bring a declaratory judgment action for a judicial declaration that a statute was void due to a conflict of interest by one voting for its enactment. *See Beshore v. Town of Bel Air,* 237 Md. 398, 206 A.2d 678 (1965). We need not decide whether the statute pre-empts any common law remedy that appellants may have possessed to attack Resolution 11-382. Appellants do not seek declaratory relief; they rely on the mechanism provided within § 19A-22(b) to render the resolution void.

*Sugarloaf*, 78 Md. App. at 560, 554 A.2d at 439.

In the present case, Appellees do not rely on the provisions of the Procurement Code to confer standing. Rather, they assert standing as taxpayers (as well as separately property owners) and they seek relief granted traditionally to taxpayers: declaratory relief that the governmental action is illegal and *ultra vires* and that the action thus taken should be voided; and injunctive relief to preclude further illegal and *ultra vires* governmental actions that will cause pecuniary harm to their taxes. Because taxpayer

suits in this State do not require also a separate private right of action,[54] such an inquiry is irrelevant in our analysis.

Rather, the proper question (if any) is whether the Procurement Code pre-empted the common law right for taxpayers to bring such suits. Neither party addressed this issue, however. Because neither party argued whether the Procurement Code pre-empted the common law right of taxpayer suits, which has a long history in this State of allowing challenges of governmental procurements, we do not address this question today and, for now, assume that the common law right to taxpayer suits remains intact.

> ii.     *The necessary party plaintiffs for taxpayer standing doctrine.*

"The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before the court . . . ." *Pollokoff v. Maryland Nat. Bank*, 288 Md. 485, 497, 418 A.2d 1201, 1208 (1980) (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 1952, 20 L. Ed. 2d 947 (1968)). For purposes of taxpayer standing doctrine, the conceptual basis of the doctrine is that the action is brought by complainants, *as taxpayers and on behalf of all other similarly situated taxpayers*. In other words, under the taxpayer standing doctrine, a complainant's standing rests upon the theoretical

---

[54] We acknowledge that dicta in a footnote in *120 West Fayette St., LLLP v. Mayor of Baltimore*, 426 Md. 14, 43 A.3d 355 (2012) ("*Superblock III*"), could be read reasonably to suggest that complainants asserting the taxpayer standing doctrine must also have a cause of action, such as a statutory private right of action. *See id.*, 426 Md. at 28 n.13, 43 A.3d at 365 n.13 (stating that 120 West Fayette is "categorically barred from alleging a violation of § 5A-326(a)(2)" because that statute "explicitly prohibits private causes of action for a State unit's non-compliance with the Trust's review, consultation and cooperation on historic preservation projects"). That dicta is contradictory to prior case law, such as *Schley v. Lee*, 106 Md. 390, 403-05, 67 A. 252, 257-58 (1907).

concept that the action is brought not as an individual action, but rather as a class action by a taxpayer on behalf of other similarly situated taxpayers.

To establish eligibility to bring a suit under the taxpayer standing doctrine, the case law establishes that the complainant must allege two things: (1) that the complainant is a taxpayer and (2) that the suit is brought, either expressly or implicitly, on behalf of all other taxpayers. *See, e.g.*, *Holt v. Moxley*, 157 Md. 619, 622-26, 147 A. 596, 597-99 (1929). Where a complainant fails to allege such a basis adequately, this Court has refused repeatedly to address taxpayer standing as a basis to maintain suit. *See, e.g.*, *Baker*, 427 Md. at 716, 50 A.3d at 1126-27 (declining to address the issue of taxpayer standing doctrine after the "[p]etitioners maintained steadfastly, albeit quixtocially . . . that they were not asserting standing as taxpayers, relying instead solely on their claimed private cause of action theory"); *Kendall*, 431 Md. at 607-08, 66 A.3d at 694 (refusing to address taxpayer standing doctrine because petitioners did not assert taxpayer standing and, instead, asserted that "the ability to enforce the right to referendum in the Charter should not be restricted to persons with specially affected property rights or taxpayers who may suffer pecuniary harm."); *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 689 n.30, 46 A.3d 473, 505 n.30 (2012) (declining to consider appellants' "taxpayer standing" argument which was mentioned on appeal, but not argued before the circuit court as a basis for conferring standing). Thus, we determine whether Appellees alleged sufficiently here that they were taxpayers and that they brought the action pursuant to equitable grounds, under the taxpayer standing doctrine, on behalf of other taxpayers.

First, we address the requirement that, for taxpayer standing to exist, the complainant must allege sufficient facts to prove that he or she or it is, in fact, a taxpayer.[55] In this case, the State Agencies argue that Appellees, as "pass-through" business entities, are not actual taxpayers. In a footnote of their initial brief, the State Agencies aver that, because "all of the *original* plaintiffs are either limited liability companies or limited partnerships, which are 'pass-through' tax entities," Appellees failed to allege taxpayer status sufficient to be eligible for the application of the taxpayer doctrine.[56] (Emphasis added). In a footnote of their Reply Brief, they averred again (but more broadly to include all plaintiffs) that "the plaintiffs are not taxpayers. Each of them is either a limited liability company or a limited partnership, and those entities do not pay Maryland income taxes as a matter of law."

Appellees retort that the State Agencies failed to preserve their argument that Appellees are not taxpayers because they did not advance that argument in the Circuit Court. Consequently, we should dismiss the argument because, if the State Agencies had

---

[55] For purposes of clarity, we consider here the status of taxpayers generally. A later subsection of this opinion discusses the nexus requirement that, unless met, the mere status as a taxpayer (of any tax) is not sufficient. In order to meet the nexus necessary for the injury requirement, a plaintiff must prove that the taxpayer pays a tax, which will be increased most likely by the alleged *ultra vires* or illegal municipal act.

[56] In support of this assertion, the State Agencies rely on *Baltimore Street Builders v. Stewart*, 186 Md. App. 684, 690 n.2, 975 A.2d 271, 274 n.2 (2008), as "noting benefits of pass-through taxation for LLCs and partnerships." Footnote two in *Baltimore Street Builders* relies on the United States Internal Revenue Service web site's definition of a Limited Liability Company (which is not specific to Maryland tax law). This definition stated that LLCs enjoy "the benefit of pass-through taxation." *Id.* The footnote did not explain what these benefits were and did not consider expressly the nature of limited partnerships.

raised properly this issue in the Circuit Court, Appellees would have had an opportunity to present evidence that they were, in fact, taxpayers. Moreover, according to Appellees, the State Agencies' argument lacks any merit because they are taxpayers in Maryland.

As a preliminary matter, we address the non-preservation contention. "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131(a). This general rule is appropriate, particularly for cases in which both parties were not given the opportunity to produce relevant evidence in the trial court that might have rebutted the tardy argument. Appellees believe this case falls into that category. Although we might agree that this case falls in that category generally, we note also the exception that "the Court may decide such an [unpreserved] issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal" is applicable to this case. *Id.* The record is adequate to those ends for our conclusion in this case (in which we may resolve the matter without reaching the merits of the State Agencies' argument that the limited liability entities may not claim taxpayer standing).[57] Thus, we exercise our discretion to resolve the point.

---

[57] Were the only issue whether limited liability entities are able to claim taxpayer standing, we would agree likely with Appellees that the record was insufficient to address this issue because Appellees would not have had the opportunity to set forth any evidence or arguments to the contrary in the trial court. Thus, we use our discretion to resolve the matter in this case, while saving the substantive issue for another day when we are provided with a better record.

For purposes of taxpayer standing doctrine, "[i]t is a long established rule that 'where there exists a party having standing to bring an action or take an appeal, we shall not ordinarily inquire as to whether another party on the same side also has standing.'" *Bd. of Sup'rs of Elections v. Smallwood*, 327 Md. 220, 233 n.7, 608 A.2d 1222, 1228 n.7 (1992) (quoting *Bd. of License Comm'rs v. Haberlin,* 320 Md. 399, 404, 578 A.2d 215, 217 (1990)) (citations omitted) (internal bracket omitted); *see also Long Green Valley Ass'n*, 205 Md. App. at 652, 46 A.3d at 483; *Garner v. Archers Glen Partners*, *Inc.*, 405 Md. 43, 54, 949 A.2d 639, 645-46 (2008); *Dorsey v. Bethel A.M.E. Church*, 375 Md. 59, 67, 825 A.2d 388, 392 n.1 (2003). Although the Original Complaint listed fifteen businesses as plaintiffs, all of which were limited partnerships or limited liability corporations (and, therefore, "pass-through" entities),[58] the Amended Complaint added

---

[58] Companies are subject generally to federal and state income tax on their taxable income. A "pass-through" entity, however, is not a separate taxable entity. "Instead, its income, loss, deductions, and credits are passed through to its stockholders." Charles A. Borek, *Borek's Maryland Business Planning Guidebook* § 2-13 (2009). Thus, "pass through" refers to a mechanism by which

> [i]f certain conditions are satisfied, dividends paid to shareholders of regulated investment companies and real estate investment trusts are deductible in computing investment company taxable income . . . . Through this mechanism, no corporate tax will generally be imposed on these entities if all of their earnings are properly distributed to shareholders.

Joseph H. Langhirt, *Corporate Income Tax*, *in* 1 *Maryland Taxes* § 4-5 (Robert A. Rombro et al. eds., 4th ed. 2005 & Supp. 2008) (footnote omitted). In other words, "the income of a . . . corporation is deemed to 'pass through' to the shareholders who are then directly taxed on that income" in the same manner as other income. *Maryland State Comptroller of Treasury v. Wynne*, 431 Md. 147, 154, 64 A.3d 453, 456-67 (2013).

(Continued…)

David & Dad's Inc. and the Second Amendment by Interlineation added DaMimmo's Italian Restaurant;[59] Sabatinos, Incorporated; Chiapparelli's Inc.; Vaccaro's Italian Pastry Shop, Inc.; Bonnie's Peanut Shoppe, Inc.; Davis and Davis, Inc., d/b/a Flowers by Gina D.; and Caesar's Den, Inc., to the named Plaintiffs in this suit. These eight companies are general Maryland corporations. None are a limited partnership or a limited liability corporation and, therefore, we may assume for purposes of this appeal that they are not "pass-through" entities.[60] Because "the filing of an amended complaint supercedes the

---

(…continued)

In Maryland, a "pass-through entity" is defined as "(i) an S corporation; (ii) a partnership; (iii) a limited liability company that is not taxed as a corporation under this title; or (iv) a business trust or statutory trust that is not taxed as a corporation under this title." Md. Code (1988, 2010 Repl. Vol.), Tax-General Art., § 10-102.1(a)(7).

[59] DaMimmo's Italian Restaurant, although not a party to this appeal, was one of the listed Plaintiffs to the suit at the time the Circuit Court ruled on the State Agencies' Motions to Dismiss and, thus, is part of our review whether that ruling was legally correct. Regardless of DaMimmo's Italian Restaurant's inclusion, though, Appellees satisfy the requirements for eligibility to bring taxpayer suit based solely on the inclusion of at least one presumed taxpaying corporation.

[60] We acknowledge that limited liability corporations and limited partnerships are not the only business entities that may receive "pass-through" tax treatments in this State. These eight corporations, if they were sub-chapter S corporations, would be classified as "pass-through" business entities with the same "pass-through" tax benefits of limited liability corporations and limited partnerships. We do not entertain, however, the possibility that these eight corporations may be a "pass-through" entity for purposes of this analysis. The State Agencies failed to mention that even one Plaintiff was neither a limited liability corporation nor a limited partnership and, moreover, failed to mention that sub-chapter S Corporations qualify as "pass-through" business entities as well in either its initial or reply brief. Although we could search the judicially-noticeable public records theoretically for this information (because the taxable status of a company is information available publicly), we find that such over-reaching is not proper for this Court. The State Agencies had the opportunity to present this evidence, if they so desired, at the trial court (but they did not) and, again, to this Court (but they did not).

(Continued…)

initial complaint, rendering the amended complaint the operative complaint," *Gonzales v. Boas*, 162 Md. App. 344, 355, 874 A.2d 491, 497 (2005), we conclude that the State Agencies' argument, relying on the type of "pass-through" business entities listed as Plaintiffs in the Original Complaint, without recognizing that not all of the parties listed in the operative Amended Complaint fell within those types, has no merit.[61]

Next, we consider whether Appellees alleged taxpayer standing as a basis for bringing their complaint, either implicitly or explicitly. We do so not in response to any of the parties' arguments. Rather, we analyze this requirement to illustrate the importance of the distinction between an individual's complaint and a derivative complaint brought on behalf of all other taxpayers similarly situated. This distinction, found in the nature of the pleadings' description of the party plaintiffs, becomes important in our subsequent analysis of the injury sufficient for the taxpayer standing doctrine to apply in a given case.

In this case, Appellees did not plead explicitly in either the Original or Amended Complaint that they brought their claims on behalf of other, unnamed taxpayers similarly situated. Rather, Appellees' allegations claimed merely that they are harmed as taxpayers of the State of Maryland and the City of Baltimore. *See* Amended Complaint, at ¶ 35. Where a complainant brings a claim as a taxpayer, but not explicitly as a class

---

(…continued)

[61] We reiterate that we do not reach the merits of the argument that pass-through entities may not allege taxpayer standing doctrine, but rather save that question for another day.

representative of other taxpayers as well, the question arises whether the suit is private in nature (and, thus, the doctrine of taxpayer standing would not confer standing). The importance of the nature of the complaint is revealed by our earliest cases addressing the taxpayer standing doctrine.

In *Kelly v. City of Baltimore*, 53 Md. 134 (1880), a disappointed bidder, allegedly the low bidder which should have been granted the contract, sought an injunction voiding the municipal contract, awarded allegedly as a result of a fraudulent bid-rigging conspiracy between the successful bidder and mid-level municipal contracting officers. 53 Md. at 136-39. The Court described the nature of the complaint filed as follows:

> The bill is filed by the complainants in their own right as copartners, and actually engaged in the business of printers and stationers, and **as tax-payers of said city largely interested in the faithful and economical administration of the affairs of said city**. It is not filed in behalf of themselves and others who may come in and contribute to the expenses of the suit. **They do not make their fellow-citizens parties to the proceeding**. No one except the persons immediately interested in the contract, and professing to be aggrieved by the award, unites in the complaint. **It is therefore strictly speaking, a private bill**.

*Kelly*, 53 Md. at 136 (emphasis added). The importance of the private nature of the complaint was described further:

> Public wrongs, although involving private injuries, are not to be made the grounds of personal suits at law, or in equity, unless the complainant has sustained special damage, and in many instances, the private injury is merged in the public.
>
> In exceptional cases, where great principles or large public interests are involved, citizens or corporators may sue in behalf of themselves, and their fellow-citizens to arrest some projected violation of constitutional law or abuse of corporate authority.

92

*Kelly*, 53 Md. at 139; *see also Kelly*, 53 Md. at 140 ("'It is certainly well settled that public wrongs cannot be redressed at the suit of individuals, who have no other interest in the matter than the rest of the public.'") (quoting *Gill*, 31 Md. at 393). The Court explained that *Gill* sustained the taxpayers' suit "only upon the principle that if such a remedy was denied citizens and property holders, residing within the limits of a municipality, would be liable to injury and damage from unauthorized and illegal acts of the corporation." *Id.*

Our predecessors emphasized, though, that "th[e] Court has not undertaken to declare that every abuse of a legal authority by a municipal corporation, to the prejudice of a tax-payer, is a ground for equitable interference to prevent injury." *Kelly*, 53 Md. at 140. Instead, *Gill* was an "exceptional case" because the Court found that "'it appears from the averments of the bill, that these **complainants as tax-payers of the city, and others similarly situated, in whose behalf as well as their own, the bill is filed, constitute a class specially damaged** by the alleged unlawful act of the corporation, in the alleged increase of the burden of taxation upon their property situated within the city.'" *Id.* (quoting *Gill*, 31 Md. at 394) (emphasis added). On that basis, the Court concluded that "'[t]he complainants have, therefore, a special interest in the subject-matter of the suit distinct from that of the general public.'" *Id.* (quoting *Gill,* 31 Md. at 394).

The *Kelly* Court concluded that, in that case, "[t]he bill . . . presents no such claim to the exercise of the preventive power of the court." 53 Md. at 142. Instead, "[r]educed to its elementary facts, it is a controversy between rival tradesmen for the custom of the

93

Mayor and City Council, in supplying the departments with stationery and printed matter." *Id.* Thus, *Kelly* concluded that "[t]**he public has no interest in this controversy. . . . To drag them in as complainants, is to make a mountain of a mole hill, and magnify the alleged injuries of private citizens, into a grave impeachment of public officers without sufficient foundation.**" 53 Md. at 143 (emphasis added).

Although *Kelly* exemplifies the importance of the nature of the complaint for purposes of analysis under the taxpayer standing doctrine (*i.e.*, who the plaintiffs are in the complaint), the Court does not order any technical requirement that the plaintiff(s) plead explicitly that the suit is brought on behalf of other taxpayers similarly situated. We held in *Holt* that the requirement is that "the action must 'either expressly **or by necessary implication**' be on behalf of the taxpayers or property owners **as a class**." *Holt v. Moxley*, 157 Md. 619, 625, 147 A. 596, 599 (1929) (quoting 1 *Freeman on Judgments* § 437 (5th ed. 1925)) (emphasis added).[62]

---

[62] In *Holt v. Moxley*, 157 Md. 619, 147 A. 596 (1929), the Court addressed a benefit assessment for street improvements in a municipality. In an earlier challenge to the assessment, a different taxpayer brought suit, as a taxpayer, but did not allege that he brought the suit on behalf of any other taxpayers, or anyone else for that matter. In the earlier case, the validity of the assessment legislation was sustained by the circuit court. In *Holt*, a second taxpayer challenged the same legislation in the same circuit court on the same grounds and sought the same relief denied in the earlier challenge. The dispositive question was whether Holt was precluded by res judicata from challenging the same legislation on the same grounds as in the earlier case.

The Court found that the second taxpayer's challenge was precluded by the first suit because the first suit was brought under the taxpayer standing doctrine and, thus, on behalf of all other taxpayers "by necessary implication." In other words, because the first challenge was based on the taxpayer standing doctrine, which is an equitable doctrine, "[the *Holt* Court] applied the concept, traditional to equity practice, of virtual

(Continued…)

Thus, even though Appellees did not allege specifically that they brought the suit on behalf of other taxpayers similarly situated, the doctrine may apply yet, if the action is, in fact, on behalf of the taxpayers as a class, by necessary implication from the nature of the alleged injury pleaded in the Amended Complaint. In other words, the allegations of the injury must apply to all taxpayers in the assumed class and not merely the plaintiffs as private complainants, in order for the taxpayer standing doctrine to apply.

### iii. *A governmental action that is illegal or* ultra vires.

An additional requirement for the taxpayer standing doctrine to confer standing upon a plaintiff is that the complainant must be challenging an action by a public official that is asserted to be illegal or *ultra vires*. This requirement has been applied leniently and seems rather easy to meet, particularly in the context of reviewing a trial court's

---

(…continued)

representation . . . ." *See Gardner v. Bd. of Cnty. Comm'rs*, 320 Md. 63, 79, 576 A.2d 208, 216 (1990) (discussing *Holt*).

The fact that the earlier case did not state explicitly it was brought on behalf of other taxpayers was not dispositive. Because "[t]he defendants . . . in the [earlier case] did not demur to the bill for want of the averment that it was brought on behalf of other interested taxpayers and property owners," it was "a formality which we can consider waived by the only parties who could have objected." *Holt*, 157 Md. at 625, 147 A. at 599. The rationale was that, if the defendant had demurred on the grounds that the bill was defective in this respect, the bill could have been amended. If amended, the "'only effect [of such an amendment would be] to make the bill profess to be what in law it was, and what in point of fact it had been considered to be.'" *Id.*, 157 Md. at 625, 147 A. at 598 (citations omitted).

Under this reasoning, the *Holt* Court distinguished *Kelly* by noting that the plaintiffs in *Kelly* were disappointed bidders for a city contract and "the wrongs complained of were personal to the plaintiffs, concerned only with matters of administration in which the plaintiffs had no interest as taxpayers differing from those of the general public . . . ." *Id.* Thus, in that case, there was no "necessary implication" that the case was brought on behalf of other taxpayers.

denial of a motion to dismiss, as is the case here. We assume that the facts well-pleaded in Appellees' Amended Complaint are true and, therefore, we must assume further that the complained-of State officials' actions were, in fact, *ultra vires*. *See, e.g.*, *RRC Ne., LLC*, 413 Md. at 643-44, 994 A.2d at 433-34.

That Appellees' allegations may be unproven at trial or Appellants' evidence found more credible or persuasive (*i.e.*, that the State Center Project and its formative documents were proper under the relevant state laws and regulations) does not figure in the analysis. *See Funk v. Mullan Contracting Co.*, 197 Md. 192, 196, 78 A.2d 632, 635 (1951) (stating that the taxpayer's right "to invoke the aid of a court of equity to restrain the action of an administrative agency of the State, when such action is illegal and may injuriously affect the taxpayer's rights or his property . . . does not depend upon the result; that is, he may be wrong in his contention, but nevertheless he has the right to invoke the aid of the courts to make it"). So long as the plaintiffs allege, in good faith, an *ultra vires* or illegal act by the State or one of its officers, as was done here, such allegations are sufficient to confer taxpayer standing doctrine, so as to entitle the plaintiff to get its foot in the courthouse door and receive potentially a merits hearing (all other things being equal) and determination whether the acts were, in fact, illegal or *ultra vires*. Therefore, we conclude that Appellees met this requirement through the allegations of their Amended Complaint.

### iv. Specific Injury Sufficient.

It is well-settled that the taxpayer must allege also a special interest distinct from the general public. *See, e.g.*, *Harlan v. Employers' Ass'n of Maryland*, 162 Md. 124, 131,

159 A. 267, 270 (1932) (citing *Gill*, 31 Md. at 375). This requirement "has been interpreted repeatedly to require a showing that the action being challenged results in a pecuniary loss or an increase in taxes." *Citizens Planning*, 273 Md. at 339, 329 A.2d at 684 (citations omitted).[63] As the inaugural case explained:

> It is certainly well settled that public wrongs cannot be redressed at the suit of individuals, who have no other interest in the matter than the rest of the public. Thus an individual cannot maintain a bill of injunction to prevent a public nuisance, unless he suffers thereby some special damage; and the principle governing cases of that kind has been supposed to be applicable to the present case. But it appears from the averments of the bill, that these complainants, as taxpayers of the city, and others similarly situated, in whose behalf as well as their own the bill is filed, constitute a class specially damaged by the alleged unlawful act of the corporation, **in the alleged increase of the burden of taxation upon their property situated within the city. The complainants have therefore a special interest in the subject-matter of the suit, distinct from that of the general public**.

*Gill*, 31 Md. at 394 (emphasis added). In other words, the special interest that is distinct from the general public is the *increased burden of taxation*.[64]

---

[63] Language in some of our cases contributes to some confusion on this point. *See, e.g.*, *Citizens Comm. of Anne Arundel Cnty., Inc. v. Cnty. Comm'rs*, 233 Md. 398, 404, 197 A.2d 108, 112 (1964) ("In any event it is clear that the loss or damage the complaining taxpayers claim to have sustained has likewise been proportionately suffered by all other taxpayers in the county."). Such dicta should not be read to unsettle the well-settled nature of the principles discussed here and in the other cases mentioned in this opinion.

[64] A common point of apparent confusion arises from prior statements and suggestions by this Court that the "restrictions on standing [regarding a special interest distinct from the general public] do not necessarily apply to a taxpayer" because "[t]his Court has held that a person's or an organization's status as a taxpayer entitles it to standing when the challenged statute, regulation, or government action increases or threatens to increase the taxpayer's tax burden." *Med. Waste Assocs. v. Maryland Waste Coal, Inc.*, 327 Md. 596, 613 n.10, 612 A.2d 241, 250 n.10 (1992) (citations omitted). This phrasing is somewhat misleading because the requirements for a special interest

(Continued…)

This Court has clarified this special interest requirement many times since *Gill*. For example, in *Ruark v. International Union of Operating Engineers, Local Union No. 37*, 157 Md. 576, 146 A. 797 (1929), we clarified the rule, explaining the requirement as follows:

> The special damage which the taxpayer of the political division sustains in a public wrong is **the prospective pecuniary loss incident to the increase in the amount of taxes he will be constrained to pay by reason of the illegal or *ultra vires* act of the municipality or other political unit**. Hence the **taxpayer's interest in the subject matter is not general, but special only, because of the future individual monetary burden cast upon him or his property**. The subsequent decisions have consistently maintained the rule, and have sanctioned the relief by injunction whenever it appeared that the taxpayer complaining would sustain a pecuniary loss, distinct from that of the general public, by reason of increased taxes, whether such increase resulted from an *ultra vires*, illegal, or void order, contract, ordinance, or statute in reference to an assessment of property, or to the levy, collection, expenditure, appropriation, or diversion of public taxes.

*Id.*, 157 Md. at 589-90, 146 A. at 802-03 (emphasis added) (footnotes omitted). *See also Harlan*, 162 Md. at 131, 159 A. at 270 ("If it appears that the wrong complained of may result in imposing an additional burden on the taxpayer, then he, with others similarly situated, constitute a class entitled to relief, and courts of equity will take cognizance of their complaint.") (citing *Gill*, 31 Md. at 375).

This requirement is the foundation of the taxpayer standing doctrine. As the Supreme Court of Alabama explained:

---

(…continued)
distinct from the general public apply still in this doctrine. Thus, the characterization of the injury is essential to the analysis.

98

> [T]he right of a taxpayer to sue is based upon **the taxpayer's equitable ownership of such funds and their liability to replenish the public treasury** for the deficiency which would be caused by the misappropriation.

*Broxton v. Siegelman,* 861 So. 2d 376 (Ala. 2003) (emphasis added) (citations and internal quotation marks omitted).

Taxpayers, like any plaintiffs, may not "'restrain official acts upon the mere ground that they are *ultra vires.*'" *Ruark*, 157 Md. at 588, 146 A. at 802 (quoting *Bauernschmidt v. Standard Oil Co.*, 153 Md. 647, 651, 139 A. 531, 533 (1927)). Rather, the *ultra vires* or illegal acts must cause a special damage to the taxpayer-complainant which differs from that impressed on the general public. *See, e.g.*, *Ruark*, 157 Md. at 592-93, 146 A. at 804 (concluding that "these taxpayers will not sustain any special damage" because "their interest in the subject matter of the eight contracts is merely that of every resident of Baltimore").[65]

"[T]he taxpayer plaintiff is not required to allege facts which **necessarily** lead to the conclusion that taxes will be increased; rather the test is whether the taxpayer 'reasonably **may** sustain a pecuniary loss or a tax increase'—'whether there has been a showing of **potential** pecuniary damage.'" *Inlet Assocs. v. Assateague House Condo. Ass'n*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988) (emphasis added in *Inlet Assocs.*) (quoting *Citizens Planning*, 273 Md. at 344, 329 A.2d at 687). To confer taxpayer

---

[65] The distinction between resident and taxpayer is significant. Remembering that distinction may contribute some clarity to the confusion. A party may be a resident of the State (and, thus, have a "general interest" in the State's actions), but not be a taxpayer whose pecuniary interest would be affected by that action (and, thus, not have the requisite "special interest").

standing upon a plaintiff, this Court requires, however, "a clear showing of [that] potential pecuniary damage" and of a nexus between that potential damage and the challenged act, *Gordon v. City of Baltimore*, 258 Md. 682, 687-88, 267 A.2d 98, 101 (1970); otherwise, the taxpayer would lack any injury upon which to base his, her, or its claim.

These general requirements are reiterated in almost every taxpayer standing doctrine case. Beyond these general requirements, though, the cases fail to articulate further guidance. The cases, while helpful on a fact-specific, individual basis, remain disorganized as a whole and even appear haphazard, due to the apparent contradictions between some of the holdings. Thus, before we are able to determine whether Appellees' allegations met the general requirements, we examine the facts from our prior cases and, to the extent possible, attempt to tease out general guiding principles that will help us determine whether the basic requirements for this doctrine are met here. In doing so, we divide our discussion of the injury into three broad subcategories: type of harm, nexus, and degree of harm.

*(1) What types of "harm" amount to a pecuniary loss?*

This Court has recognized repeatedly that taxpayers have the right to bring a lawsuit in this State to *prevent* waste or unlawful use of public property and funds.[66] *See,*

---

[66] While some other states allow taxpayer challenges to virtually any governmental conduct, *see, e.g.*, Joshua G. Urquhart, *Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines*, 81 Fordham L. Rev. 1263, 1282, 1282 n.122 (2012) (citing *Barber v. Ritter*, 196 P.3d 238, 246-47 (Colo. 2008); *Smith v. W. Va. State Bd. of Educ.*, 295 S.E.2d 680, 683 (W. Va.

(Continued…)

*e.g.*, *Hammond v. Lancaster*, 194 Md. 462, 474-75, 71 A.2d 474, 479 (1950) (concluding that, because the appellees have an interest, as taxpayer, to prevent waste of public funds, the questions regarding the constitutionality of the challenged statute was properly before the Court of Appeals); *Matthaei v. Housing Auth.*, 177 Md. 506, 510, 9 A.2d 835, 836 (1939) ("The proceeding [seeking an injunction against the erection of a housing project of the Housing Authority of Baltimore which allegedly transgressed statutory limits of the authority] is one on behalf of taxpayers who would be affected by diversion of state or city tax funds to wrong uses, or by exemption of properties from paying taxes like their own; and in this state the taxpayers may sue for an injunction."); *Hanlon v. Levin*, 168 Md. 674, 681, 179 A. 286, 289 (1935) (concluding that the appellee had the right to attack the Board of Park Commissioners' actions because "[h]e is a resident and taxpayer of Baltimore City and equity will at his instance enjoin the conveyance or diversion to unlawful use of municipal property or funds"). The question arises, however, what types of "harm" are sufficient to constitute "waste" so as to confer taxpayer standing upon a complainant.

Generally, the Court has exhibited great leniency in its interpretation of "potential pecuniary loss." *See, e.g.*, *Baltimore Retail Liquor Package Stores Ass'n v. Kerngood*, 171 Md. 426, 429, 189 A. 209, 210 (1937) ("The courts of the State will entertain

---

(…continued)
1982); *Greater Harbor 2000 v. City of Seattle*, 937 P.2d 1082, 1090-91 (Wash. 1997); Susan L. Parsons, *Comment, Taxpayers' Suits: Standing Barriers & Pecuniary Restraints*, 59 Temp. L.Q. 951, 951-52 (1986)), this State has adhered steadfastly to the requirement that the challenge must relate to fiscal conduct.

jurisdiction of suits by citizens and taxpayers for the writ of mandamus, or that of injunction, to correct unlawful action by municipal officers when the action may injuriously affect rights and property of the parties complaining. **And according to past applications of the rule, the interest or injury which will support such a suit is broadly comprehensive**.") (emphasis added) (citing *Gill*, 31 Md. at 395; *St. Mary's Industrial School v. Brown*, 45 Md. 310, 326 (1876); *Pumphrey v. Mayor of Baltimore*, 47 Md. 145, 153, 28 A. 446, 450 (1877); *Konig v. Baltimore*, 128 Md. 465, 477-78, 97 A. 837, 841 (1916); *Levering v. Williams*, 134 Md. 48, 59, 106 A. 176, 179-80 (1919); *Thomas v. Field*, 143 Md. 128, 141, 122 A. 25, 30 (1923); *Sun Cab Co. v. Cloud*, 162 Md. 419, 427, 159 A. 922, 925 (1932); *Jones v. Gordy*, 169 Md. 173, 178, 180 A. 272, 275 (1935)).

"[I]t is no longer an open question in this state that, if [a] statute is invalid and injurious to him, he has a clear right, as a taxpayer, to maintain this suit." *Dahler v. Washington Suburban Sanitary Comm'n*, 133 Md. 644, 646, 106 A. 10, 11 (1919)) (citing *Painter v. Mattfeldt*, 119 Md. 466, 87 A. 413 (1913); *Baltimore v. Keyser*, 72 Md. 106, 19 A. 706 (1809)); *see also id.* (holding that the plaintiff enjoyed taxpayer standing doctrine status because, "[a]s [a] taxpayer [the plaintiff] is liable for the assessments and taxation for the general purposes of the act," which created a suburban sanitary district); *Graf v. Hiser*, 144 Md. 418, 423, 125 A. 151, 153 (1924) ("The right of taxpayers to protect their interests by a suit in equity, for an injunction against taxation under an invalid or ineffective law, is not open to question.").

Invalid statutes are not, however, the only types of harm that may be a foundation for taxpayer standing. For example, in *James v. Anderson*, 281 Md. 137, 377 A.2d 865 (1977), the Court held that the plaintiff's pointing to an alleged "decrease in efficiency which would result from the alleged ultra vires acts" was "sufficient for a taxpayer of the county involved to maintain a suit." 281 Md. at 142, 377 A.2d at 868. In that case, the plaintiff sought declaratory judgment that the law "preclude[d] the County Executive from using the bond proceeds for the construction of the new courthouse on a new site." *James*, 281 Md. at 140, 377 A.2d at 867. The defendants countered that the plaintiff lacked taxpayer standing because "the expenditure planned by the County Executive would in fact be less than the expenditure required to renovate the old courthouse, and that, as such, the plaintiff had not alleged any special damages or pecuniary loss which would entitle him, as a taxpayer, to maintain the action." *Id.*

This Court disagreed. It noted that the plaintiff alleged "that it would be more efficient for the courts and their supporting agencies to operate in close proximity, as is called for in the renovation project." *James*, 281 Md. at 140, 377 A.2d at 867. In other words, "[t]he plaintiff challenges, as ultra vires, the actions of a County Executive, and points to a claimed decrease in efficiency which would result from the alleged ultra vires acts." *James*, 281 Md. at 142, 377 A.2d at 868. The Court held that "this is sufficient for a taxpayer of the county involved to maintain a suit." *Id.*

We have gone so far as to hold that a potential need to fend off charges of illegality *may* be sufficient to establish taxpayer standing. In *Citizens Planning*, we noted that "it is not illogical to expect that the county might incur some expense or loss, to the

103

detriment of taxpayers, including appellants, in an errort to fend off the charges of illegality." *Citizens Planning*, 273 Md. at 343, 329 A.2d at 687. We observed that "[s]uch potential losses alone may be sufficient to establish standing." *Id.* (citing *Castle Farms Dairy Stores v. Lexington Market Auth.*, 193 Md. 472, 482, 67 A.2d 490, 482 (1949)).[67]

*Sun Cab Co. v. Cloud*, 162 Md. 419, 159 A. 922 (1932), exemplifies one of the most lenient interpretations of what may constitute a sufficient plea of potential pecuniary loss.[68] In *Sun Cab Co.*, the Court held that the taxpayers, in a class suit, had sufficient monetary interest solely on the following grounds:

---

[67] This case was decided on other grounds as well. Whether the potential need to fend off charges of illegality is sufficient, standing alone, to establish this requirement of taxpayer standing is left for another day.

[68] One could argue that *Green v. Garrett*, 192 Md. 52, 59, 63 A.2d 326, 328 (1949), and *Castle Farms Dairy Stores v. Lexington Market Authority*, 193 Md. 472, 67 A.2d 490 (1949), are more lenient in not requiring taxpayers to show pecuniary or special loss. *See, e.g.*, *Gordon v. City of Baltimore*, 258 Md. 682, 688, 267 A.2d 98, 101-02 (1970) (referring to *Castle Farms Dairy Stores* as "[p]erhaps the most liberal application of the [taxpayer standing doctrine] test"). In *Citizens Committee*, however, the Court distinguished these cases in a significant manner when it found that standing in these cases was not based on taxpayer basis alone, but rather rested heavily upon the bases of nuisance and property owner standing:

> In the *Green* case, the taxpayers were allowed to attack an ordinance under which the city made profits, but they were held to have standing because the contract of renting made under the ordinance created a nuisance which detrimentally affected the rights and property of the taxpayers. It is doubtful that the taxpayers would have had standing **but for** the nuisance. Certainly the case cannot be interpreted to mean that taxpayers do not have to show either a pecuniary or special loss, for in fact the taxpayers suffered a special loss as a result of the nuisance. At p. 59 of 192 Md., at p. 328 of 63 A.2d, it was said that 'there is no doubt that as adjacent residents and property

(Continued…)

> If the subject-matter is at all within the cognizance of a court of equity, as we conclude it is, if that court may be resorted to for prevention of a popular vote which would be void because based upon insufficient petitions, then, according to the settled practice, taxpayers interested in avoiding the waste of funds derived from taxation which would be involved in conducting the void referendum may make application to the court for the remedy.

*Sun Cab Co.*, 162 Md. at 426, 159 A. at 925.

---

(…continued)

> owners, the appellants have an interest in restraining conditions arising out of the contract, which constitute a **special nuisance** to them.' [Emphasis supplied.] In the *Castle Farms* case, where the taxpayers' suit questioned the validity of an ordinance providing for the establishment of a new Lexington Market, it was said 193 Md. at p. 482, 67 A.2d at p. 493, that '[i]f the Act is unconstitutional the project is unlawful, and even though the City would not be obligated for the project [under the ordinance the City was not obligated for any expenses], it presumably would incur some expense or loss in extricating itself and its property. As taxpayers, therefore, plaintiffs are entitled to sue to enjoin such an unlawful project. * * * As owners and claimants of rights in the market, they may also, in the same case, sue to protect their property rights.' There, it had been argued that a loss to the city would constitute a pecuniary loss to the taxpayers. It had also been argued that the plaintiffs were stall holders in the old market and would be deprived of their property-a theory similar to the nuisance theory in the *Green* case. But, in the case at bar, there is no allegation or proof that the property rights of the taxpayers are adversely affected by the county gambling statutes. Therefore, both *Green* and *Castle Farm*s are distinguishable in that neither a pecuniary nor special loss is shown to have accrued as the result of deprivation of property rights.

*Citizens Comm.*, 233 Md. at 403-04, 197 A.2d at 111 (alterations and emphasis in the original).  Other cases decided since *Citizens Committee* have relied upon *Green* and *Castle Farms Dairy* as taxpayer standing doctrine cases.  This confusion in whether they represent taxpayer or property owner standing analyses is yet another example of the convoluted approach to these doctrines fomenting greater confusion in some of the later cases.

Similarly, in *Harlan v. Employers' Ass'n of Maryland*, 162 Md. 124, 159 A. 267 (1932), the Court concluded, "the facts alleged on behalf of the taxpayers [are] sufficient to allow them to maintain this suit." 162 Md. at 132, 159 A. at 270. The facts in that case were as follows:

> In the bill of complaint here demurred to it is charged "that the enforcement by the city of payment of the schedule of wages as set out in the above mentioned report of the committee will naturally increase the cost of municipal work above its present level, and the inevitable consequence of such increase will be an additional burden upon the taxpayers and property owners." The report of the committee, filed as an exhibit to the bill, shows that the high and low figures were taken into consideration and a compromise schedule arranged, all of which is admitted by the demurrer to be true. Such action on the part of the city with regard to contracts for public work may also be inconsistent with the provisions of section 15 of the City Charter, article 4 of the Code of Public Local Laws, which requires contracts to be awarded to the lowest responsible bidder, subject to the right to invite alternative bids.

*Harlan*, 162 Md. at 131-32, 159 A. at 270.

In the present case, the State Agencies argue that Appellees failed to allege any "harm" sufficient to confer taxpayer standing. According to the State Agencies, Appellees should have challenged the entire project, in order to allege taxpayer standing properly, because challenging only the formative contracts and the process by which the State conducted its search for a developer of the State Center project is improper for attainment of taxpayer standing. We find no merit in this contention. From our precedent, we are able to summarize that the issue is not what "type" of harm is sufficient necessarily, but rather a much more forgiving question of whether the type of harm is one that may affect the complainant's taxes. To determine that, Appellees' claims, framed as discrete challenges, are the proper focus of our analysis.

106

In analyzing Appellees' challenges, we begin with those challenges alleging violations of the Procurement Law. *See* Amended Complaints' Counts I, II, III, and VI. At the heart of all of these challenges are the competitive bidding requirements, which exist for the benefit of the taxpayers. *See 120 W. Fayette St., LLLP v. Mayor of Baltimore City*, 413 Md. 309, 333, 341, 992 A.2d 459, 474, 479 (2010) ("*Superblock II*") (noting that the purpose of the competitive bidding requirements is "'to prevent favoritism and collusion'" as well as "to eliminate . . . government overspending" and thereby ensure that public works projects are procured at the lowest cost to taxpayers) (quoting *Bd. of Educ. v. Allender*, 206 Md. 466, 475, 112 A.2d 455, 459 (1955)) (citing *Bennett v. Baltimore*, 106 Md. 484, 68 A. 14 (1907)); *Hylton v. Mayor of Baltimore*, 268 Md. 266, 277, 300 A.2d 656, 661 (1972) ("The general purpose of competitive bid requirements is 'to obtain unrestricted competitive bidding for contracts . . . and thereby to safeguard public funds by preventing favoritism, collusion and extravagance.'") (quoting *Hanna v. Bd. of Educ.*, 200 Md. 49, 54, 87 A.2d 846, 848 (1952)). As this Court stated in *Hylton*, quoting McQuillin's summary of the law of competitive bid requirements for contracts:

> "The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and **they are enacted for the benefit of property holders and taxpayers**, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably **with sole reference to the public interest**. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purport. Such provisions must be read in the light of the reason for their enactment, lest they be applied where they were not intended to

107

operate and thus deny municipalities authority to deal with problems in a sensible, practical way. . . ."

268 Md. at 277-78, 87 A.2d at 661-62 (emphasis added) (quoting 10 McQuillin, *Municipal Corporations* 321-22, § 29.29 (3d. Ed. rev. vol. 1966)).  *See generally* Livingston & Hoover, *supra*, at 1-12 (discussing, throughout their examination of Maryland Procurement Law, the underlying driving motivation for the law to benefit the taxpayers).  Accordingly, in the context of taxpayer suits challenging governmental acts for failing allegedly to abide by competitive bidding requirements, this Court has conferred a particularly broad interpretation of "potential pecuniary loss."  *See, e.g.*, *Mayor of Baltimore v. Keyser*, 72 Md. 106, 19 A. 706; *Bennett v. City of Baltimore*, 106 Md. 484 (1907); *Hanna*, 200 Md. 49.  Therefore, where it is alleged that the State or municipality fails to abide by the requirements for competitive bidding, we presume (at least for present purposes) that the taxpayers are injured directly in that they are responsible for the claimed extra expenses attendant to whatever other method was adopted.

An important distinction exists, however, between a taxpayer's challenge of a contract or statute as *ultra vires*, as discussed above, and that of a contract or statute as not being administered correctly.  We explained this difference in *Ruark*:

> [T]here is a distinction drawn between the prevention of public officials from doing a primary act, which is *ultra vires* or unlawful, as the making of a contract, of an assessment of property, of a levy of taxes, or of an appropriation of funds; and the occurrence of secondary errors, irregularities, or criminal conduct in the course of the performance of a valid contract or of an authorized municipal function. The latter acts fall into a different category and, generally, do not justify the issuing of an injunction, since they are not of a fundamental character, and may be

108

controlled or compensated by other remedies, and because equity has no supervisory power over public corporations and their officers.

*Ruark*, 157 Md. at 593, 146 A. at 804 (citations omitted). Although the distinction made in *Ruark* dealt with the equitable right to injunction, it also appears to apply with equal force to taxpayer standing to seek the injunction. We clarified this distinction (somewhat) in our recent decision in *Superblock III*, which precluded taxpayer standing where the complainants challenged the administration of a contract and distinguished *Superblock I* on the grounds that the complainants in the earlier iteration of the litigation were maintaining that the government failed to comply with an ordinance or statute. *See Superblock III*, 426 Md. at 27-29, 43 A.3d at 363-64.

The rationale is partially that, at a certain point, the requirement that the *ultra vires* act result reasonably in a potential pecuniary loss is much more difficult to prove if there is merely an officer or unit administering a program. The reason this situation is more difficult is because

> **where the action of a municipal corporation or administrative agency is within the scope of its authority, and does not affect the vested rights of liberty or property, the court will not review its exercise of discretion**, unless such exercise is fraudulent or corrupt or such abuse of discretion as to amount to breach of trust. The courts assume the fitness of administrative officials who are familiar with the matter in dispute and informed by training and experience to pass upon the questions of fact presented to them. Therefore, the courts feel that they should not substitute their own judgments for the findings of administrative officials in the absence of unusual circumstances.

*Coddington v. Helbig*, 195 Md. 330, 337, 73 A.2d 454, 456-57 (1950) (emphasis added) (citations omitted). Similarly, in *Hanna*, we stated:

> On a suit by a taxpayer, a court of equity will not review the exercise of discretion of an administrative agency, if it acts within the scope of its authority, unless its power is fraudulently or corruptly exercised; but the court will restrain an agency from entering into or performing a void or ultra vires contract or from acting fraudulently or so arbitrarily as to constitute a breach of trust . . . .

*Hanna*, 200 Md. at 50, 87 A.2d at 847 (citations omitted). In that case, we held that the taxpayers had standing to challenge a contract awarded in violation of a statute requiring public works contract to be let to the lowest bidder.

In contrast, in *Coddington*, several taxpayers sought to enjoin the Board of Commissioners of Garrett County from expending certain borrowed money for the construction of two high school buildings. The taxpayers argued that the Commissioners were authorized to borrow the money to build new schools *and to improve and/or make additions to existing* schools. The Commissioners planned, however, to use all of the borrowed money to build two new schools, leaving no money to make improvements to existing schools. The Court of Appeals found that this was "an administrative function to be exercised by the officials to whom the Legislature has delegated authority over the administration of the schools." *Coddington*, 73 A.2d at 337, 73 A.2d at 457 (citations omitted). The Court reasoned, however, that

> "if there be an attempt to apply the funds to objects not embraced within the power granted, or to objects within the power, but in total disregard of essential conditions prescribed by the statute to make it lawful to appropriate the funds, a court of equity will interfere to restrain such action. . . . But so long as such body of public functionaries confine themselves within the limits of the power delegated, the court will not interfere with the exercise of their discretionary powers, or undertake to determine the question whether the act complained of be wise or unwise, good or bad."

110

*Coddington*, 195 Md. at 337-38, 73 A.2d at 457 (quoting *Wiley v. Bd. of School Comm'rs*, 51 Md. 401, 404 (1879)). The Court concluded:

> In the instant case there is no allegation that the County Commissioners are acting fraudulently. The only question for decision, therefore, is whether the bill alleges such gross abuse of discretion as to amount to breach of trust. There is no doubt that the Commissioners have the authority to erect high school buildings in places other than the towns mentioned in the Act, for the Act gives them broad authority, subject only to the State Superintendent's approval, to build school buildings in any community or communities that need new buildings.

*Coddington*, 195 Md. at 338, 73 A.2d at 457.[69] *See also Montgomery Cnty. Comm'rs v. Henderson*, 122 Md. 533, 536, 89 A. 858, 860 (1914) ("The question as to whether it appeared from the petition of the citizens and taxpayers of the district filed in the case that there was a general public demand for the 'procurement and improvement' of the road as stated by the statute was a matter left by the statute to the judgment and discretion of the county commissioners, and their action in this respect is not reviewable by this court.").

Thus, because challenges of "a *secondary* error" do not fall necessarily within the same category of the well-settled doctrine in this State that taxpayers may seek the aid of

---

[69] A correlative principle is that, even where the administrative agency may act outside of its authority, if the claimant fails to allege how the *ultra vires* act would create an increase in taxes, then the claimant has not alleged sufficient facts to confer taxpayer standing. For example, in *Superblock III*, 120 West Fayette averred that it had taxpayer standing because it was a taxpayer and a governmental agent's action was *ultra vires* and illegal allegedly. The alleged illegal action was the loss of a discretionary power to cooperate in decisions involving the demolition of buildings in a historical area. There was no alleged explanation, however, for how this would amount to a pecuniary loss for taxpayers. *See generally Superblock III*, 426 Md. at 27-29, 43 A.3d at 363-64 (discussing lack of taxpayer standing in that case).

a court of equity to "prevent[] [] public officials from doing a primary act, which is ultra vires or unlawful, [such] as the making of a contract . . . ," *Ruark*, 157 Md. at 593, 146 A. at 804, we must analyze Appellees' individual challenges with this distinction in mind. With regard to Appellees' claims involving violations of the Procurement Law, we conclude that their Amended Complaint does not fall prey to the same flaws as identified in *Superblock III* and other cases. Appellees alleged, throughout their Amended Complaint, that the State violated the Procurement Law by entering into the formative contracts for the Project other than through public bidding. This alone was sufficient (for pleading purposes) to meet this element of the requisite injury component of the taxpayer standing doctrine as to Appellees for those challenges.

In contrast, Appellees' challenge of the State Center's TOD designation is, if error at all, a "secondary error" that is not subject to our review.[70] While the RFQ, MDA, and First Amendment envisioned a TOD designation, the State Agencies and the Developers did not designate the State Center as a TOD. Rather, the Secretary of MDOT and the Mayor of the City of Baltimore effected this designation. While the designation has implications on where certain tax incentives and benefits are directed, such tax implications are within the proper scope of the municipal corporation or administrative agency's authority, "and does not affect the vested rights of liberty or property . . . ." Thus, as we explained in *Coddington*, the court will not review such an exercise of

---

[70] This issue is not for our review also because Appellees chose not to pursue it on appeal. We point out this distinction for clarity in application of the law, however.

112

discretion, unless such exercise is fraudulent or corrupt, or such abuse of discretion rises to the level of a breach of trust. Because Appellees made no direct allegations of fraud or corruption,[71] if the TOD designation were before us on appeal, we would conclude that the TOD designation failed to impact taxpayers' pecuniary interest in a primary way so as to confer taxpayer standing.

Lastly, Appellees alleged that they were damaged by the presumed competition that the completed State Center would pose to their businesses. *See, e.g.*, Amended Complaint, at ¶ 22 ("The relocation of State agencies from the CBD to State Center will cause the Commercial Property Owners and Retail Merchants [termed "Plaintiffs" in this opinion] loss of revenues, diminution of asset values and other economic harms, deprive Baltimore City of property tax revenues at levels now paid by the [Plaintiffs] and further the flight and blight in the CBD. This constitutes an imminent harm to the [Plaintiffs] caused by the *ultra vires* actions of the State agencies.") While such allegations do not detract from our finding that other allegations were sufficient to satisfy this element, these allegations of competition do not fit within the purview of taxpayer standing injuries and, thus, for our analysis, we disregard them entirely. Those harms are individual, private harms that do not affect the relevant class of taxpayers. As the

---

[71] Their suggestion that "[t]he Project was designated as a TOD only after the State was made aware of potential litigation through discussions with property owners who were attempting to resolve the dispute prior to instituting litigation," Amended Complaint, at ¶ 216, is not sufficient to raise genuine concerns of fraud or corruption. Furthermore, their suggestion that the designation of the State Center as a TOD is "arbitrary and capricious," Amended Complaint, at ¶ 220, lacks any support as well.

113

Plaintiffs stated correctly in their Amended Complaint, these allegations of harm arising from the increased competition "constitutes an imminent harm **to the Commercial Property Owners and Retail Merchants** . . . ." Amended Complaint, at ¶ 22 (emphasis added).

*(2) Nexus*

Perhaps the most frequent stumbling block for a taxpayer to bring a suit under the doctrine is that the challenged act must affect potentially a tax that the taxpayer-plaintiff pays, *i.e.*, this nexus must be alleged sufficiently. A review of the cases reveals that the taxpayer must be asserting a challenge and seeking a remedy that, if granted, would alleviate the tax burden on that individual and others;[72] otherwise, standing does not exist. The corollary to this requirement is also that taxpayers may challenge only certain

---

[72] That the taxpayers may have an ulterior motivation (beyond the altruistic desire to ensure that government behaves correctly and spends taxpayers' money legally and prudently) for bringing the suit does not matter to the analysis. *Packard v. Haynes*, 94 Md. 233, 243, 51 A. 32, 36 (1902) (holding that, where the plaintiff, as taxpayer, had a clear legal right to enforce, "the motives that actuated the bringing of the suit were immaterial" and, thus, "the allegation of the want of good faith in the plaintiff in bringing the suit . . . was immaterial"); *see also Castle Farms Dairy Stores v. Lexington Mkt. Auth.*, 193 Md. 472, 482, 67 A.2d 490, 493 (1949) ("As owners and claimants of rights in the market, they may also, in the same case, sue to protect their property rights. The conflict between any rights of plaintiffs in the market and their interests as taxpayers shows the artificial character of this suit, but does not bar it.") (internal citation omitted). In fact, scholars recognize that ulterior, non-altruistic motivations underlie most taxpayer suits and yet serve as the impetus for checking improper governmental actions. *See, e.g.*, Note, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895, 914 (1960) (recognizing that "the theory of taxpayer litigation is employment of private motivations for public benefit"). Without the ulterior motivations, the potential gain from a taxpayer suit, which is often very small when divided among all taxpayers, would serve rarely as an impetus for a taxpayer suit.

114

statutes.  In viewing other areas of law, we have not permitted taxpayers to enforce any

statute unless it affects the taxpayers' individual tax burden.  *See, e.g.*, *Baltimore Retail*

*Liquor Package Stores Ass'n v. Kerngood*, 171 Md. 426, 429, 189 A. 209, 209-10 (1937)

(discussed more in-depth *infra* p. 116 and note 74).

Many cases emphasize that standing cannot exist if the remedy sought would not

decrease the taxpayer's monetary burden.  For example, in *Citizens Committee of Anne*

*Arundel County, Inc. v. County Commissioners of Anne Arundel County*, 233 Md. 398,

197 A.2d 108 (1964), the Court held that the taxpayer did not prove or show that he had a

sufficient interest to test the constitutionality or validity of the pertinent statute because

the remedy sought, if granted, would not decrease the taxpayer's burden.  233 Md. at 405,

197 A.2d at 112.  In that case, a group of individual county residents, citizens, taxpayers

and an incorporated citizens committee challenged the constitutionality and validity of

local laws authorizing the operation of gambling devices and activities, and sought

injunctive relief.  The Court noted that, because the revenues from the licensing program

exceeded the cost of its administration by more than $500,000, "[i]t would seem obvious

therefore that the plaintiffs suffered no pecuniary loss due to the fact that some of the

administration expenses were paid out of general public funds."  *Citizens Comm.*, 233

Md. at 404, 197 A.2d at 111.  Moreover, "the taxpayers would be damaged by a

discontinuance of the program rather than a continuance of it."[73] *Id.*, 233 Md. at 404, 197

---

[73] *Murray v. Comptroller of Treasury*, 241 Md. 383, 391-92, 216 A.2d 897, 901-02 (1966), summarized *infra* p. 119, represents the converse.

A.2d at 111-12. Thus, the Court concluded, the plaintiffs failed to prove they had standing. *Id.*, 233 Md. at 405, 197 A.2d at 112.

It is important to note also that, even where a plaintiff may aver he is bringing the suit as a taxpayer, a court must examine whether he alleges that his tax burden is hurt by the allegedly illegal act or statute. For example, in *Baltimore Retail Liquor Package Stores Ass'n v. Kerngood*, 171 Md. 426, 429, 189 A. 209, 209-10 (1937), the plaintiffs, as owners of licensed retail liquor stores and as taxpayers of the City, protested the renewal of a purchased license for a competing store on the grounds that such renewal violated a statute. Although the plaintiffs brought the suit as taxpayers of the City, the Court pointed out that, even though the courts in this State have found the "interest or injury which support [a taxpayer doctrine] suit is broadly comprehensive," "[i]n this instance, there is no levy of taxes or outlay of public money to affect the petitioners as taxpayers." *Id.*, 171 Md. at 429, 189 A. at 210.[74] *See also Carroll Park Manor Cnty. Ass'n v. Bd. of*

---

[74] The Court continued by analyzing whether the plaintiffs had an individual interest sufficient to confer standing. *Baltimore Retail Liquor Package Stores Ass'n v. Kerngood*, 171 Md. 426, 429-30, 189 A. 209, 210 (1937). The Court found they did not.

> As holders of liquor licenses they have no franchises or exclusive privileges to be affected; they have only permits to engage in the business of selling alcoholic liquors. The interest which impels them to sue is only that of business advantage in keeping down the number of their competitors. They are not entitled in law to any advantage in a restricted number; it was not within the purpose of the statute to restrict competition for the benefit of any licensee; and in the accomplishment of the purpose which was sought, whatever it may have been, the petitioners are entirely without special interest.

*Id.* (internal citations omitted).

116

*Cnty. Comm'rs*, 50 Md. App. 319, 324, 437 A.2d 689, 692 (1981) (finding that Frederick County's failure to honor a charitable trust was an *ultra vires* act, but concluding that appellants were not entitled to bring the suit because they failed to show how the failure to abide the terms of the trust may result in their sustaining an increased tax burden or a pecuniary loss); *Kerpelman*, 261 Md. at 442-43, 276 A.2d at 60 (finding that complainant failed to allege sufficient injury because "the challenged transactions have-or-will-result in the placing of additional land on the tax rolls which will increase the tax base of the State so that the State taxes paid by [complainant] will actually be reduced as a result of those transactions" and because the complainant failed to explain how the "general allegations that the conveyances will have a damaging effect upon the marine ecology of the State" might "result in the payment of higher State taxes by [complainant]").

The requirement that the remedy sought, if granted, must alleviate the taxpayer's burden must be viewed also in light of the general principles that require the doctrine to extend to *all* similarly-situated taxpayers. In other words, the remedy sought, if granted, must alleviate *all* similarly situated taxpayers' burden, not just the plaintiffs' personal burdens. This Court concluded that taxpayer standing did not exist in those cases where the plaintiffs sued in equity, allegedly as taxpayers, but failed to explain how the injury would extend to all taxpayers as a class generally. In such cases, "the ground of complaint is limited to their own injury." *Cook v. Normac Corp.*, 176 Md. 394, 395, 4 A.2d 747, 748 (1939). Because "[p]rivate individuals cannot redress the mere public wrong from disregard of the ordinances [or other statutes]," the only injury that the Court finds in such cases is that of the individual.

117

In *Cook*, the individual injury alleged was "only that which may result from competition . . . . But mere competition is not an evil which business men may enjoin as a wrong to them. Competition without full compliance with the law has been enjoined at the suit of private individuals, but only under some conditions . . . ." *Cook*, 176 Md. at 397, 4 A.2d at 749. Similarly, in *Fisher & Carozza Bros. Co. v. Mackall*, 138 Md. 586, 114 A. 580 (1921), the Court emphasized the importance that the alleged injury must be alleged to affect potentially all similarly-situated taxpayers:

> This suit, however, was not brought by the plaintiff as a taxpayer of the state, on its own behalf and on behalf of other taxpayers of the state, nor does it appear from the averments of the bill that it was such a taxpayer. The bill does not therefore bring the plaintiff within the class of persons entitled to maintain a suit to restrain the execution on behalf of the state of an illegal contract, or to enjoin the unlawful expenditure of the funds of the state.

138 Md. at 597, 114 A. at 584.

When, however, the complainant alleges that he or she will suffer as a taxpayer due to increased taxpayer burdens and the government alleges that the taxpayers will not suffer any increased taxpayer burden, but rather the taxes would be diminished likely, "the court will not weigh potential gains against potential losses and speculate on a net result" "in determining a taxpayer's pecuniary injury resulting from a claimed unlawful governmental act."[75] *Inlet Assocs.*, 313 Md. at 442, 545 A.2d at 1311 (citing *Citizens Planning*, 273 Md. at 343-44, 329 A.2d at 687). Thus, "the taxpayer need not

---

[75] The Court's refusal to weigh potential gains against potential losses and to speculate on a net result is different from the Court's finding that the complainant failed to allege *any* potential loss resulting from the alleged harm. *See, e.g.*, *Kerpelman*, 261 Md. at 443, 276 A.2d at 60.

demonstrate that, **necessarily**, there will be pecuniary loss or increased taxes, but only the reasonable existence of that potential." *Id.*, 313 Md. at 442-43, 545 A.2d at 1311.

When the complainant alleges a reasonable potential for increased taxes or pecuniary loss, this Court has not hesitated to find (repeatedly) that such minimal allegations are sufficient. *See, e.g.*, *Boitnott v. Mayor of Baltimore*, 356 Md. 226, 234, 738 A.2d 881, 885 (1999) (finding that "[t]he allegation by the petitioners that the City has expended Twenty million dollars in developing Inner Harbor East prior to the present litigation is sufficient allegation of potential pecuniary damage by way of tax increase to withstand a standing challenge"); *Murray v. Comptroller of Treasury*, 241 Md. 383, 391-92, 216 A.2d 897, 901-02 (1966) (finding that the appellants had taxpayer standing to challenge the tax exemption because "[t]he property owners who pay real estate taxes to the state, represented by all the appellants, would pay less taxes to the state if the exempted property were taxed"). Moreover, we have found that it is not dispositive that the complainant may be incorrect in his/her/its assertion that the taxes will be increased. *See, e.g.*, *McKaig v. Mayor of Cumberland*, 208 Md. 95, 102, 116 A.2d 384, 387-88 (1955). The test is merely whether an increase in taxes is *reasonably* likely to occur.

In the present case, the State Agencies aver that Appellees' claims of taxpayer harm lack any "nexus" to the alleged illegal acts of the public officials. This is not accurate. While it is true that the total cost exposure to the State is difficult to ascertain, *see* Amended Complaint, at ¶ 14 (quoting the Department of Legislative Services ("DLS"), *State Center – Transit-oriented Development Briefing* (Feb. 2009)), as stating that "the total cost exposure to the State may never be known"), such a difficulty is the

reason that we do not require taxpayers to demonstrate in pleading the exact pecuniary loss or increase in taxes.

In this case, Appellees alleged in their Amended Complaint that the Project is expected to cost $1.5 billion. Amended Complaint, at ¶ 2. "By virtue of the First Amendment, MDOT assumed that obligation [for the design, financing, construction, operation and maintenance of an underground garage for the Project] and also agreed to contribute up to $28 million taxpayer dollars toward the cost of the garage design and construction." Amended Complaint, at ¶ 10. On 15 December 2010, "the BPW approved the issuance of $33 million in MEDCO Bonds supported by taxpayer revenues to build a Phase I parking garage at State Center . . . ." Amended Complaint, at ¶ 17. More specifically, Appellees allege that they will suffer a property tax increase due to this Project:

> Although the cost of the redevelopment has been represented to be financed with private funds, it will actually be financed in substantial part at the expense of existing Commercial Property Owners, Retail Merchants and others, through, among other ways, the issuance of City property tax increment financed bonds and other State and City assisted tax incentives. For example, the Project calls for the establishment of a Tax Incentive Financing ("TIF") program of up to $314,254,055.00, allowing the Project's self-described "partner," Baltimore City, irrevocably to redirect future, increased property tax payments away from important City services and needs and into the debt service for the Developer's construction financing. Plaintiffs will sustain an adverse impact from these expenditures, and those of the State, of taxpayer funds.

Amended Complaint, at ¶ 19 (emphasis added) (footnote omitted). Additionally, Appellees assert that, because,

> "[t]he projected property assessments for State Center appear unrealistically high and do not appear to provide a sufficient base for paying the annual

120

debt service on the TIF without providing any additional property tax revenue in Baltimore City for the first 25 years,' . . . 'there is the potential that the developer could pass on higher costs to the State in the form of additional rent payments in order to cover annual debt service on the TIF."

Amended Complaint, at ¶ 20 (quoting DLS, *State Center Transit Oriented Development Briefing* (May 2009) (hereinafter "DLS May 2009 Briefing")).[76] Appellees conclude the

---

[76] Appellees aver in their Amended Complaint that the Project may not be viable in the long-run or may not be the best course of action for the State. *See, e.g.*, Amended Complaint, at ¶ 24 ("The Project . . . undermines past public policy decision to revitalize the CBD, including downtown Baltimore and the Inner Harbor."); ¶ 25 ("Injecting over 1.5 million square feet of new State and city subsidized commercial office space in the Baltimore metropolitan area will add an enormous, commercially unsupportable supply of office space in an already oversaturated and under-leased marketplace . . . It will directly and proximately cause myriad problems in the core downtown area, including long-term commercial vacancies, blight and business flight away from the center core of the City, all at a substantial loss of City property tax revenues. The CBD cannot remain viable under these circumstances."); ¶ 26 ("Existing adverse commercial and market forces will be further exacerbated by the Project."); ¶ 27 ("The large increase in the supply of retail space through the Project will lead directly to higher vacancy rates in the CBD, directly cause further harm to the Commercial Property Owners and lower levels of property tax collection for the City of Baltimore."); ¶ 28 ("The Project threatens to increase vacancy rates by injecting government incentives into a massive State-sponsored development project that would otherwise be dependent on free market factors. . . . Increased supply of commercial office and retail space will, in turn, depress rental rates, which will adversely impact Plaintiffs' properties and business"); ¶ 30 ("Redirecting the concentration of commercial office space to areas outside the CBD will lead to pockets of blight and will threaten the economic viability of the existing commercial and retail properties, including those in the CBD. Often referred to as 'leap frog' development strategies, the decentralization of commercial development has repeatedly led to the devaluation of the investments made by private sector entrepreneurs, urban blight, the flight of retail establishments, and other negative impacts."). Appellees cite the DLS as reaching similar findings. *See, e.g.*, Amended Complaint, at ¶ 29 ("According to DLS, '[t]he current economic climate raises concerns about the viability of the project given high inventory levels of vacant office space and housing in Baltimore City . . .'") (brackets in original) (quoting DLS May 2009 Briefing); ¶ 31 ("DLS concludes that 'the current State Center proposal is not in the best interest of the State.'") (quoting DLS May 2009 Briefing); ¶ 33 (noting that the DLS stated that the benefits may never materialize) (citing DLS February 2009 Briefing).

(Continued…)

introduction of their Amended Complaint by stating "[f]or these reasons and others, the Project will have a devastating financial impact on the CBD [Central Business District], its Commercial Property Owners and Retail Merchants, who are taxpayers and/or landowners in Baltimore City" and "Plaintiffs will uniquely bear the excessive costs, . . . as well as increased taxes, among other reasons, from the State's failure to use open competition for procurement of design and construction services, thus, not ensuring the best deal for the State."[77]  Amended Complaint, at ¶ 33.  Such allegations are sufficient to overcome the Motions to Dismiss as to this element of taxpayer standing.

---

(…continued)

Such arguments are not within the purview of this Court.  Taxpayer standing doctrine is not a method by which litigants may ask this Court to review the feasibility or wisdom of legislative decisions made properly within the Legislature's authority—under the guise of a loss of tax revenues due to the alleged lack of wisdom in the decision.  The taxpayer standing doctrine does not grant standing to every taxpayer who may allege a general harm.  Thus, the Plaintiffs' allegations of the general harm suffered by taxpayers of the State are irrelevant as well.  *See, e.g.*, Amended Complaint, at ¶ 33 ("[T]he Project will have a devastating financial impact on the CBD, its Commercial Property Owners and Retail Merchants, **who are taxpayers and/or landowners in Baltimore City**.  The Commercial Property Owners and Retail Merchants employ, directly or indirectly, thousands of people and have invested heavily in their properties, their business, and the City.  The Project allows the Developer to receive City and State subsidized benefits and opportunities unavailable to the Commercial Property Owners and Retail Merchants, all without compliance with State procurement laws.") (emphasis added).

In this case, Appellees wasted a great deal of everyone's time attempting to establish the infeasibility and the imprudence of the Project, as well as general harms unrelated to expenditures from the public coffers.

[77] Appellees alleged, in full, that "Plaintiffs will uniquely bear the excessive costs, **lose business opportunities, loss of customers, suffer a diminution in the value of their assets and other catastrophic financial loss**, as well as increased taxes . . ." Amended Complaint, at ¶ 33 (emphasis added).  These additional factors (and other similar allegations) do not provide a basis for taxpayer standing and, as stated previously, are disregarded in our analysis.

*(3) Amount of Pecuniary Harm.*

In this case, the State Agencies aver that, even if Appellees alleged a proper type of "harm," the amount of pecuniary loss asserted was too speculative to confer taxpayer standing. The State Agencies suggest that, because the State is the actor in this case, the amount of increase in Appellees' taxes is too attenuated or diluted to confer taxpayer standing. This argument continues that the taxpayers have more of a direct interest in challenging a municipal action (like one taken by the City only) than the State's action because, when the damage is spread across all of the City's taxpayers, the individual taxpayer will feel more of an impact than when spreading an alleged injury across all of the State's taxpayers.

It is well-settled that the individual's monetary burden does not need to be calculable at the time of filing suit. Equally well-settled, however, is the requirement that there must be a "clear showing" that a monetary burden is alleged. This Court has noted repeatedly that the taxpayers are not required to prove an exact amount of pecuniary damage that he or she or they will suffer. In fact, we have gone so far as to state that the amount of individual loss is largely irrelevant. *See, e.g.*, *Citizens Planning*, 273 Md. at 344, 329 A.2d at 687 ("The property loss may be small when apportioned among all of them, especially where . . . the suit is instituted by one or more taxpayers in representation of all those similarly situated."). As we said in *Citizens Planning*,

> The courts below attached considerable significance to what they regard as conclusory language in the bill of complaint. Concededly, the allegations might have been particularized in greater detail, but this shortcoming may have been unavoidable in the unique circumstances of this case. **The extent to which a taxpayer is capable of detailing the damage anticipated**

123

**from an illegal and ultra vires act, such as is alleged here, may be rather limited** at the time the suit is initially filed. Contrary to the suggestion of the Court of Special Appeals, **appellants are not required to allege '. . . facts which necessarily lead to the conclusion that taxes will be increased.'** [*Citizens Planning & Housing Ass'n v. Cnty. Exec. of Baltimore Cnty.*,] 20 Md. App. [430,] 434, 316 A.2d [263,] 266 [(1974)] (emphasis added). **The test is whether appellants reasonably may sustain a pecuniary loss or a tax increase**; *see Reed v. McKeldin*[, 207 Md. 553, 558, 115 A.2d 281, 284 (1955)]; *Masson v Reindollar*[, 193 Md. 683, 687-88, 69 A.2d 482, 484 (1949)]; *Liquor Stores Assn. v. Commrs*[, 171 Md. 426, 429, 189 A. 209, 210 (1937)]. . . .; or, as the Court of Special Appeals itself noted, whether there has been a showing of potential pecuniary damage. *Gordon v. City of Baltimore*, [ ] 258 Md. [682,] 687-688, 267 A.2d 98[, 101-02 (1970)]; *see Thomas v. Howard County*, [ ] 261 Md. [422,] 432, 276 A.2d 49[, 54 (1971)].

273 Md. at 344, 329 A.2d at 687 (emphasis added). Moreover, in reviewing a circuit court's action on a motion to dismiss, the appellate courts "accept as true the reasonable inferences which may be drawn from the facts alleged . . . ." *Citizens Planning*, 273 Md. at 345, 329 A.2d at 687. Accordingly, it is not "essential that the amount of the loss of revenue be specifically set forth." *Id.*, 273 Md. at 344, 329 A.2d at 687. The important requirement is that the plaintiff allege that, as a taxpayer, he or she "would be pecuniarily affected." *See Funk*, 197 Md. at 196, 78 A.2d at 635 (distinguishing that case from *Phillips v. Ober*, 197 Md. 167, 78 A.2d 630 (1951)). As discussed above, Appellees pleaded sufficiently a loss of revenue from the public funds contributed by them as taxpayers.

We also reject the State Agencies' contention that the alleged loss is too miniscule relative to the State action challenged. The relevant line of decisions in this State do not appear to us to support this assertion.[78] For example, in *Sun Cab Co.*, the Court stated,

> Probably the loss to one taxpayer in any such proceeding seldom amounts to $20, the minimum of the debt or damage which a court of equity may consider. Code, art. 16, § 109; *Kenneweg v. Allegany County Com'rs*, 102 Md. 119, [121], 62 A. 249, 250 [(1905)]. **But, when a suit is instituted by one or more taxpayers in representation of all, the case is quite different. The amount involved and sought to be protected is then the total amount of loss to taxpayers, or the total amount which may be wrongfully expended.** In *Kenneweg v. Allegany County*, supra, cited against the maintenance of the present suit, a single taxpayer was the complainant, and, as the court observed, he "does not sue in behalf of

---

[78] Dicta in some cases refers to the small amount of damages that *each* taxpayer suffers. For example, in 1880, this Court stated, "[t]he public has no interest in this controversy. The difference between the proposals of the competing contractors is infinitesimally small, when divided amongst the tax-payers." *Kelly*, 53 Md. at 142-43. As discussed *supra*, however, that case is distinguishable as a private claim and, thus, this language should be read as dicta.

Additionally, *Kerpelman* found that a taxpayer of the State and of Baltimore City did not have sufficient interest in the subject matter, a piece of property in Worcester County, because "Mrs. Kerpelman alleges no interest in that property as a local taxpayer." *Kerpelman*, 261 Md. at 442, 276 A.2d at 59-60. That case is distinguishable also. The Court found there that, when considering the tax implications of the challenged conveyance of the property,

> it appears that the challenged transactions have-or will-result in the placing of additional land on the tax rolls which will increase the tax base of the State so that the State taxes paid by Mrs. Kerpelman will actually be reduced as a result of those transactions. There are general allegations that the conveyances will have a damaging effect upon the marine ecology of the State, but there are no allegations of facts which would support these general allegations and, in any event, there are no allegations which indicate how this will result in the payment of higher State taxes by Mrs. Kerpelman.

*Id.*, 261 Md. at 443, 276 A.2d at 60.

himself and other taxpayers who may be similarly situated, * * * but he sues alone, in his own name and his own behalf." His loss alone was too small to come within the statutory limitation, the court held. But a bill filed in the name of one or more of the taxable inhabitants for themselves and all others similarly situated the court should regard as "in the nature of a public proceeding to test the validity of the corporate acts sought to be impeached and deal with and control it accordingly." 4 Dillon, Municipal Corporations (5th Ed.) § 1587; *Kelly, Piet & Co. v. Mayor, etc., of Baltimore*, 53 Md. 134, 141 [(1880)].

*Sun Cab Co.*, 162 Md. at 427, 159 A. at 925 (emphasis added). *See also Christmas v. Warfield*, 105 Md. 530, 540-41, 66 A. 491, 492 (1907) (concluding that taxpayer standing doctrine conferred standing upon the complainant, a taxpayer and resident of the State, alleging a State's action as illegal).[79]

In sum, we conclude that Appellees pleaded taxpayer standing doctrine sufficiently and, thus, the Circuit Court denied properly the State Agencies' Motions to Dismiss on standing grounds.

## B.  THE FATAL FLAW—THE DOCTRINE OF LACHES.

After climbing the foothills to this point and with the mountain almost in sight, Appellees' surviving claims on the merits shall stumble and fall to a figurative death in the crevasse that is the equitable doctrine of laches. The State Agencies moved to dismiss Appellees' Amended Complaint in the Circuit Court, arguing, *inter alia*, that the claims were barred by the doctrine of laches due to an unreasonable delay in bringing

---

[79] Notably, multiple secondary sources classify Maryland as one of the majority of states which grant taxpayers the right to sue as litigants for state grievances. *See, e.g.*, Comment, *Taxpayers' Actions: Public Invocation of the Judiciary*, 13 Wake Forest L. Rev. 397, 402, 402 n.29 (1977) (citing *Christmas v. Warfield*, 105 Md. 530, 66 A. 491 (1907), as authority for the proposition that Maryland falls into the category of "[a]lmost every state grants taxpayers the right to sue as litigants for state grievances").

their claims, causing prejudice to the defendants. In dismissing the State Agencies'

Motion on this ground, the Circuit Court stated:

> The doctrine of laches applies when there has been an "unreasonable delay in the assertion of one's rights" and when "that delay results in prejudice to the opposing party." *Liddy v. Lamone*, 398 Md. 233, 244 (2007). Defendants argue that Plaintiffs adopted a "wait and see attitude" and should have brought their claims following the issuance of the Request for Qualifications in 2005. Conversely, Plaintiffs assert that the Master Development Agreement, executed and approved in June 2009, was the first binding agreement related to the State Center Project and that the operative documents giving rise to this suit were the September 1, 2010 First Amendment to the Master Development Agreement and the Phase I Occupancy Leases, approved July 28, 2010 and amended on December 15, 2010.
>
> When considering a motion to dismiss, the court must assume the truth of Plaintiffs' well-pleaded factual allegations in the complaint. *McDaniel v. Am. Honda Fin. Corp.*, 400 Md. 75, 83 (2007). As Plaintiffs' initial complaint was filed on December 17, 2010, this Court finds that Plaintiffs' claims are not barred by laches.

In Appellees' Motion to Dismiss this appeal, they argued that this Court should not

entertain this argument because the State Agencies failed to present properly this

argument in the State Agencies' Petition for Writ of Certiorari. Thus, we consider first

the propriety of addressing this issue. Because we find such a review proper in this case,

we will move then to analyzing the merits of the laches argument.

### 1. *Propriety of Addressing Laches.*

Although this issue was not presented in the Petition for Writ of Certiorari, we

find that addressing it is properly within our discretion. Generally, the affirmative

defense of laches in Maryland "can be invoked by a court on its own initiative," even if it

was not pleaded. *Liddy v. Lamone*, 398 Md. 233, 242-43, 919 A.2d 1276, 1282-83

127

(2007) (and see cases cited therein).  While other jurisdictions require the defendant to assert the defense of laches so that the parties have a full opportunity to set forth the facts in support of their argument regarding whether the delay in bringing the suit was reasonable, *see Liddy*, 398 Md. at 243 n.13, 919 A.2d at 1283 n.13 (discussing cases in other states which require the defense to be pleaded), this Court has adopted a more generous approach to the doctrine that permits a court to apply it when equity demands. In this case, both sets of parties had a full opportunity to present evidence on the issue, as well as to argue their position to the Circuit Court and this Court.  Accordingly, we find that it is proper for us to consider whether equity declines relief here.

### 2.  *Standard of Review.*

In reviewing whether the doctrine of laches bars Appellees' claims, we review the Circuit Court's determination without deference.  *See Liddy*, 398 Md. at 248-49, 919 A.2d at 1287 ("[W]here the issue is whether a party is precluded by laches from challenging an action of another party, we shall review the trial court's ultimate determination of the issue *de novo* . . . .").  Although assuming the truth of the well-pleaded facts (such as the pertinent dates alleged in the Amended Complaint) for purposes of laches analysis, we review the Circuit Court's legal determination of whether any delay was reasonable and whether the State Agencies and/or Developers were prejudiced, without deference to Appellees' conclusory characterization of the delay as reasonable.  Thus, we examine well-pleaded facts in the Amended Complaint to determine whether the delay was unreasonable and the State Agencies and Developers were prejudiced, so as to preclude this action.

128

### 3. *The Fatal Flaw.*

"Laches 'is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society.'" *Ross v. State Bd. of Elections*, 387 Md. 649, 668, 876 A.2d 692, 703 (2005) (quoting *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195, 197 (1962)). "[T]he word ['laches'], itself, derives from the old French word for laxness or negligence." *Buxton v. Buxton*, 363 Md. 634, 645, 770 A.2d 152, 158 (2001). In *Liddy v. Lamone*, 398 Md. 233, 919 A.2d 1276 (2007), this Court summarized recently the "well settled" law in this State on the doctrine of laches:

> It is . . . well settled that laches "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *Frederick Road Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 117, 756 A.2d 963, 985 (2000), *citing Inlet Assoc. v. Assateague House Condominium Ass'n,* 313 Md. 413, 438–39, 545 A.2d 1296, 1309 (1988); *See Ross,* 387 Md. at 669, 876 A.2d at 704 ("[L]aches must include an unjustifiable delay and some amount of prejudice to the defendant"); *Schaeffer v. Anne Arundel County,* 338 Md. 75, 83, 656 A.2d 751, 755 (1995) ("[L]aches is an *inexcusable* delay, without necessary reference to duration in asserting an equitable claim") (emphasis in original); *Simpers v. Clark,* 239 Md. 395, 403, 211 A.2d 753, 757 (1965) ("[F]or the doctrine [of laches] to be applicable, there must be a showing that the delay [in the assertion of a right] worked a disadvantage to another"); *Hungerford v. Hungerford,* 223 Md. 316, 320–21, 164 A.2d 518, 521 (1960) ("Only two requisites are necessary in order to invoke the doctrine of laches. There must have been some lapse of time during which plaintiff failed to assert his rights, and the lapse must have caused some prejudice to the defendant"). Prejudice is "generally held to be any thing that places [the defendant] in a less favorable position." *Ross,* 387 Md. at 670, 876 A.2d at 704, *quoting Buxton,* 363 Md. at 646, 770 A.2d at 159; *Parker,* 230 Md. at 130, 186 A.2d at 197; *Roberto v. Catino,* 140 Md. 38, 43, 116 A. 873, 875 (1922).

*Liddy*, 398 Md. at 244-45, 919 A.2d at 1283-84. Thus, generally, we must analyze whether, (1) in the context of an equitable claim, (2) there was an unreasonable delay in the filing and, if so, (3) whether there was any prejudice. Because Appellees' broadest standing rested upon the doctrine of taxpayer standing, their claims—both those seeking declaratory judgment and injunctive relief—sound in equity and, thus, are subject to this doctrine, we are concerned primarily with the latter two elements. Before we may reach those elements, however, we analyze briefly whether laches applies in taxpayer suits generally despite some foreign authority to the contrary.

### a. Whether laches applies to taxpayer suits?

While neither party raised the contention that laches may not be applicable in taxpayer suits, we find it necessary to examine this issue prior to our further analysis of laches here. Some authority in other jurisdictions does not permit the doctrine of laches to bar a taxpayer's right to invoke the powers of a court of equity to prevent the unlawful dissipation of public funds. For example, the Supreme Court of North Dakota reached such a conclusion in a Nineteenth Century case, explaining,

> In our judgment, no laches on the part of taxpayers or others can operate to confer authority upon the officials of a corporation in a case where such officials are wholly without power to act. . . . [L]aches does not ordinarily prevent the intervention of a taxpayer to enjoin a disbursement of public funds about to be made without the authority of law or in defiance of law. Nor (if this action should be dismissed without a decision upon the merits, and on account of the laches of this plaintiff) are we able to see any reason why another action for the same relief might not be instituted by some taxpayer and resident who has not been guilty of laches in the premises. If this be true, it would certainly not be in furtherance of justice to dismiss the present action without determining the merits.

130

*Storey v. Murphy*, 81 N.W. 23, 27 (N.D. 1899) (internal citations omitted); *see also Dahl v. City of Grafton*, 286 N.W.2d 774, 777 (N.D. 1979) (restating the court's refusal to apply the doctrine of laches in class-action suits, such as taxpayer suits, and citing part of the language quoted above as the rationale).

Moreover, this Court has stated that limitations is unavailable as a defense against the state, or its agency or subdivision, asserting public rights on behalf of all the people of the State. In *Goldberg v. Howard Cnty. Welfare Bd.*, 260 Md. 351, 272 A.2d 397 (1971), the Court quoted favorably the following quotation from 51 Am. Jur. 2d, Limitation of Actions, s. 412,

> **"s 412. Distinction between private or proprietary rights and public or governmental rights.**
> 'A distinction has been made in many jurisdictions, with respect to the application of the statute of limitations in actions by political subdivisions, between actions based upon 'private' or 'proprietary' rights and those based upon 'public' or 'governmental' rights. Where this distinction is recognized, the inquiry is whether the state, or its agency or subdivision, is asserting public rights on behalf of all the people of the state or merely private rights on behalf of a limited group.
>
> 'The statute of limitations will bar the governmental unit where it is asserting a private or proprietary right, but will not apply where the right being asserted is public or governmental in nature. In other words, the governmental plaintiff, in seeking to enforce a contract right or some right belonging to it in a proprietary sense, may be defeated by the statute of limitations, but as to rights belonging to the public and pertaining purely to governmental affairs, and in respect of which the political subdivision represents the public at large or the state, the exemption in favor of sovereignty applies, and the statute of limitations does not operate as a bar."

260 Md. at 358-59, 272 A.2d at 401. Because a taxpayer suit is analogized to such a governmental suit based upon public rights, it could be argued that laches, a defense

131

similar to a statute of limitations defense, should not be allowed as a defense in taxpayer suits.

In *Gloyd v. Talbott*, 221 Md. 179, 156 A.2d 665 (1959), a taxpayer brought suit in equity, on behalf of himself and all other taxpayers, seeking a declaratory decree that certain payments of money from municipal funds to certain individuals were illegal and *ultra vires*. Appellants in that case answered contending that the payments were legal and asserting limitations and laches. Regarding the laches argument, this Court stated,

> On the point of laches, it has been said that an equity court will temper the relief according to the circumstances of the particular case. *Cf. Konig v. Mayor & City Council of City of Baltimore*, [128 Md. 465, 97 A. 837 (1916)]. It has also been said that laches should not be applied against a public body, or in a derivative suit with the same rigor as against an individual. *See Thornton v. Willage of Ridgewood*, 17 N.J. 499, 111 A.2d 899. The reasoning seems to be that laches is a special application of the doctrine of estoppel, which does not generally apply against a public body. *See* note 1 A.L.R.2d 338, 351. We see no reason for applying it in the instant case, at least as to payments made subsequent to April 1, 1954.

*Gloyd*, 221 Md. at 186, 156 A.2d at 668-69.

Even considering the foregoing, we conclude that it is inappropriate to adopt a bright line or *per se* rule that laches may not be asserted as a defense in a taxpayer suit. Rather, the application of the doctrine of laches should be determined by what equity demands in a given case. For example, where a taxpayer seeks an injunction prior to a state agency entering a contract, courts might be more inclined to finding that laches should not apply. In this case, however, due to the five-year period between the beginning of the official process for the development of the State Center Project and Appellees filing of their lawsuit (and due to the extensive, public communications

132

regarding both the visions and the process for the Project throughout the five-year period), it would be unequitable to foreclose consideration of the doctrine of laches in this case.

### b. Delay in Filing.

In order for laches to bar a claim, "'there [must be] an unreasonable delay in the assertion of one's rights . . . '" *Liddy*, 398 Md. at 244, 919 A.2d at 1283 (quoting *Frederick Rd.*, 360 Md. at 117, 756 A.2d at 985). "There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Parker*, 230 Md. at 130, 186 A.2d at 197 (citing *Brashears v. Collison*, 207 Md. 339, 352, 115 A.2d 289, 295 (1955)). "The passage of time, alone, does not constitute laches but is simply 'one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made.'" *Buxton*, 363 Md. at 645, 770 A.2d at 158 (quoting *Parker*, 230 Md. at 130, 186 A.2d at 197).

In determining whether a delay is unreasonable, we must analyze (i) when, if ever, the claim became ripe (*i.e.*, the earliest time at which Appellees were able to bring their claims); and (ii) whether the passage of time between then and when the Appellees filed the complaint was unreasonable.

## i. *The starter's gun sounds.*

We begin by considering when Appellees' claims became ripe in this case. In order for a circuit court to entertain an action, a justiciable controversy must exist.[80] *See*

---

[80] As the Court explained in more detail in *Superblock II*,

The Maryland Uniform Declaratory Judgments Act, Maryland Code (2006 Repl.Vol.) § 3–401 et seq. of the Courts & Judicial Proceedings Article ("C.J."), provides that "a court of record within its jurisdiction may declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.J. § 3–403(a). Generally, a motion to dismiss "'is rarely appropriate in a declaratory judgment action.'" *Broadwater v. State,* 303 Md. 461, 466, 494 A.2d 934, 936 (1985) (quoting *Shapiro v. Bd. of County Com'rs,* 219 Md. 298, 302–03, 149 A.2d 396, 398–99 (1959)).

> Where a bill of complaint shows a subject matter that is within the contemplation of the relief afforded by the declaratory decree statute, and it states sufficient facts to show the existence of the subject matter and the dispute with reference thereto, upon which the court may exercise its declaratory power, it is immaterial that the ultimate ruling may be unfavorable to the plaintiff. The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree.

*Id.,* 494 A.2d at 936 (quoting *Shapiro,* 219 Md. at 302–03, 149 A.2d at 398–99).

When a complaint fails to allege a justiciable controversy, however, a motion to dismiss is proper. *See* C.J. § 3–409(a)(1) (authorizing declaratory judgments only when the complaint establishes that "[a]n actual controversy exists between contending parties") . . . .

*Superblock II*, 413 Md. at 355-56, 992 A.2d at 487-88.

134

*Boyds Civic Ass'n v. Montgomery Cnty. Council*, 309 Md. 683, 689, 526 A.2d 598, 601 (1987) ("'[T]he existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action.' . . . It follows, therefore, that in the absence of a justiciable controversy a court should not entertain an action for declaratory judgment.") (quoting *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076, 1078 (1983)) (citations omitted). "This Court has defined a justiciable controversy as one wherein 'there are interested parties asserting adverse claims **upon a state of facts which must have accrued** wherein a legal decision is sought or demanded.'" *Id.*, 309 Md. at 690, 526 A.2d at 601 (emphasis added in *Boyds*) (quoting *Patuxent Co. v. Comm'rs*, 212 Md. 543, 548, 129 A.2d 847, 849 (1957)). The rationale is that "addressing non-justiciable issues 'would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.'" *Id.*, 309 Md. at 690, 526 A.2d at 602 (quoting *Hatt*, 297 Md. at 46, 464 A.2d at 1078).

Justiciability has been described as a "concept embodying 'numerous hurdles.'" *Boyds*, 309 Md. at 690, 526 A.2d at 602 (quoting E. Borchard, *Declaratory Judgments* 770 (2d ed. 1941)). One of these "hurdles" is that of ripeness. *Id.* "Generally, an action for declaratory relief lacks ripeness if it involves a request that the court 'declare the rights of parties upon a state of facts which has not yet arisen, [or] upon a matter which is future, contingent and uncertain.'" *Id.* (alteration in original) (quoting *Brown v. Trustees of M.E. Church*, 181 Md. 80, 87, 28 A.2d 582, 586 (1942)) (some internal quotation marks omitted). The purpose of ripeness is "to ensure that adjudication will dispose of an actual controversy in a conclusive and binding manner." *Id.*, 309 Md. at 691, 526 A.2d at

135

602. Where an issue is not ripe, the issue is not justiciable and, thus, a court will not entertain the claim. For purposes of the present case, the relevance of this prerequisite to justiciability is that there could be no "delay" until a claim was ripe such that a court could entertain it.

One of the first steps in the ripeness analysis is to analyze what interests Appellees claim have been injured. It is important to remember the limited basis upon which Appellees stand. Namely, Appellees bring their claims on the grounds of taxpayer standing; the implications of this is that the only claims that might be before this Court on the merits properly (and, thus, that could be barred by the doctrine of laches) are those claims brought under the taxpayer standing doctrine and on appeal in this case.[81] Thus,

---

[81] Thus, even if the TOD designation was before us on appeal generally, it would not be under review here for purposes of the doctrine of laches. Similarly, those claims of harm which were rejected in our earlier justiciability analysis, such as Appellees' allegations of harm to their properties, as property owners, and of general harm to the CBD and of harm in the form of competition to their business, are not under consideration here.

Moreover, Counts VII (seeking declaratory judgment that "the selection of the architect, engineer and/or contractor for the parking garage was required to have been procured by the State Center Agencies through mandatory methods of source selection under the General Procurement Law . . . and that the State Center Agencies' actions failed to comply with [the Procurement Law], and as such, the parking garage selections are void and invalid") and VIII (seeking injunctive relief for alleged violations of the Procurement Law), on which the Circuit Court granted summary judgment in favor of the State Agencies, are not before us. Therefore, the State Center actions in 2010 involving the financing and development of the parking garage do not factor into our laches analysis.

we confront only those claims alleging *ultra vires* or illegal governmental actions that may cause a pecuniary loss to taxpayers.[82]

[82] The asserted claims of *ultra vires* or illegal governmental conduct that might cause pecuniary loss to the taxpayers are reiterated as follows: (a) the selection of the original Master Developer, State Center, LLC, in 2005, for the exclusive right to negotiate to developer the Project by a RFQ, rather than through the RFP competitive-bidding process, *see* Amended Complaint, at ¶ 6, 13; (b) the "allow[ance] [of] substantial change in ownership structure," despite the RFQ's emphasis on the experience and capabilities of all key members of the Project, *see* Amended Complaint, at ¶ 7, 61-66, 79-80; (c) the BPW's approval of and the State Center Agencies and the Developer's execution of the MDA, without using an RFP's competitive bidding process, *see* Amended Complaint, at ¶ 11, (d) the MDA's commitment to long-term leasing arrangements for State agency occupancy of the Developer's buildings without the issuance of an RFP, as required by the State's procurement laws, specifically SFP ¶ 13-105, *see* Amended Complaint, at ¶ 56, 59, 89, 91-93, 103-04, 106; (e) the State's contracting for building construction services without following State Procurement Law, specifically SFP § 13-103, *see, e.g.*, Amended Complaint, at ¶ 90-91; (f) the DGS's control of the development process and the buildings once developed, as set provided in the MDA, *see* Amended Complaint, at ¶ 98-102; (g) the BPW's approval of and the State Center Agencies and the Developer's execution of the First Amendment, which "extensively amended, modified and altered the terms and conditions of the MDA in a manner that violated the State's procurement laws and rules," *see* Amended Complaint, at ¶ 8, 10, 11, 109; (h) the First Amendment's relieving the Developers "of the commercially and financially risky development of a parking garage" and committing $28.3 million to build the parking garage, *see* Amended Complaint, at ¶ 68, 109, 111-13; (i) "unlawfully modifying the terms and conditions of the initial MDA, including modifications to the construction and financing plan, all without issuance of an RFP," *see* Amended Complaint, at ¶ 7; (j) the First Amendment's change of the terms of the First Phase Ground Lease from 50 years, with the right to renew twice for 20 year terms (as set forth initially in the MDA) to a 75-year initial term with 15-year renewal, without any procurement for this "material, favorable change to the Developer," *see* Amended Complaint, at ¶ 118; (k) the First Amendment's approval of a "material change in the Developer's Structure, as described above, without any procurement and contrary to the "RFQ," *see* Amended Complaint, at ¶ 119; (l) the BPW's approval of leases in July 2010, "under which four State agencies will procure office space from the Developer as tenants at the Project, without competitive bidding or adherence to State procurement laws and procedures," *see* Amended Complaint, at ¶ 16, 32, 110; (m) the BPW's approval of amendments on 15 December 2010 to those four leases originally approved in July 2010,

(Continued…)

The State Agencies argue that Appellees' claims are based almost wholly on "aspects of the project [which] were apparent on the face of the 2005 public RFQ" and, as such, for purposes of laches analysis, the claims should be viewed as accruing when the RFQ was issued publicly and, thus, the delay in filing suit was more than five years. Appellees counter that this starting point mischaracterizes their claims and the nature of the events that occurred subsequent to publication of the RFQ. They rely on *Superblock II*, 413 Md. at 354, 992 A.2d at 486, and *Inlet Associates*, 313 Md. at 439, 545 A.2d at 1309, for the proposition that there was no delay in filing their lawsuit because the action was not ripe until "the execution of the definitive and binding Project development documents." They aver that "[t]he Project was merely conceptual prior to the execution of the MDA in June 2009" because, as the Letter of Intent ("LOI") stated, "[t]he parties do not intend to be legally bound [to the Project] unless and until a Master Development Agreement ('MDA') is entered into and approved by the BPW."

We reject ultimately the parties' arguments. We begin by addressing Appellees' assertion that their claims were not ripe until the execution of the binding MDA. The ripeness analysis depends upon the type of lawsuit, which, in this case, is a taxpayer suit. A traditional remedy sought in a taxpayer suit is an injunction to preclude the government

---

(…continued)

*see* Amended Complaint, at ¶ 16; (n) the Developer's assignment of development rights to its affiliates violates the Procurement Laws.

Notably, this second "stage" of the "switch-out" of the Developers, referred to in (n), is not included in the Amended Complaint, but is raised in Appellees' briefs. Regardless of its lack of inclusion in the Amended Complaint, we find that such actions were envisioned in the MDA and, thus, are felled by the same sword as many of the other claims, as discussed *infra*.

138

from acting in an illegal or *ultra vires* manner. As such, the taxpayer suit is unique and, although there must be substantial certainty that the government will act in an illegal or *ultra vires* manner, taxpayers are not required to wait until the government has acted in an illegal or *ultra vires* manner prior to filing suit. Such a holding would be inconsistent entirely with the nature of the taxpayer suit modality. The question remains, though, when does the government's imminent action become substantially certain so that the claim reaches ripeness?

In answering this question in the context of the present case, we find *Boyds* most applicable and very instructive. In *Boyds*, Montgomery County amended a master plan to provide that certain described land might be suitable for imposition of a mineral resource recovery zone, as prerequisite to adoption of that zoning for a specific area. The complainants sought in their action for declaratory judgment a declaration that the master plan amendment was illegal and unconstitutional, and of no force or effect, because "[it] was approved and adopted in contravention of state and county laws requiring notice and public hearings at certain stages of the amendment process." *Boyds*, 309 Md. at 687-88, 526 A.2d at 600. "The circuit court in that case dismissed the claim as not presenting a justiciable controversy" and the Court of Special Appeals affirmed. *Id.*

The Court of Special Appeals and the respondents perceived the case to be governed by *Anne Arundel County v. Ebersberger*, 62 Md. App. 360, 489 A.2d 96 (1985). As we summarized in *Boyds*,

> In *Ebersberger,* a group of homeowners . . . challenged as unconstitutional and ultra vires a county ordinance which authorized their community association . . . to raise money for swimming pool renovation and

139

maintenance. The Court of Special Appeals held that the action lacked ripeness. In so doing, it emphasized the fact that the ordinance merely authorized, but did not require, the renovations and the fact that there was no certainty the work would ever be done:

> "[T]he . . . ordinance does not **require** the district to renovate the pool; it merely **authorizes** such work. Nor does it specify any particular means of financing the renovation. There is certainly no assurance, from the record now before us, that a budget containing an appropriation for the pool will ever be approved or that a special benefit tax to support such an appropriation will ever be levied.

> "At least until the prospect of such an appropriation or such a tax becomes substantially more certain, the plaintiffs will have suffered no injury from the challenged ordinance, and its validity or invalidity is therefore of no practical consequence." 62 Md. App. at 371, 489 A.2d at 101-02 (emphasis in the original).

309 Md. at 695-96, 526 A.2d at 604-05 (alterations in the original). In *Boyds*, the

respondents argued that, because

> [t]he challenged amendment to the Boyds Master Plan merely authorizes the District Council to grant an application for Mineral Resource Recovery zoning; it does not require the District Council to do so. . . . the adoption of the amendment has not affected any of petitioners' legal rights or caused them any injury, and the future effect upon petitioners remains "wholly speculative."

309 Md. at 696, 526 A.2d at 605.

> This Court disagreed, stating:

> There is, however, an important distinction between *Ebersberger* and the case at bar. The *Ebersberger* court reasoned that the challenged ordinance could have no injurious effect upon the plaintiffs until the prospect of its implementation became "substantially more certain." 62 Md. App. at 371, 489 A.2d at 102. Here, by contrast, **the challenged plan amendment was initiated, approved, and adopted in furtherance of an actual, pending application to amend the local zoning map**. Moreover, the designation of an area on the applicable master plan as suitable for a Mineral Resource Recovery Zone was a **condition precedent** to the granting of an application

140

for zoning of an area as a Mineral Resource Recovery Zone. In Count I of the complaint filed in the circuit court petitioners claimed that hearings—spanning some four days—on the application to amend the local zoning map would not have gone forward if the master plan had not been amended. In Count II petitioners alleged that the actions of the Commission and District Council with respect to the plan amendment forced petitioners to hire counsel and land consultants in order to participate in the local zoning map amendment proceedings. **The prospect of a controversy, therefore, lay well beyond the realm of matters "future, contingent and uncertain."**

*Boyds*, 309 Md. at 696-97, 526 A.2d at 605 (emphasis added).

Similar to *Boyds*, in the present case, several earlier steps were initiated, approved, and executed in furtherance of the envisioned State Center Project. In this sense, the State Center Project would not have gone forward if certain earlier steps had not taken place. At several points prior to the actual execution of the formative and binding documents regarding the Project, "[t]he prospect of a controversy . . . lay well beyond the realm of matters 'future, contingent and uncertain.'" *Id.*

This approach, which recognizes that certain earlier stages in a series of envisioned overall stages may reach a level of substantial certainty prior to the government executing a binding document, fits properly within the realm of Procurement Law. This State's Procurement Law recognizes that filing and resolving disputes earlier, rather than later, is best. Taxpayers filing suits based on violations of the Procurement Law should not be encouraged to delay airing their claims because delay may cost taxpayers more money where the announced path to the binding contract for a procurement is set and, as in this case, takes many years to reach fruition. If the government acted illegally in an early stage that sets the stage for (and serves as a

141

condition precedent to) its later execution of a binding contract, then the alleged illegality has "occurred" for purposes of laches analysis.

Contrary to Appellees' assertions, this approach to the ripeness analysis does not contradict either *Inlet Associates* or *Superblock II*. Neither of those cases held that a final or binding document was a prerequisite to ripeness. Rather, the specific facts of those cases illustrate when a controversy may be "future, contingent and uncertain" and when one may become ripe. We consider these cases further.

In *Superblock II*, 120 West Fayette alleged that a *proposed* plan for the Superblock would violate the MOA and the Renewal Plan. The plan was a mere proposal, however; the City had not yet adopted, approved, or authorized any plans. The Court stated that "[a] declaratory relief action that requests adjudication based on facts that have yet to occur or develop lacks ripeness and should be dismissed for failure to allege a justiciable controversy." *Superblock II*, 413 Md. at 356, 992 A.2d at 488 (citing *Hickory Point P'ship v. Anne Arundel Cnty.*, 316 Md. 118, 130, 557 A.2d 626, 632 (1989)); *see also id.* ("In a declaratory judgment proceeding, the court will not decide future rights **in anticipation of an event which may never happen**, but will wait until the event actually takes place.") (emphasis added) (quoting *Boyds*, 309 Md. at 690, 526 A.2d at 602) (internal quotation marks and brackets omitted); *id.* ("The disagreement over which declaratory relief is sought **must not be nebulous or contingent but must have taken on fixed and final shape** so that a court can see what legal issues it is deciding.") (emphasis added) (quoting *Hickory Point P'ship*, 316 Md. at 131, 557 A.2d at 632) (internal quotation marks and brackets omitted). In reviewing the record of that case, the

Court found "nothing that rises to the level of an actual dispute," *id.*, and "nothing from which [the Court could] infer that the City **would** approve plans to the contrary [of what was stated in the MOA and the Renewal Plan]." *Superblock II*, 413 Md. at 358, 992 A.2d at 489 (emphasis added) (citing *Boyds*, 309 Md. at 691, 526 A.2d at 602). In sum, the Court found it was "unable to infer from the **proposed** designs and project plans that Lexington Square or the City intends to violate the MOA or the Renewal Plan . . . ." *Id.* (emphasis in the original). Thus, "[t]he possibility remains that Lexington Square will propose, and the City will approve, plans that, in accordance with the LDA's requirements, conform to the MOA and the Renewal Plan." *Id.* Accordingly, the Court upheld the Circuit Court's grant of the motion to dismiss Count Two of the amended complaint "on the grounds that 120 West Fayette failed to alleged [sic] facts ripe for adjudication and thus failed to establish a justiciable controversy." *Id.*

*Inlet Associates* involved a taxpayer action to enjoin the conveyance of a municipality's public right-of-way that was part of a dedicated street, together with riparian rights purported to accrue as a result of the municipality's interest in the dedicated street. In that case, this Court rejected Inlet's argument that the doctrine of laches barred the plaintiffs' action. In so holding, the Court stated,

> The trial judge noted that the City Council did not place its final imprimatur on the Inlet proposal, which as amended included the restaurant in place of the shops on the pier, until October 6, 1986; and that the present case was filed approximately one month later. One reason for the opposition of the unit owners in Assateague House was the late inclusion of the restaurant and its location in the Inlet proposal. In any event, we think it clear from our discussion of equitable estoppel that the doctrine of laches, even if otherwise applicable, does not legalize this patent violation of the Ocean City Charter. We note parenthetically, however, that until the summer of

> 1986, Inlet had not received the necessary permits and authorizations to
> permit it to proceed to implement its proposed plan. Plaintiffs' suit in
> November of 1986 was hardly a delay befitting a serious claim of laches.

*Inlet Assocs.*, 313 Md. at 439, 545 A.2d at 1309. The analysis, viewed in light of the facts and the taxpayers' claims in that case, makes apparent that the material changes in the amendments approved by the City Council on 6 October 1986 constituted the violation that the taxpayers challenged. At the time of the action, no "formal documentation" was extant. Rather, the taxpayers brought suit specifically to enjoin the City from entering into a binding contract to convey the municipality's public right-of-way or riparian rights.

Although no binding written agreement is required necessarily for a claim to achieve ripeness, some of Appellees' claims rest on governmental actions which were not envisioned specifically by earlier stages of the State Center Project and did not occur until after the MDA and/or First Amendment were executed. Appellees' suggestion, in their brief, that these latter-arising claims save all claims (even those which arose at an earlier date) is without merit. Although the doctrine of laches may not bar a singular claim arising later in the process, Appellees' inclusion of latter-arising claims does not save from a laches bar those claims which accrued earlier. Thus, for our analysis of the starting of the clock for ripeness, we organize Appellees' claims together in groups according to when we deem the point of controversy became substantially certain.

The majority of the claims arose out of events or actions envisioned in (or foretold by) the RFQ. The public issuance of the RFQ standing alone, however, is not substantially certain for ripeness purpose. Under the Procurement Law (assuming for

144

argumentative purposes it applies), prior to the issuance of an award, prospective bidders are permitted generally to file a complaint (until the time the bid is awarded) concerning the information listed in an RFP. Normally, up until the time of the awarding of a bid, the State may withdraw an RFP and change some of the provisions. By analogy, the awarding of a bid under an RFP is similar to the selection of the Master Developer under the RFQ in the present case. Thus, we must look to some further action by the State Agencies (other than the public issuance of the RFQ) to determine the time that the claims accrued as to subsequent actions predicated upon what the RFQ predicted would follow.

First, the State's intentions to select a Master Developer in the manner prescribed in the RFQ is not considered as finalized until the public announcement of the selection of the Developers on 21 March 2006. The procedures for the original selection of the Master Developer were set forth explicitly in the publicly issued RFQ in 2005. Although construction and leasing of the Project was not enforceable between the State and the Developers merely upon selection of the Developers, the awarding of the exclusive right to negotiate was the intended first stage in a series of envisioned stages required for the Project to reach fruition. The claimed illegality that caused Appellees asserted harm stemmed from this stage and, thus, it is the proper starting point for ripeness as to those claims related to those actions. In other words, the significance—and the alleged violation of the Procurement Law—does not occur when the MDA and/or the First Amendment were executed, but rather when the State Agencies agreed to negotiate only with the Developers in pursuit of the later stages outlined in the RFQ. After the

145

Developers were selected, these taxpayers could have filed suit seeking an injunction to preclude the State from expending further resources in the form of negotiations with the Master Developer chosen in an *ultra vires* manner, as well as the intended execution of the MDA with the Master Developer after the period of negotiations.[83]  Instead, the taxpayers bided their time.

Second, those claims regarding the nature of the Project as envisioned in the RFQ became finite at the very least by the time the BPW authorized the State Agencies to enter into the MDA.  Although the earlier contracts (such as the LOI) were not binding, it is undisputable that the MDA bound the State and the Developers to the State Center Project.  The taxpayers did not need to abide the date of execution of the MDA, but rather only until the controversy became substantially certain.  The BPW authorized the State Center Agencies to enter the contract on 3 June 2009.  At the very least, taxpayers could have maintained a suit at that point seeking an injunction to preclude the State from entering into this contract, which the taxpayers should have known would bind the State to later actions Appellees allege now as *ultra vires* and illegal, with the Developer that was chosen in an *ultra vires* manner.  Instead, the taxpayers bided their time.

---

[83] Even were we to agree with Appellees that the claim was not ripe until the State Agencies and the Developers executed a binding and enforceable agreement and, thus, they could not file suit this early, we would still impute the knowledge of the claim of illegal governmental action to them from that time.  In that sense, they had a long lead time to prepare their suit and should have filed the suit more promptly after the execution of the MDA.

At that time the MDA was executed on 15 June 2009, there is no doubt that an enforceable, binding contract existed. All claims relating to the envisioned stages set forth in the RFQ accrued at that point. Particularly in light of the taxpayers' knowledge of what the 2005 RFQ envisioned, the selection of the Master Developer in 2006, and the BPW authorization of the State Agencies to enter the MDA, Appellees could have filed suit more promptly in an effort to forestall further allegedly illegal pursuit of unauthorized objectives. Instead, Appellees continued to bide their time.

The third group of claims includes those which related to alleged "material changes" in the First Amendment (departed from the terms set forth in the MDA). Appellees allege that these changes were so substantial that they could not have been envisioned at the time of the MDA and, thus, no claim existed prior to the adoption of these changes in the First Amendment. We agree that, to the extent that such changes were not predicted or called for in the MDA, they would accrue generally at the time of the First Amendment, rather than at the time of the execution of the MDA. Because we conclude ultimately that the time period between the First Amendment and the filing of the present lawsuit was unreasonable and prejudicial to the State Agencies and Developers, however, we do not consider whether these changes were so "material" as to warrant requiring a new selection of a Master Developer (assuming again, argumentatively, that the Procurement Law applies). Rather, we find it sufficient to assume that Appellees are correct that these changes were so material that the First Amendment represented a new violation upon which Appellees' related claims ripened.

147

Lastly, the fourth group consists of various claims Appellees allege arose after the execution of the First Amendment. Appellees note that the BPW approved amendments on 15 December 2010 to four leases approved originally in July 2010. According to Appellees, the sample leases contained in the MDA and the First Amendment did not include sufficient details upon which their claims related thereto could be described as ripe. Perhaps had Appellees's alleged violations relied upon the specific details set forth in either the original or amended leases, we might find some merit in their contention. In this case, however, Appellees' argument is based on an alleged violation of the Procurement Code, which, for all practical purposes as regards their claims, was envisioned clearly in the RFQ and then set forth again—at great length—in the MDA and First Amendment. Because Appellees did not need to wait until the final binding document to file suit, these claims accrued, it seems to us, at the same time the State Agencies were authorized to enter into the MDA (alongside the third group of claims (the "material changes") in the First Amendment).

In sum, we group certain claims together that fall under the same umbrella of accrual. The first group, those claims envisioned by the RFQ that came to pass with the selection of the Developers, accrued at the very latest on 21 March 2006. The second group, those envisioned either by the RFQ and included in the executed MDA or envisioned initially in the MDA, accrued on 3 June 2009, the date that the BPW authorized the State Agencies to enter the agreement. The third group, those claims of material changes between the MDA and the First Amendment, accrued in July 2010, when the BPW authorized the State Agencies to enter the First Amendment. Lastly, the

148

other "material changes" which occurred after the First Amendment were not the basis of the alleged violations and, thus, we conclude that those claims should be grouped as falling under the same analysis of the "material changes" in the First Amendment because they were envisioned in the earlier stages.

### ii. Whether the delay was unreasonable?

Next, we consider the proper approach for determining what amount of time constitutes an unreasonable and unjustified delay. Although there is no bright-line rule, the doctrine of laches and statutes of limitations have an intertwined relationship that we must consider as a first step in this portion of the analysis. This Court has recognized that, where appropriate, we should look to the General Assembly for guidance in determining what amount of time is reasonable. *Schaeffer v. Anne Arundel Cnty.*, 338 Md. 75, 81, 656 A.2d 751, 754 (1995); *see also Frederick Rd.*, 360 Md. at 117, 756 A.2d at 985 ("When a case involves concurrent legal and equitable remedies, 'the applicable statute of limitations for the legal remedy is equally applicable to the equitable one.'") (quoting *Schaeffer*, 338 Md. at 81, 656 A.2d at 754). We analyzed the principles for analogizing statutes of limitations to the equitable defense of laches in *Schaeffer v. Anne Arundel County*, 338 Md. 75, 656 A.2d 751 (1995). There, we stated:

> Choosing the applicable measure of impermissible delay for cases where an equitable remedy is sought is most straightforward in cases when there are concurrent legal and equitable remedies and the applicable statute of limitations for the legal remedy is equally applicable to the equitable one.

*Schaeffer*, 338 Md. at 81, 656 A.2d at 754 (citing *Rettaliata v. Sullivan*, 208 Md. 617, 621, 119 A.2d 420, 422 (1956); *Dugan v. Gittings*, 3 Gill 138, 161-62 (1845)). Thus,

149

"[i]n most cases involving an exclusively equitable remedy, we refer to the limitations period for the cause of action at law most analogous to the one in equity." *Id.*

> "The authorities indicate that even when the remedy for a claimed right is only in equity, the period of limitations most nearly apposite at law will be invoked by an equity court, provided there is not present a more compelling equitable reason-such as fraud or other inequitable conduct which would cause injustice if the bar were interposed-why the action should not be barred."

*Id.* (quoting *Stevens v. Bennett*, 234 Md. 348, 351, 199 A.2d 221, 223-24 (1964)).

"Generally, if there is no action at law directly analogous to the action in equity, the three-year statute of limitations found in Maryland Code (1974, 1989 Repl. Vol., 1994 Cum. Supp.), § 5-101 of the Courts and Judicial Proceedings Article[84] will be used as a guideline." *Schaeffer*, 338 Md. at 82, 656 A.2d at 754 (citing *Washington Suburban Sanitary Comm'n v. C.I. Mitchell & Best Co.*, 303 Md. 544, 562, 495 A.2d 30, 39 (1985)). For example, in *Washington Suburban*, a case in which developers brought an action seeking declaratory and injunctive relief against the collection of a "System Expansion Offset Charge" ("SEOC") imposed by the Washington Suburban Sanitary Commission ("WSSC"), we held that the proposed analogy was inappropriate. 303 Md. at 563, 495 A.2d at 39. In that case, the developer argued that the WSSC lacked the

---

[84] Section 5-101 provides,

> A civil action at law shall be filed within **three years from the date it accrues** unless another provision of the Code provides a different period of time within which an action shall be commenced.

Md. Code (1973, 2013 Repl. Vol.), Courts & Judicial Proceedings Art., § 5-101 (emphasis added).

authority to impose this new charge and, in the alternative, that even if the WSSC had such authority, the charge was unreasonable and void. The WSSC responded by asserting laches, and proposed "that the analogy be drawn [ ] to the 30 days provided by [Md. Code (1957, 1983 Repl. Vol., 1984 Cum. Supp.), Art. 29,] § 6-110(b),"[85] which provided a process for appealing certain actions of the WSSC to the Maryland Public Service Commission ("PSC"). *Id.* The Court rejected this proposal:

> That statute, however, applies to the special statutory remedy before the PSC while the issue now under consideration, WSSC's authority to adopt SEOC, is not subject to that special statutory remedy. Where, as here, the claim under consideration properly invokes the original jurisdiction of the circuit court, the analogy for laches should not be to a time limit for initiating a special statutory administrative remedy applicable to a different theory of the case.

*Id.*, 303 Md. at 563, 495 A.2d at 39.

In this case, the State Agencies urge an analogy to the timeliness requirements in the Procurement Law's Regulations. Title 21 of the Code of Maryland Regulations promulgates the State Procurement Regulations. COMAR 21.10.02.03B requires protests relating to the formation of a contract to be filed "no[] later than 7 days after the basis for protest is known or should have been known, whichever is earlier." COMAR 21.10.02.03B.

Before we confront the proffered analogy to the Procurement Law *vel non*, we conclude that, under the more generous analogy to the three-year statute of limitations, many of Appellees' claims succumb to laches on that basis. The challenges to the

---

[85] This statute was repealed by Acts 2010, c. 37, § 1, eff. Oct. 1, 2010.

selection of the Developers were justiciable by no later than 21 March 2006. Laches bars those claims because Appellees did not file their Original Complaint until 17 December 2010. The State was open and transparent with the entire "unique" procurement process. The local newspapers covered the matter extensively. If the announced process was illegal, Appellees could have—and should have—brought their complaints on that score to court sooner than they did.

In regards to the second group (those claims arising from events or actions envisioned in either the RFQ or MDA and made actual in the MDA) and third group (those claims arising from events or actions that represented allegedly "material changes" from the MDA to the First Amendment), we consider whether the less generous analogy to COMAR 21.10.02.03B makes sense in the context of this case. We note first that a strict timeliness requirement is reasonable generally for protests of alleged procurement infractions, as the COMAR section makes evident. Procurements are issued for services or goods that the government needs. Once a submission is awarded for the project or the order for goods, both the awardee and the government proceed (presumably promptly) to expend time and resources on the completion of the procurement's goal. Allowing an extended period for protests to be brought forth would hinder the government's ability to obtain the needed item or service (and would increase costs for developers and contractors interested in government contracts). The question in this case, though, is whether the seven day statutory limit, which is appropriate for bid protests to the Appeals Board, is appropriate for importation by analogy here where the complainants are not entitled to protest the action in any administrative avenue.

152

In light of *Washington Suburban*, which held that the statutory limitation for an administrative remedy was not appropriate for a claim for which a circuit court had original jurisdiction, we decline here to adopt the direct analogy to the COMAR provision. Rather, adhering to the flexible nature of the laches doctrine, we conclude nonetheless that, at least in this case involving time-sensitive procurement issues,[86] the delay until 17 December 2010 to file suit was unreasonable and unjustified for both of the latter groups of claims.

Such a conclusion fits comfortably within our taxpayer standing doctrine jurisprudence. Although the motive of a taxpayer bringing suit is immaterial to whether the complainant has standing, the motive is not immaterial as to the relief sought in taxpayer standing suits. As the Court stated in *Konig v. City of Baltimore*, 128 Md. 465, 97 A. 837 (1916):

> While under the decisions a Court of Equity may grant relief to a taxpayer even if it is not satisfied that he is acting in good faith, or is influenced by proper motives, **yet when it is called upon to determine what relief it will grant the plaintiff, there is no reason why the court should be compelled to shut its eyes and not see what the real facts are**. This court refused to grant to Kelly, Piet & Co. any relief, although they were taxpayers as well as bidders, because it was really a controversy between

---

[86] We recognize that some federal courts have adopted a *per se* rule with respect to the application of laches to claims arising out of time-sensitive issues involving elections, for example. *See Ross v. State Bd. of Elections*, 387 Md. 649, 671, 876 A.2d 692, 705 (2005) (citing *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980); *MacGovern v. Connolly,* 637 F. Supp. 111, 115 (D. Mass. 1986); *Barthelmes v. Morris,* 342 F. Supp. 153, 160–61 (D. Md. 1972)). Similar to our conclusion in *Ross*, however, we need not decide here whether any *per se* rule should apply because the doctrine of laches is a flexible doctrine and, moreover, "[t]here may be situations in which such a rule would be inappropriate." *Id.*

153

rival tradesmen for the custom of the city. [*Kelly v. Mayor of Baltimore*, 53 Md. 134 (1880).] Notwithstanding what we have said, the appellant claims to appear in this court for the purpose of protecting himself and other taxpayers from loss, but no other taxpayer has within the two years since the bill was filed asked to be made a party. The board of awards cannot be censured for endeavoring to save the city money in awarding the contract, if they believed they were complying with the charter. No other motive is suggested, and, when we remember of whom the board is composed, no improper motive will be presumed. Every principle of justice would prohibit an individual or a private corporation from profiting by such a mistake affecting an honest contractor, by keeping the fruits of the mistake without paying for them, and, while the rules of law applicable to officers of municipal corporations are different from those governing private corporations, **it would not be regarded by the public, for whose benefit such rules have been adopted, as just to deprive a contractor of all compensation for work done and accepted by the city under such circumstances as exist in this case**.

128 Md. at 478, 97 A. at 841 (emphasis added).

Similarly, in this case, when analyzing what constitutes an unreasonable delay, we note that significant motivations of Appellees appear to be a "desire to stave off competition." Their initial objections to the Project stemmed from the selection of the Master Developer, which was announced publicly by Governor Ehrlich on 21 March 2006, more than three years prior to Appellees' filing of the Original Complaint. That they alleged additional violations should not save their complaint for equitable relief based on taxpayer standing. If the First Amendment's "material" changes, which were approved and executed in September 2010, were the first stage of the alleged violations, we might be more likely to find reasonable the short time period between September 2010 and December 2010. Equity is not limited, however, to such a tunneled vision of

154

the circumstances. Instead, we are permitted to weigh all the facts. In doing so, the motivations of the parties matter and indicate that Appellees' delay in bringing their claims was unreasonable and unjustified.

### c. Prejudice from the delay

The State Agencies assert on appeal that "[the Plaintiffs] waited to file while the State of Maryland and the Developer spent millions executing a contract the plaintiffs believe is void." Appellees retort that there was no prejudice to the State Agencies and that State Agencies made merely a "conclusory assertion of prejudice . . . , claiming to have spent 'millions,' without any citation to the record to support such assertion." Moreover, Appellees argue that "[a]mong the reasons the State Parties may have been unable to so demonstrate prejudice was that the State-funded parking garage that literally forms the foundation of the Project was not even authorized by BPW until December 15, 2010. The Project could not be constructed without the authorization and subsequent issuance of State bonds for the garage."

We find that the State Agencies in this case were prejudiced by Appellees' unreasonable delay in bringing the suit.[87] To allow the taxpayers to bring the claim at the stage in the development when they did caused the State and Developers to waste

---

[87] Although the time frame in which we analyze prejudice for purposes of laches is narrower than that for taxpayer standing's harm analysis, we find that prejudice—in the form of the almost certainty of the expenditure of substantial money and resources—occurred in both the narrower and broader time frames in such a way that to find otherwise could be considered inconsistent with our prior analysis of the harm alleged for purposes of taxpayer standing. *See supra* pp. 116-23.

substantial public funds, if there were any merit in Appellees' substantive claims. Although we recognize a taxpayer's interest in the State complying with the competitive bidding and other requirements set forth in the Procurement Law, when obliged to do so, the taxpayer cannot delay bringing suit in such a way that would cost the taxpayers even more money if the complaining taxpayer was right. Such a situation, although not directly parallel, is reminiscent of those taxpayer standing cases in which this Court found the taxpayer did not have an interest because declaring the act unconstitutional would cost the taxpayers actually more money, rather than a savings for the taxpayers. In such cases, we have found always that the complaining taxpayer lacked standing. *See, e.g.*, *Citizens Comm. of Anne Arundel Cnty., Inc. v. Cnty. Comm'rs*, 233 Md. 398, 404, 197 A.2d 108, 111-12 (1964) (concluding that taxpayer standing could not exist if "the taxpayers would be damaged by a discontinuance of the program rather than a continuance of it").

> As this Court stated many years ago:

> In equity, *laches* and neglect are discountenanced. Stale demands without any effort to enforce them, cannot meet the aid of a tribunal which only lends its power to reasonable diligence. . . . [T]he indolence of those who are dilatory in recovering their property, and claiming what is due them, should be punished, and they should impute to themselves the punishment.

*Hall v. Clagett*, 48 Md. 223, 243-44 (1878). "'Under the equitable doctrine of laches, a lack of diligence on the part of a party who fails to assert his rights may result in his being equitably precluded from later asserting these same rights if the opposing party has incurred prejudice or injury.'" *Allied Inv. Corp. v. Jasen*, 123 Md. App. 88, 111, 716 A.2d 1085, 1096 (1998), *rev'd on other grounds,* 354 Md. 547, 731 A.2d 957 (1999)

(quoting *Shah v. HealthPlus, Inc.*, 116 Md. App. 327, 336, 696 A.2d 473 (1997)). The record in this case convinces us that, regardless of how we group Appellees' claims, they slumbered unreasonably in asserting their claims.

Therefore, the present claims were improperly before the Circuit Court. We decline to address the merits of the procurement issue (Question #1, *see supra* at 23).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THE CIRCUIT COURT, WITH DIRECTIONS TO DISMISS APPELLEES' AMENDED COMPLAINT, WITH PREJUDICE. COSTS TO BE PAID BY APPELLEES.**

Judge Battaglia joins the judgment only.